DOWNEY BRAND LLP
MICHAEL J. THOMAS (Bar No. 172326)
APARNA RAJAGOPAL-DURBIN (Bar No. 218519)
555 Capitol Mall, Tenth Floor
Sacramento, CA  95814-4686
Telephone:     (916) 444-1000
Facsimile:      (916) 444-2100
E-mail: mthomas@downeybrand.com
E-mail: adurbin@downeybrand.com

Attorneys for Plaintiff
Nutrishare, Inc.

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| Nutrishare, Inc., a California corporation,<br><br>Plaintiff,<br><br>v.<br><br>BioRx, LLC, an Ohio Limited Liability Company,<br><br>Defendant. | Case No.  2:08-CV-01252-WBS-EFB<br><br>**NOTICE OF MOTION AND MOTION FOR PRELIMINARY INJUNCTION**<br><br>**ORAL ARGUMENT REQUESTED**<br><br>Date:        August 4, 2008<br>Time:       2:00 p.m.<br>Dept:       Courtroom 5 |

TO BIORX, LLC AND ITS ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on August 4, 2008 at 2:00 p.m., or as soon thereafter as the matter may be heard before the Honorable William B. Shubb of the United States District Court for the Eastern District of California (the "Court"), located at 501 "I" Street, Courtroom 5, Sacramento, CA  95814, Plaintiff Nutrishare ("Nutrishare") will and does hereby move the Court, pursuant to Federal Rule of Civil Procedure 65 and Local Rule 65-231(d), to issue a preliminary injunction enjoining Defendant BioRx, LLC, its agents, servants, and employees, and all persons acting under, in concert with, or for it from:

a.   Using the name "NutriThrive," or any variation of the term "nutri," as a source
     identifier for itself, any related entities, or the products and services it offers;

b.   Using the domain name www.nutrithrive.com, or any other domain name involving

1    the term "nutri" or any variation thereof;

2    c.   making any references to the term "NutriThrive" on any websites, including but not

3         limited to www.nutrithrive.com, www.biorx.com, and any other websites;

4    d.   Causing likelihood of confusion, deception, or mistake as to the source, nature, or

5         quality of Defendant's products or services; and

6    e.   Otherwise infringing Plaintiff's "Nutrishare" mark.

7         This Motion is based upon this Notice of Motion and Motion, the Memorandum of Points

8    and Authorities In Support of the Motion for Preliminary Injunction, filed herewith, and replies

9    thereto, the Declarations of Rodney Okamoto, Reid Nishikawa, Anita Wallin, and Michael J.

10   Thomas in support thereof, the pleadings and papers on file in this action, and upon any further

11   evidence and argument that may be presented at the hearing on this Motion.

12        Per the requirements of Local Rule 65-231(d)(3), Nutrishare does not at this time believe

13   it will be necessary to present oral testimony at the hearing on this motion, and estimates that two

14   hours will be required for the hearing on this motion.

15

16   Dated:      June 24, 2008                    DOWNEY BRAND LLP

17

18                                               By:_____/s/ Michael J. Thomas_____

19                                                       MICHAEL J. THOMAS
                                                          Attorney for Plaintiff
20                                                          Nutrishare, Inc

21

22

23

24

25

26

27

28

1   DOWNEY BRAND LLP
    MICHAEL J. THOMAS (Bar No. 172326)
2   APARNA RAJAGOPAL-DURBIN (Bar No. 218519)
    555 Capitol Mall, Tenth Floor
3   Sacramento, CA  95814-4686
    Telephone:     (916) 444-1000
4   Facsimile:      (916) 444-2100
    E-mail: mthomas@downeybrand.com
5   E-mail: adurbin@downeybrand.com

6   Attorneys for Plaintiff
    Nutrishare, Inc.

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  Nutrishare, Inc., a California corporation,    Case No.  2:08-CV-01252-WBS-EFB

12                   Plaintiff,                     **MEMORANDUM OF POINTS AND**
                                                    **AUTHORITIES IN SUPPORT OF**
13          v.                                      **MOTION FOR PRELIMINARY**
                                                    **INJUNCTION**
14  BioRx, LLC, an Ohio Limited Liability
    Company,
15                                                  **ORAL ARGUMENT REQUESTED**
                     Defendant.
16                                                  Date:        August 4, 2008
                                                    Time:        2:00 p.m.
17                                                  Dept:        Courtroom 5

18

19

20

21

22

23

24

25

26

27

28

925020.5

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ..................................................................................................1

II.   STATEMENT OF FACTS ......................................................................................2

    A.   The Nutrishare History...........................................................................2

    B.   The "Nutrishare" Mark............................................................................5

    C.   BioRx and the "NutriThrive" Marks........................................................7

III.  LEGAL ARGUMENT ...........................................................................................11

    A.   Nutrishare is Likely to Succeed on the Merits of its Infringement and
        Unfair Competition Claims ...................................................................11

        1.   The Marks are Confusingly Similar ...........................................13
        2.   The Products and Services Offered by the Parties are Virtually Identical .15
        3.   Nutrishare's Mark is Strong.......................................................15
        4.   The Parties Utilize the Same Marketing Channels.....................16
        5.   BioRx Intended to Deceive Consumers......................................17
        6.   Evidence of Actual Confusion is Already Starting to Surface...................18

    B.   Nutrishare Will Suffer Irreparable Harm Unless BioRx is Enjoined from
        Using the "NutriThrive" Mark ...............................................................18

    C.   The Balance of the Hardships Strongly Tips in its Favor ....................20

    D.   A Preliminary Injunction Will Protect the Public Interest ...................21

IV.   CONCLUSION .....................................................................................................21

1

**TABLE OF AUTHORITIES**

2

**Page**

3

**CASES**

4

*Alfacell Corp. v. Anticancer Inc.,*
   71 U.S.P.Q.2d 1301 (C.D. Cal. 2004) ............................................................... 14

5

*American Int'l Group v. American Int'l Bank,*
   926 F.2d 829 (9th Cir. 1991) .............................................................................. 18

6

*AMF Inc. v. Sleekcraft Boats,*
   599 F.2d 341 (9th Cir. 1979) ........................................................................11, 12

7

*Apple Computer, Inc. v. Formula Intern. Inc.,*
   725 F.2d 521 (9th Cir. 1984) .............................................................................. 12

8

*Brookfield Communications, Inc. v. West Coast Entertainment Corp.,*
   174 F.3d 1036 (9th Cir. 1999) .................................................11, 12, 15, 16, 17, 18

9

*Century 21 Real Estate Corp. v. Magee,*
   19 U.S.P.Q.2d 1530 (C.D. Cal. 1991) ................................................................ 14

10

*Coca-Cola Co. v. Carlisle Bottling Works,*
   43 F.2d 101, aff'd, 43 F.2d 119 (6th Cir. 1930)................................................. 14

11

*Daddy's Junky Music Stores v. Big Daddy's Family Music,*
   109 F.3d 275 (9th Cir. 1997) .............................................................................. 17

12

*Dreamwerks Prod. Group, Inc. v. SKG Studio,*
   142 F.3d 1127 (9th Cir. 1998) ............................................................................ 17

13

*Earth Technology Corp. v. Environmental Research & Technology, Inc.,*
   222 U.S.P.Q. 585 (C.D. Cal. 1983)..................................................................... 14

14

*Entrepreneur Media, Inc. v. Smith,*
   279 F.3d 1135 (9th Cir. 2002) ............................................................................ 13

15

*Ethicon, Inv. v. American Cyanamid Company*
   192 U.S.P.Q. 647 (TTAB 1976) ......................................................................... 21

16

*First Sav. Bank. F.S.B. v. First Bank System, Inc.,*
   101 F.3d 645 (10th Cir. 1996) ............................................................................ 12

17

*Fleischmann Distilling Corp. v. Maier Brewing Co.,*
   314 F.2d 149 (9th Cir. 1963) .............................................................................. 13

18

*Freecycle Network, Inc. v. Oey,*
   505 F.3d 898 (9th Cir. 2007) .............................................................................. 11

19

*Giant Food, Inc. v. Nation's Foodservice, Inc.,*
   710 F.2d 1565 (Fed. Cir. 1983)........................................................................... 13

20

*GoTo.com, Inc. v. The Walt Disney Co.,*
   202 F.3d 1199 (9th Cir. 2000) .................................................................11, 16, 19

21

*Guaber, S.P.A. v. Nutri-Metrics Int'l, Inc.,*
   1991 U.S. App. LEXIS 10842 (Fed. Cir. 1991) ................................................. 14

22

*In Re Merck. & Co.*
   1982 TTAB LEXIS 35 (TTAB 1992) ................................................................. 21

23

24

25

26

27

28

1
2

**TABLE OF AUTHORITIES**
(continued)

Page

3
*McLean v. Fleming,*
96 U.S. 245 (1878) ............................................................................................. 13

4
*McLeod v. Hosmer-Dorrance, Inc.,*
5
1976 U.S. Dist. LEXIS 12289, 192 U.S.P.Q. 683 (C.D. Cal. 1976)................................. 21

*Metro Publ'g, Ltd. v. San Jose Mercury News,*
6
987 F.3d 637 (9th Cir. 1993) ............................................................................... 18

7
*Nutri/System, Inc. v. Con-Stan Industries, Inc.,*
809 F.2d 601 (9th Cir. 1987) ............................................................................... 16

8
*Official Airline Guides, Inc. v. Gross,*
6 F.3d 1385 (9th Cir. 1993) ....................................................................... 13, 16, 17

9
*Paul Sachs Originals Co. v. Sachs,*
10
325 F.2d 212 (9th Cir. 1963) ............................................................................... 13

*Presto Products, Inc. v. Nice-Pak Prods., Inc.,*
11
9 U.S.P.Q.2d 1895 (TTAB 1988) .......................................................................... 14

12
*Reno Air Racing Ass'n v. McCord,*
452 F.3d 1126 (9th Cir. 2006) ............................................................................. 12

13
*Rent-a-Center, Inc. v. Canyon Television & Appliance,*
944 F.2d 597 (9th Cir. 1991) ............................................................................... 20

14
*Russell v. Caesar,*
15
62 U.S.P.Q.2d 1125 (N.D. Cal. 2001) .................................................................... 14

*Sands, Taylor, & Wood Co., v. The Quaker Oats Co.,*
16
978 F.2d 947 (7th Cir. 1992) ............................................................................... 19

17
*Sony Computer Entertainment America, Inc. v. Gamemasters,*
87 F. Supp. 2d 976 (N.D. Cal. 1999).................................................................... 13

18
*Stork Restaurant v. Sahati,*
166 F.2d 348 (9th Cir. 1948.) .............................................................................. 17

19
*TBC Corp. v. Holsa, Inc.,*
20
126 F.3d 1470 (Fed. Cir. 1997)............................................................................ 13

*Thane Int'l v. Trek Bicycle Corp.,*
21
305 F.3d 894 (9th Cir. 2002) ............................................................................... 18

22
*Tom Doherty Assocs., Inc. v. Saban Ent't, Inc.,*
60 F.3d 27 (2d Cir. 1995) ................................................................................... 20

23
*Walter v. Mattel, Inc.,*
24
31 F. Supp. 2d 751 (C.D. Cal. 1998)..................................................................... 20

*Watts Health Systems, Inc. v. United Healthcare Corp.,*
25
960 F. Supp. 1431 (C.D. Cal. 1996)...................................................................... 20

26

**STATUTES**

15 U.S.C. § 1057(b) ........................................................................................... 12
27
15 U.S.C. § 1057(c) ........................................................................................... 17

28
15 U.S.C. § 1072................................................................................................ 12, 17

1

**TABLE OF AUTHORITIES**
**(continued)**

2
Page

3    15 U.S.C. § 1114(1) ........................................................................................... 11

4    15 U.S.C. § 1115(a) .....................................................................................12, 17

     15 U.S.C. § 1125(a)(1) ...................................................................................... 11
5

**OTHER AUTHORITIES**

6
     Lanham Act section  43(a) .................................................................................. 11

7    Lanham Act section 32(1) .................................................................................. 11

8

**RULES**

9
     Federal Rule of Civil Procedure 65...................................................................... 11

     Local Rule 65-231(d) ......................................................................................... 11
10
     Local Rule 65-231(d)(3)...................................................................................... 22

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MEMO OF  Ps&As ISO MOT. FOR PRELIMINARY INJUNCTION

# I.    **INTRODUCTION**

This is an action for trademark infringement.  Both Plaintiff Nutrishare, Inc. (hereinafter "Nutrishare") and Defendant BioRx, LLC (hereinafter "BioRx") through its "NutriThrive" division, specialize in providing products and services to individuals requiring total parenteral nutrition (hereinafter "TPN") in their homes.  TPN is the practice of providing nutrients intravenously to those who suffer from ailments that deteriorate their gastrointestinal system to such a degree that they can no longer eat and digest food.

After spending nearly two decades, millions of dollars, and countless hours to establish a reputation for excellence surrounding the "Nutrishare" brand name, and federally registering the "Nutrishare" mark, Nutrishare's mark is now widely known in the TPN industry and Nutrishare has a thriving business with consumers nationwide.  Now, a competing pharmacy has entered the scene in the very same specialization providing the very same medical services with the confusingly similar name, NutriThrive.  NutriThrive is a division of BioRx, a large Ohio-based infusion pharmacy that appears to be a greenhorn in the in-home TPN business.  Until NutriThrive's debut in November, 2007, Nutrishare was the only company in the nation that specialized in providing in-home TPN care.  Although it had an infinity of names to choose for its new venture, BioRx intentionally chose "NutriThrive" to trade off Nutrishare's notoriety and goodwill.  Nowhere is BioRx's intent more evident than in the facts that it has intentionally mimicked Nutrishare's advertising format, mirrored Nutrishare's web-site functionality, copied Nutrishare's marketing slogans, and solicited and hired former patients of Nutrishare, as well as their family members, to become spokespersons for NutriThrive.

Nutrishare initially believed NutriThrive, based in Cincinnati, Ohio, would not cover the same territory as Nutrishare.  So it came as a surprise that early this year, multiple customers of Nutrishare and physicians with whom Nutrishare has a professional relationship were approached by NutriThrive, and NutriThrive quickly expanded into Nutrishare's territory, including California.  Even more alarming (although not surprising given the similarity of the marks) was news that several physicians and nurses actually became confused and believed NutriThrive somehow associated with Nutrishare.  One medical professional became so confused that a

1    patient was almost mistakenly released to the care of NutriThrive instead of Nutrishare.  Imagine

2    the consequences had a physician or a nurse made a medical decision based on the erroneous

3    impression that NutriThrive and Nutrishare were related.  If that were not enough, NutriThrive is

4    a brand new venture with no track record in the relevant industry, and is not currently accredited

5    by the appropriate licensing entities.  Thus, consumer confusion between a well-established

6    company with a seventeen-year track record and a newcomer with far less experience could

7    tarnish Nutrishare's reputation.  By this motion, Nutrishare seeks to put an immediate stop to this

8    confusion before it jeopardizes someone's health and well being.

9        The 2008 Oley Foundation Conference – one of Nutrishare's primary marketing venues

10    sponsored by the leading organization in the TPN industry – is this week.  When Nutrishare

11    learned that BioRx, like Nutrishare, would be one of this year's top sponsors of the Oley

12    Foundation, and that "Nutrishare" and "NutriThrive" would be prominently displayed throughout

13    the conference in close proximity of each other in the same size and format, Nutrishare

14    immediately asked BioRx to cease its infringing activities.  BioRx refused.  Accordingly,

15    Nutrishare requests that the Court enter a preliminary injunction prohibiting BioRx from: (a)

16    using the name "NutriThrive," or any variation of the term "nutri," as a source identifier for itself,

17    any related entities, or the products and services it offers; (b) using the domain name

18    www.nutrithrive.com, or any other domain name involving the term "nutri" or any variation

19    thereof; (c) making any references to the term "NutriThrive" on any websites, including but not

20    limited to www.nutrithrive.com, www.biorx.com, and any other websites; (d) causing likelihood

21    of confusion, deception, or mistake as to the source, nature, or quality of Defendant's products

22    and services; or (e) otherwise infringing Nutrishare's mark.

23                    **II.        STATEMENT OF FACTS**

24    **A.        The Nutrishare History**

25        In 1991, Rod Okamoto and Dr. Tom Diamantidis founded Nutrishare, a company

26    dedicated exclusively to providing TPN-related products and services to long-term TPN

27    consumers in their homes.  (Declaration of Rod Okamoto, filed herewith (hereinafter "Okamoto

28    Decl.," ¶ 2.)  The Nutrishare business model was originally developed to fill a need for

improvement in Home TPN care for long-term consumers that was not being met by then-existing

health care providers.  (*Id.*)  At that time, there was a glut of home infusion pharmacies that

provided a range of products, including intravenous antibiotics, chemotherapy, pain management,

enteral (tube feeding) nutrition, and parenteral nutrition.  (*Id.*)  These pharmacies often simply

shipped and delivered products to their patients and were forced to distribute their scant clinical

resources over the numerous types of home infusion therapies that they believed they had to offer

to remain competitive in their marketplace.  (*Id.*)  Nutrishare's founders believed that these

pharmacies largely ignored Home TPN patients because they appeared to be more stable than

more acute patients.  (*Id.*)  They believed that these customers were, in reality, in need of more

attention in areas that would improve the quality of life for them and their family member

caregivers.  (*Id.*)

In 1991, Nutrishare's founders launched the business with a combination of cornerstone

principles and an untested hypothetical Home TPN service model, which includes the following:

    a.    Specializing exclusively in Home TPN therapy, something that no other home infusion pharmacy had committed to doing  (*Id*, ¶ 3);

    b.    Using overnight delivery services to deliver Home TPN supplies, including infusion pumps, special intravenous catheters, and a sterile form of intravenous liquid nutrients, to Home TPN consumers nationwide, which was also a unique concept at the time (*Id.*);

    c.    Based on input from Home TPN consumers and caregivers, providing its customers with the freedom to choose the equipment and supplies they were most comfortable with instead of having to choose from a 'formulary' of items determined by the company (*Id.*);

    d.    Providing its customers with education on  Home TPN through web and CD-based guides, a secure on-line forum (where they can discuss various aspects of Home TPN and share their knowledge, experiences, and plans for better outcomes), newsletters, and presentations at events nationwide, including the Oley Foundation Conference (*Id.*);

1     e.  Hiring Board-certified clinicians, including nurses, pharmacists, and

2        dieticians, who work closely with its customers' primary care physicians

3        and/or gastroenterologists, monitor the clinical progress of its customers,

4        and routinely offer clinical suggestions to the physician and the consumer,

5        as appropriate (*Id.*);

6     f.  Partnering up with local infusion pharmacies and nursing agencies to

7        provide professional services for its TPN customers to augment

8        Nutrishare's basic pharmacy delivery system (*Id.*); and

9     g.  Continuing to engage in the research and development of state-of-the-art

10       technology in Home TPN.  (*Id.*)

11    Seventeen years after Nutrishare first set out to improve the lives of the Home TPN

12 consumer, the company has accomplished significant milestones.  (*Id*, ¶ 4.)  Its client base has

13 nearly doubled in the last ten years.  (*Id.*)  It now has, in its employ, the nation's top Board

14 certified Nutrition support pharmacists as part of its "primary care team," in support of its

15 consumers.  (*Id.*)  It has established relationships with medical professionals and institutions

16 nationwide, who consistently refer their patients to Nutrishare.  (*Id.*)  It has consistently sponsored

17 the Oley Foundation, a national foundation supporting education and networking for Home TPN

18 consumers, for the last fifteen years (in fact, it currently is the top "Platinum level" sponsor of the

19 Oley Foundation and has been one of the Oley Foundations top sponsors since 1993).  (*Id.*)  It has

20 published dozens of articles and made several presentations at American Society of Parenteral

21 and Enteral Nutrition (ASPEN) and European Society of Parenteral and Enteral Nutrition

22 (ESPEN) conferences, several of which have advanced the state of the art in Home TPN therapy

23 and many of which have been honored at ASPEN.  (*Id.*)  Its founders developed and patented a

24 special Home TPN bag designed to improve the quality of the product used by the patients.  (*Id.*)

25 It has led pioneering research in, for example: developing a new Home TPN infusion pump

26 designed by Home TPN consumers, using chlorhexidine/alcohol as a topical antiseptic in lieu of

27 the conventional povidone iodine, identifying ways to reduce the potential of blood backing up

28 into the catheter, and identifying new chemicals that could reduce the risk of catheter infections.

925020.5          4

1    (*Id.*)  It now has a reputation in the industry and amongst the clinical leaders in the field of Home

2    TPN as the "superior Home TPN pharmacy service" in the country, which can be verified by

3    physicians, nurses and dietitians who work for competitors as well as clinicians who are routinely

4    "teaching faculty" at the ASPEN, ESPEN, and the AGA (American Gastroenterology

5    Association).  (*Id.*)  It has established a track record with its customers demonstrating the quality

6    of its service, and hundreds of its Home TPN consumers can confirm that Nutrishare has

7    improved their quality of life and in some cases, has saved their lives.  (*Id.*)  Its customers have

8    reported that they experience fewer central catheter complications and are more satisfied with

9    their Home TPN pharmacy service than customers of other pharmacy services.  (*Id.*)  It was

10   honored by the Assembly of the State of California as a "Hero in Healthcare" for the way it saved

11   the life of one of its consumers by virtue of its centralized, national Home TPN specialty

12   infrastructure.  (*Id.*)  It played a key role in ensuring that the Accreditation Commission for

13   Health Care (ACHC) stayed afloat so that it could serve as an alternative to the Joint Commission

14   on the Accreditation of Healthcare Organization (JCAHO) for home infusion providers seeking

15   accreditation.  (*Id.*)  It continues to be accredited by ACHC today.  (*Id.*)  And finally, it remains

16   the only "platinum" corporate supporter of the ACHC and the only company that the ACHC has

17   ever recognized as "Specialists" in Home TPN care.  (*Id.*)

18   **B.    The "Nutrishare" Mark**

19          In order to preserve and protect the goodwill and brand recognition associated with the

20   "Nutrishare" mark, Nutrishare hired attorneys and spent a considerable amount of funds obtaining

21   trademark registrations for its distinctive mark.  (*Id*, ¶ 5.)  The word mark "Nutrishare" was first

22   registered as a trademark by the U.S. Patent and Trademark Office ("USPTO") on October 19,

23   1993 (Registration No. 1799840) in the category of health care services, and more particularly,

24   providing TPN pharmaceutical solutions, supplies and equipment to TPN patients at their home.

25   (*Id.*)  On September 3, 2002, Nutrishare obtained a registration of the "Nutrishare" word mark in

26   the category of retail pharmacy and mail order services in the field of TPN pharmaceutical

27   solutions, supplies and equipment for TPN patients at their home (Registration No. 2615200).

28   / / /

1   (*Id*.)  A true and correct copy of the Certificate of Registration for "Nutrishare," which remains in

2   full force and effect, is attached to the Okamoto Declaration as Exhibit A.  (*Id*., Ex. A.)

3       Nutrishare first used the "Nutrishare" mark in 1991, years prior to its registration.  (*Id*, ¶

4   6.)  The mark has always been displayed either in standard characters or in conjunction with a

5   logo depicting "Nutrishare" in block letters preceded by the stylized image of a bag and IV

6   catheter.  Almost all of Nutrishare's goods prominently bear the "Nutrishare" mark.  (*Id*.)

7       Nutrishare's marketing is conducted by word-of-mouth, through referrals by physicians

8   and TPN consumers, through a publicly available web-site located at www.nutrishare.com,

9   through newsletters and other special educational materials, and by its attendance at Home TPN

10  conferences and events throughout the country, including the Oley Foundation Conference.  (*Id*, ¶

11  7.)  In each medium and each venue, the "Nutrishare" mark is displayed prominently.  (*Id*.)

12      On Nutrishare's web-site, individuals can request information from Nutrishare on its

13  products and services, view an on-line infomercial regarding Nutrishare, take on-line tutorials in

14  TPN best practices, join and participate in a secure on-line TPN discussion board, consult with

15  Nutrishare's clinician "team," read Nutrishare's newsletter, and join the "Nutrishare family."  (*Id*,

16  ¶ 8, Ex. B.)  Through a "members only" secured login, Nutrishare's customers also can order

17  TPN supplies directly on-line and access special educational material and family photos of

18  members.  (*Id*.)

19      Nutrishare has also invested millions of dollars over the past seventeen years to establish

20  its corporate identity and is held in high esteem amongst Home TPN consumers as well as

21  clinicians throughout the country.  (*Id*, ¶ 9.)  For the past twelve years, Nutrishare has donated to

22  the Oley Foundation at the highest "Platinum" level or the second to highest level.  (*Id*.)  In fact,

23  Nutrishare has donated over half a million dollars to the Oley Foundation to date.  (*Id*.)  Last year,

24  Nutrishare, together with the Oley Foundation, established the Nutrishare Research Prize,

25  designed to recognize and encourage clinical research that will improve the quality of life for

26  Home TPN consumers and their families.  (*Id*.)  Nutrishare has also published advertisements in

27  more than 100 issues of the Oley Foundation's bi-monthly newsletter, *LifelineLetter*, since 1993.

28  / / /

1   (*Id*.)  At each Oley Foundation Conference, Nutrishare strategically and prominently displays the

2   "Nutrishare" mark and products and services bearing the "Nutrishare" mark.  (*Id*.)

3       Nutrishare has not only spent significant funds on advertising and promoting the

4   "Nutrishare" mark, but the owners and employees of Nutrishare have spent countless hours

5   promoting Nutrishare.  (*Id*, ¶ 10.)  The exact cost of this time and effort may potentially amount

6   to millions of dollars, but is not readily calculable.  (*Id*.)  Nevertheless, the opportunity cost of the

7   owners and employees of Nutrishare is substantial, and must be taken into consideration.  (*Id*.)

8       As a result of Nutrishare's considerable investment of time and money, the "Nutrishare"

9   mark has developed distinctive meaning to consumers.  (*Id*, ¶ 11.)  By virtue of Nutrishare's

10  advertising and sales, together with customer acceptance and recognition, the "Nutrishare" mark

11  identifies Nutrishare's products and services only, and distinguishes them from products and

12  services provided by others.  (*Id*.)  The "Nutrishare" mark has thus become and is a valuable asset

13  symbolizing Nutrishare, its quality products and services, and its goodwill.  (*Id*.)  In short, the

14  "Nutrishare" mark has come to indicate to consumers a meaning of quality in Home TPN care

15  originating with Nutrishare.  (*Id*.)

16  **C.      BioRx and the "NutriThrive" Marks**

17      BioRx, LLC is based in Cincinnati, Ohio.  (*Id*, ¶ 12, Ex. C.)  BioRx's web-site,

18  www.BioRx.net, states that BioRx is a national provider and distributor of certain specialty

19  pharmaceuticals, related supplies, as well as clinical and reimbursement support services., and

20  provides: (1) in-home hemophilia care; (2) in-home Immunoglobulin G services; (3) in-office

21  enteral and parental nutrition; and (4) in-home enteral and parenteral nutrition.  Enteral nutrition,

22  as opposed to parenteral nutrition, is the practice of feeding individuals through a tube placed in

23  the nose, the stomach, or the small intestine.  (*Id*.)

24      At last year's Oley Foundation Conference in June, 2007, BioRx made its debut.  (*Id*, ¶

25  12.)  A representative of BioRx announced that BioRx was establishing a new division called

26  "NutriThrive" to provide in-home enteral nutrition and in-Home TPN products and services.  (*Id*.)

27  The representative indicated that NutriThrive was in the nascent stages of its existence, had not

28  yet established a web-site, and did not yet have a single customer.  (*Id*.)  In conjunction with

925020.5                                          7

1    NutriThrive's announcement, BioRx (using the NutriThrive name) sponsored the Oley

2    Foundation at the donor level immediately below the Platinum level.  (*Id.*, Ex. D.)  NutriThrive is

3    not registered as an entity with the Ohio Secretary of State.  (*Id.*)  At the time of its

4    announcement, Nutrishare's founders were not aware of the exact nature of NutriThrive's

5    business, the territory in which it intended to provide its products and services, or the extent to

6    which NutriThrive intended to compete with Nutrishare.  (*Id.*)  Only now has it become clear that

7    NutriThrive provides the same products and services (although of inferior quality) as Nutrishare.

8    (*Id.*)

9           After the 2007 Oley Foundation Conference, BioRx began advertising its NutriThrive

10   products and services in the Oley Foundation's bi-monthly *LifelineLetter* newsletter, which is the

11   most widely circulated Home TPN newsletter and Nutrishare's primary marketing vehicle for its

12   print advertising.  (*Id*, ¶ 13, Ex. E.)  NutriThrive's advertisements adopt substantially *verbatim*

13   the language in Nutrishare's advertisements.  (*Id.*)  For example, Nutrishare created a series of

14   ads featuring customer testimonials accompanied by the customer's photograph.  (*Id.*)  In the

15   November-December 2007 issue of *LifelineLetter*, NutriThrive also featured a photograph and a

16   customer testimonial featuring one of Nutrishare's former customers.  (*Id.*)  In another

17   advertisement, Nutrishare states that it is dedicated to improving "clinical outcomes" and "the

18   quality of life" of Home TPN consumers.  (*Id.*)  In the July-August 2007 issue of *LifelineLetter*,

19   NutriThrive's advertisement likewise states that NutriThrive's goals are "positive clinical

20   outcomes" and "to improve the qualify of life for the home nutrition support patient."  (*Id.*)

21          According to BioRx's web-site, the NutriThrive division was not officially launched until

22   November 18, 2007.  (*Id*, ¶ 14, Ex. F.)  Since then, BioRx has created a web-site for NutriThrive,

23   www.nutrithrive.com, which can be accessed independently or through BioRx's web-site,

24   www.biorx.net.  (*Id.*)  NutriThrive's web-site functions almost identically to Nutrishare's web-

25   site.  (*Id.*)  Through NutriThrive's web-site, persons can request information on NutriThrive's

26   products and services, participate in a secure on-line TPN discussion board, consult with

27   NutriThrive's clinician "team" and "consumer advocates" (former or current TPN consumers who

28   act as liaisons), and join the "NutriThrive family."  (*Id.*)  The only functional difference appears

1   to be that NutriThrive does not have links to newsletters, and its on-line educational services are

2   still "under construction." (*Id.*)

3           Within the past six months, NutriThrive has begun encroaching on Nutrishare's sales

4   territory, and actually has solicited Nutrishare's customers and approached physicians and nurses

5   with whom Nutrishare has a professional relationship. (*Id*, ¶ 15.) Several of these individuals

6   have actually become confused about the relationship between the two companies. (*Id.*) There

7   have been several instances of actual confusion, including the following:

8       •       The owner of a Sullivan's Pharmacy in Boston indicated that the names

9               "Nutrishare" and "NutriThrive" would cause confusion among his pharmacists

10              unless he explained the difference to them. (*Id.*)

11      •       A patient of Chicago's Northwestern Medical Faculty Foundation was nearly

12              accidentally discharged to NutriThrive based on the discharge personnel's

13              confusion between Nutrishare and NutriThrive. (Declaration of Anita Wallin,

14              filed herewith (hereinafter "Wallin Decl.").)

15      •       Dr. Samuel Kocoshis of Cincinnati Children's Hospital in Burlington asked

16              Nutrishare for clarification regarding the relationship between Nutrishare and

17              NutriThrive, as he believed the two companies were related. (Declaration of Reid

18              Nishikawa, filed herewith (hereinafter "Nishikawa Decl."), ¶ 4(a).)

19      •       Dr. Leo Rodriguez of Massachusetts General Hospital for Children agreed to meet

20              with Nutrishare based on the mistaken belief that he had been contacted by

21              Nutrishare's representatives, and also sought clarification from Nutrishare that

22              they two companies were not related. (*Id.*, ¶ 4(b).)

23      •       Dr. Alex Flores and his colleagues at Boston's Tufts Medical Center were

24              confused about the relationship between NutriThrive and Nutrishare, even after

25              meeting with NutriThrive, and the difference only became clear after Dr. Flores

26              received clarification from Nutrishare that the two companies were unrelated. (*Id.*,

27              ¶ 4(c).)

28   / / /

925020.5

9

1    In April, 2008, Nutrishare learned that BioRx had obtained Notices of Allowance from the

2    USPTO on a trademark and a servicemark for "NutriThrive." (Okamoto Decl., ¶ 17, Ex. G.)

3    Nutrishare also learned that BioRx hired Donna Noble, the mother of one of Nutrishare's former

4    and now deceased customers to act as a "Consumer Advocate" for NutriThrive, and that BioRx

5    has also retained Ellen Seiz, one of Nutrishare's former customers, to act as a NutriThrive

6    spokesperson. (*Id.*, ¶ 18.) Nutrishare recently discovered that NutriThrive has been representing

7    to consumers and to the public that it is accredited by the ACHC and sending out business cards

8    to consumers indicating that it is accredited by the ACHC, when in fact only BioRx is accredited

9    by the ACHC. (*Id.*, ¶ 19.) Investigations have revealed that, unlike Nutrishare, NutriThrive does

10   not currently have Board certified nutrition support pharmacists managing the day to day care of

11   its patients. (*Id.*, ¶ 20.) Furthermore, NutriThrive does not have a comparable breadth and years

12   of experience in caring for Home TPN consumers that Nutrishare does; from staffing, to research

13   to technology development and education programs. (*Id.*)

14   Until last year, Nutrishare was the only company in the nation that focused <u>exclusively</u> on

15   providing Home TPN products and services. (*Id.*, ¶ 21.) The ACHC actually recognized

16   Nutrishare as the ONLY home care pharmacy organization certified as "specialists in Home TPN

17   therapy." (*Id.*) And until NutriThrive's establishment, no existing TPN provider other than

18   Nutrishare used the "Nutri" prefix to designate its offerings. Now, there are two companies –

19   Nutrishare and BioRx's NutriThrive division – that focus on in-Home TPN products and services.

20   (*Id.*)

21   The next Oley Foundation Conference is scheduled for June 26, 2008. On June 3, 2008,

22   Nutrishare learned that NutriThrive is sponsoring the Oley Foundation this year at the "Gold

23   Medallion" level and that a banner will prominently display this year's corporate sponsors,

24   including both "Nutrishare" and "NutriThrive" in close proximity of each other in the same font

25   and typeface. (*Id.*, ¶ 22, Ex. H.)

26   On June 4, 2008, the undersigned attorney sent a letter to BioRx requesting that BioRx

27   provide written assurances by June 20, 2008 that it will cease and deist from conducting its

28   / / /

1  infringing activities.  (Declaration of Michael J. Thomas (hereinafter "Thomas Decl."), Ex. A.)

2  BioRx has refused to do so, leaving Nutrishare with no choice but to file this motion  (*Id.*, Ex. B.)

3  ### III.    LEGAL ARGUMENT

4      Federal Rule of Civil Procedure 65 and Local Rule 65-231(d) provide that the Court may

5  issue a preliminary injunction on notice to the adverse party.  The Ninth Circuit has established

6  two different tests for determining whether to grant a preliminary injunction in the trademark

7  context.  Under the first and more traditional test, Nutrishare must show: (1) a strong likelihood

8  of success on the merits; (2) the possibility of irreparable injury to Nutrishare if preliminary relief

9  is not granted; (3) a balance of hardships favoring Nutrishare; and (4) advancement of the public

10  interest (in certain cases).  Alternatively, a court may grant the injunction if Nutrishare

11  demonstrates either a combination of probable success on the merits and the possibility of

12  irreparable injury or that serious questions are raised and the balance of hardships tips sharply in

13  its favor.  *Freecycle Network, Inc. v. Oey*, 505 F.3d 898, 902 (9th Cir. 2007); *see also Brookfield*

14  *Communications, Inc. v. West Coast Entertainment Corp.*, 174 F.3d 1036, 1046 (9th Cir. 1999).

15      Under each test, Nutrishare is entitled to a preliminary injunction.

16  **A.    Nutrishare is Likely to Succeed on the Merits of its Infringement and Unfair**
      **Competition Claims.**

17

18      Nutrishare seeks an injunction based on BioRx's violation of sections 32(1) and 43(a) of

19  the Lanham Act.  15 U.S.C. § 1114(1); 15 U.S.C. § 1125(a)(1).  The analysis under either of these

20  provisions is identical and an injunction is available for violation of either section.  *See*

21  *GoTo.com, Inc. v. The Walt Disney Co.*, 202 F.3d 1199, 1205 & n. 3 (9th Cir. 2000); *Brookfield*,

22  174 F.3d at 1046 & n. 6, 8.

23      To demonstrate a likelihood of success under either of these sections, Nutrishare must

24  establish a likelihood of confusion due to BioRx's use of a mark that is similar to a valid,

25  protectable trademark of Nutrishare.  *Brookfield*, 174 F.3d at 1046 (citing *AMF Inc. v. Sleekcraft*

26  *Boats*, 599 F.2d 341, 348 (9th Cir. 1979)).  More precisely, Nutrishare must establish that "it is

27  likely to be able to show ... a likelihood of confusion."  *Id.* at 1052 n.15; *see GoTo.com*, 202 F.3d

28  at 1205.

925020.5

11

1       There is no question that Nutrishare has a valid, protectable mark.  Nutrishare properly

2   registered its marks on the Principal Register in the USPTO.  (Ex. A.)  These registrations

3   constitute *prima facie* evidence of the validity of the registered marks and of Nutrishare's

4   exclusive right to use the marks on the goods and services specified in the registration throughout

5   the United States.  *See* 15 U.S.C. §§ 1057(b); 1072; 1115(a); *see also First Sav. Bank. F.S.B. v.*

6   *First Bank System, Inc.*, 101 F.3d 645, 651 (10th Cir. 1996) ("[F]ederally registered marks

7   receive nationwide protection regardless of the area in which the registrant actually uses the mark,

8   because registration constitutes nationwide constrictive notice to competing users. . . .  A

9   federally registered mark is superior to any confusingly similar mark subsequently adopted

10  anywhere in the United States.")  Because BioRx did not begin using the "NutriThrive" name

11  until several years after Nutrishare registered its trademarks, the law recognizes Nutrishare as the

12  "senior user" of the "Nutrishare" mark, with a right to enjoin BioRx from using any confusingly

13  similar mark.  *Brookfield*, 174 F.3d at 1047.

14      Once a plaintiff establishes that it is a holder of a valid and protectable mark, the Ninth

15  Circuit looks to what are often referred to as the "Sleekcraft factors" to determine whether the

16  marks are confusingly similar.  These factors are: (1) similarity of the conflicting designations;

17  (2) relatedness or proximity of the two companies' products or services; (3) the strength of the

18  mark; (4) marketing channels used; (5) degree of care likely to be exercised by purchasers in

19  selecting goods; (6) the defendants' intent in selecting the mark; (7) evidence of actual confusion;

20  and (8) likelihood of expansion in product lines.  *Reno Air Racing Ass'n v. McCord*, 452 F.3d

21  1126, 1136 n.9 (9th Cir. 2006) (citing *Sleekcraft*, 599 F.2d at 348-49).

22      The Ninth Circuit has expressly cautioned, however, that this eight-factor test should not

23  be applied rigidly.  *Brookfield*, 174 F.3d at 1053-54 ("Some factors are much more important than

24  others, and the relative importance of each individual factor will be case-specific.")  Moreover,

25  the court need not consider all of the factors at the preliminary injunction stage, since the record

26  is not likely to be sufficient to permit thorough consideration of each factor.  *See Apple*

27  *Computer, Inc. v. Formula Intern. Inc.*, 725 F.2d 521, 526 (9th Cir. 1984) (affirming issuance of

28  preliminary injunction on ground that trade names were "confusingly similar" despite district

925020.5

12

court's failure to consider all eight Sleekcraft factors); *Sony Computer Entertainment America, Inc. v. Gamemasters*, 87 F. Supp. 2d 976, 984 (N.D. Cal. 1999). Application of the Sleekcraft factors conclusively demonstrates that a likelihood of confusion exists due to the BioRx's use of the "NutriThrive" name and marks.

1.    ***The Marks are Confusingly Similar.***

"The greater the similarity between the two marks at issue, the greater the likelihood of confusion." *Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1144 (9th Cir. 2002). Three axioms apply to the similarity analysis: (1) marks should be considered in their entirety and as they appear in the marketplace; (2) similarity is best adjudged by appearance, sound, and meaning; and (3) similarities weigh more heavily than differences. *Entrepreneur Media*, 279 F.3d at 1144.

Here, both parties use "Nutri" to identify their offerings. The fact that "Nutrishare" and "NutriThrive" are not identical does not matter, as exact similitude is not required. *McLean v. Fleming,* 96 U.S. 245, 253 (1878); *Fleischmann Distilling Corp. v. Maier Brewing Co.,* 314 F.2d 149, 161 (9th Cir. 1963). Nor should the Court "dissect" the marks into their individual parts by comparing "share" to "Thrive," as the marks must be viewed as a whole. *Official Airline Guides, Inc. v. Gross*, 6 F.3d 1385, 1392 (9th Cir. 1993). The fact that the design of the "Nutrishare" and "NutriThrive" marks differ is also not important. The similarity of the words is far more important than the similarity in the designs. *See TBC Corp. v. Holsa, Inc.*, 126 F.3d 1470, 1472 (Fed. Cir. 1997); *Giant Food, Inc. v. Nation's Foodservice, Inc.*, 710 F.2d 1565, 1571 (Fed. Cir. 1983).

While the basic rule is that marks must be compared in their entireties and not dissected, courts nevertheless focus on the dominant feature of a mark to determine the degree of similarity. *Giant Food, Inc.*, 710 F.2d at 1571. If the dominant portion of the conflicting marks is the same, then confusion may be likely, notwithstanding peripheral differences. *Paul Sachs Originals Co. v. Sachs,* 325 F.2d 212 (9th Cir. 1963). Here, both parties use the "Nutri" prefix to identify their offerings. Many cases indicate that the first word, prefix, or syllable in a mark is always the dominant part. *See, e.g., Coca-Cola Co. v. Carlisle Bottling Works*, 43 F.2d 101, *aff'd,* 43 F.2d

925020.5

13

119 (6th Cir. 1930), *cert den'd*, 282 U.S. 881 (1930); *Presto Products, Inc. v. Nice-Pak Prods., Inc.*, 9 U.S.P.Q.2d 1895 (TTAB 1988) (holding that "Kid-Wipes" was confusingly similar to "Kid Stuff" for baby wipes because "it is often the first part of the mark which is most likely to be impressed upon the mind of a purchaser and remembered."). Several courts in this Circuit previously have held marks having a similar prefix, but different suffix, to be confusingly similar. *See e.g., Century 21 Real Estate Corp. v. Magee*, 19 U.S.P.Q.2d 1530 (C.D. Cal. 1991) ("CENTURY 21" and "CENTURY 31" for real estate services); *Earth Technology Corp. v. Environmental Research & Technology, Inc.*, 222 U.S.P.Q. 585 (C.D. Cal. 1983) ("ERT" and "ERTEC" for environmental consulting services; preliminary injunction granted); *Alfacell Corp. v. Anticancer Inc.*, 71 U.S.P.Q.2d 1301 (C.D. Cal. 2004) ("ONCANASE" and "ONCASE" for anti-cancer drugs); *Russell v. Caesar*, 62 U.S.P.Q.2d 1125 (N.D. Cal. 2001) ("RABBIT RIDGE" and "RABBIT HILL" for wine). Indeed, in a specific case involving "Nutri" prefix marks, the Court of Appeals for the Federal Circuit affirmed the ruling of the Trademark Trials and Appeals Board that the marks in question – "Nutromed" and "Nutri-metrics" – were confusingly similar because they "use a variation of the same prefix." *Guaber, S.P.A. v. Nutri-Metrics Int'l, Inc.*, 1991 U.S. App. LEXIS 10842, at *1-5 (Fed. Cir. 1991). The court should reach the same result here.

The words "Nutrishare" and "NutriThrive" marks are even more confusingly similar by virtue of how they appear in the marketplace. The conflicting marks generally appear in printed advertisements and on the parties' respective web-sites. (Okamoto Decl., Ex. B, E.) In the printed medium, both parties' marks appears prominently at the bottom of their advertisements. (*Id.*, Ex. E.) Furthermore, both parties use customer testimonials accompanied by customer photographs, and language such as improved "quality of life" and "clinical outcomes" to advertise their offerings. (*Id.*) At the bottom of Nutrishare's advertisements is an indication that Nutrishare is one of the "proud Platinum Partners of the Oley Foundation." (*Id.*) NutriThrive's advertisements since June 2007 also state that NutriThrive is an "Oley Gold Medallion Sponsor." (*Id.*) In fact, in the list of Oley Corporate Partners published in each issue of *LifelineLetter* subsequent to the 2007 Oley Conference, Nutrishare and NutriThrive appear in the top three

1    positions of the list.  Notably, no other Oley Corporate Partner uses the "Nutri" prefix in its name.

2    (*Id.*, Ex. D.)  The conflicting marks also are used in conjunction with web-sites that function

3    almost identically.  Both parties' web-sites refer to the parties' staff as a "clinician team," and the

4    consumers as part of the Nutrishare or NutriThrive "family."  (Okamoto Decl., Ex. B, F.)  Both

5    parties' web-sites also prominently feature customer testimonials and provide an on-line

6    discussion board for home TPN consumers.  (*Id.*)  Finally, NutriThrive and Nutrishare use the

7    ACHC logo in conjunction with their marks to convey their accreditation status.  (*Id.*, ¶ 19.)

8    Consequently, the use of the conflicting marks in the marketplace is likely to lead to confusion.

9        Thus, the "Nutrishare" and "NutriThrive" marks are confusingly similar.

10        2.    ***The Products and Services Offered by the Parties are Virtually Identical.***

11        Whether the companies provide competing goods and services is a critical question in the

12    likelihood-of-confusion analysis.  *See Brookfield*, 174 F.3d at 1054 (noting that the similarity of

13    the marks and whether the companies provide competing services "will always be important").

14    "The rights of the owner of a registered trademark ... extend to any goods related in the minds of

15    consumers."  *Brookfield*, 174 F.3d at 1056.

16        Here, both Nutrishare and NutriThrive provide essentially <u>identical</u> goods and services.

17    Among other things, both ship TPN products, including pumps, nutritional formulas in bags, and

18    intravenous catheters to customers' homes, both permit their customers to "customize" the

19    products based on the customers' unique needs, both provide a "team" of advisors with whom

20    customers can consult, both provide on-line discussion boards for customers, and both work with

21    health care service providers and insurance companies in managing long-term home TPN

22    patients.  (Okamoto Decl., ¶¶ 3, 15.)  The only difference between the two companies appears to

23    be that NutriThrive also provides in-home enteral nutrition products and services.  (*Id.*, ¶ 15.)

24        Accordingly, this factor supports a finding of likelihood of confusion.

25        3.    ***Nutrishare's Mark is Strong.***

26        In general, the more unique and arbitrary a mark, the more protection a court will afford it.

27    Marks usually lie on a continuum of strength, from "generic," afforded no protection; through

28    "descriptive" or "suggestive," given moderate protection; to "arbitrary" or "fanciful," awarded

925020.5                                    15

1   maximum protection. *GoTo.com*, 202 F.3d at 1207; *Brookfield*, 174 F.3d at 1058 & n.19. On

2   examination of the "Nutri/System" mark, the Court of Appeals for the Ninth Circuit previously

3   determined that the term "Nutri" in the food and health products industry is suggestive and

4   therefore entitled to protection. *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601, (9th

5   Cir. 1987). Suggestive marks are entitled to trademark protection absent proof of any secondary

6   meaning. *See Official Airline Guides v. Goss*, 6 F.3d 1385, 1390-91 (9th Cir. 1993). Thus, the

7   "Nutrishare" mark at a minimum is entitled to protection as a "suggestive" mark.

8         That aside, the "Nutrishare" mark has only become stronger by virtue of Nutrishare's

9   seventeen-year campaign of building a name and reputation around the mark in order to

10  distinguish it from other TPN providers. This is not a case where the marks are being used a

11  "crowded field." *See, e.g., Miss World (UK) Ltd. v. Mrs. America Pageants, Inc.*, 856 F.2d 1445,

12  1449 (9th Cir. 1988) (finding that "Mrs. Of the World" was not a strong mark because it was

13  "merely one of a crowd of marks" which was "hemmed in on all sides by similar marks on

14  similar goods.") This is a field of two players. (Okamoto Decl., ¶ 21.) Until last year, Nutrishare

15  was the <u>only</u> company focusing on in-home TPN products and services, and even today, no other

16  existing TPN provider besides NutriThrive uses the "nutri" term to identify its offerings. (*Id.*)

17        Finally, where, as here, the products and services involved are virtually identical and the

18  competing marks are similar, "the strength of the mark is of diminished importance in the

19  likelihood of confusion analysis." *Brookfield*, 174 F.3d at 1058-59; *see GoTo.com*, 202 F.3d at

20  1208. Nevertheless, Nutrishare's mark, when properly viewed as a whole, is a strong mark.

21        **4.    *The Parties Utilize the Same Marketing Channels.***

22        There is no question that the parties use identical channels – namely, attendance at the

23  Oley Conference, advertising in the *LifelineLetter*, web-based advertising, and in-person meetings

24  with healthcare professionals – to market their products and services. (Okamoto Decl., ¶¶ 7, 13-

25  16.) The parties' use of the Internet will also lead to a likelihood of confusion where, as here,

26  NutriThrive is "maneuvering to attract customers via the Web." *See Brookfield*, 174 F.3d at

27  1057; *GoTo.com*, 202 F.3d at 1207 ("the Web, as a marketing channel, is particularly susceptible

28  to a likelihood of confusion since, as it did in this case, it allows for competing marks to be

925020.5                                      16

1   encountered at the same time, on the same screen.")  Also relevant is the fact that the parties are

2   two of only a few companies that utilize these marketing channels.  (Okamoto Decl., ¶ 21.)  This

3   factor thus strongly supports a finding of a likelihood of confusion.

4            5.      ***BioRx Intended to Deceive Consumers.***

5           "An intent to confuse consumers is not required for a finding of trademark infringement."

6   *Brookfield,* 174 F.3d at 1059; *see Dreamwerks Prod. Group, Inc. v. SKG Studio,* 142 F.3d 1127,

7   1132 n. 12 (9th Cir. 1998) ("[a]bsence of malice is no defense to trademark infringement").

8   However, "the presence of intent can constitute strong evidence of confusion."  *Daddy's Junky*

9   *Music Stores v. Big Daddy's Family Music*, 109 F.3d 275, 287 (9th Cir. 1997).

10          Within the trademark context, a showing of "intent to deceive the public" does not require

11  a showing that the junior user of the mark adopted its mark with the specific purpose of infringing

12  the senior user's mark.  *Id.*  Instead, the "intent" factor favors the plaintiff where the alleged

13  infringer adopted mark with knowledge, actual or constructive, of the plaintiff's mark.  *Id.* (citing

14  *Official Airline Guides*, 6 F.3d at 1394).  The rationale is that "a newcomer has an "infinity" of

15  other names to choose from without infringing upon a senior appropriation," *Stork Restaurant v.*

16  *Sahati*, 166 F.2d 348 (9th Cir. 1948.)  Thus, a junior user who knows of a senior user's mark, has

17  the freedom to choose any mark, and "just happens" to choose a confusingly similar mark, is

18  deemed to have acted in bad faith with the intent to deceive.  *Id.*

19          BioRx had constructive knowledge of Nutrishare's federally registered mark long before it

20  opened the "NutriThrive" product line.  *See* 15 U.S.C. §§ 1057(c), 1072; 1115(a).  Even the most

21  basic search with the USPTO at the time BioRx adopted its name would have revealed that

22  Nutrishare had federally registered the name "Nutrishare," and thus had a presumptive exclusive

23  right to use those marks nationwide.

24          BioRx's knowledge, however, was not merely constructive.  It knew that Nutrishare had

25  customers in the Ohio area, and purposefully solicited Nutrishare's former customers and their

26  families to become spokespersons for NutriThrive's marketing campaign.  (Okamoto Decl., ¶ 18.)

27  BioRx also blatantly mimicked Nutrishare's advertising formats and copied Nutrishare's

28  advertising slogans.  (*Id.,* ¶ 14.)  Furthermore, BioRx, through NutriThrive, has sponsored the

925020.5                                        17

1   Oley Foundation at a similar level to Nutrishare.  (*Id.*, ¶¶ 13, 22_.)  These factors unequivocally

2   demonstrate that BioRx acted in bad faith in using its mark.

3         Accordingly, BioRx should be presumed to have acted with the intent to deceive the

4   public.  *Brookfield*, 174 F.3d at 1059.

5         6.      ***Evidence of Actual Confusion is Already Starting to Surface.***

6         Courts have recognized that evidence of actual confusion is not likely to be present at the

7   preliminary injunction stage, and that the absence of such evidence does not weigh against the

8   issuance of an injunction.  *American Int'l Group v. American Int'l Bank*, 926 F.2d 829, 832 (9th

9   Cir. 1991) ("actual confusion is not necessary to a finding of likelihood of confusion under the

10  Lanham Trade Mark Act").  However, "[e]vidence of actual confusion constitutes persuasive

11  proof that future confusion is likely."  *Thane Int'l v. Trek Bicycle Corp.*, 305 F.3d 894, 902 (9th

12  Cir. 2002).

13        In this case, within six months of its launch, BioRx already has caused doctors, nurses,

14  pharmacists, and other medical professionals to become confused regarding the relationship,

15  sponsorship, or affiliation between NutriThrive and Nutrishare.  (Okamoto Decl., ¶ 16; Nishikawa

16  Decl., ¶ 4; Wallin Decl.)  These instances are chronicled in great detailed in the declarations of

17  Rod Okamoto, Reid Nishikawa, and Anita Wallin filed in support of this motion.

18  **B.   Nutrishare Will Suffer Irreparable Harm Unless BioRx is Enjoined from Using the "NutriThrive" Mark.**

19

20        Because Nutrishare has demonstrated a likelihood of success on the merits, it is legally

21  presumed that Nutrishare will suffer irreparable harm absent an injunction.  *Brookfield*, 174 F.3d

22  at 1066 ("irreparable injury may be presumed from a showing of likelihood of success on the

23  merits of a trademark infringement claim"); *Metro Publ'g, Ltd. v. San Jose Mercury News*, 987

24  F.3d 637, 640 (9th Cir. 1993) ("Once the plaintiff has demonstrated a likelihood of confusion, it

25  is ordinarily presumed that the plaintiff will suffer irreparable harm if injunctive relief is not

26  granted").  The Ninth Circuit has recognized that this presumption of irreparable harm

27  "effectively conflates the dual inquiries of [the first alternative test for a preliminary injunction]

28  into the single question of whether the plaintiff has shown a likelihood of success on the merits."

925020.5                                    18

1  *GoTo.com*, 202 F.3d at 1205. In any event, it is clear that Nutrishare will sustain irreparable harm

2  in the absence of a preliminary injunction.

3      First, Nutrishare will suffer harm to its reputation and goodwill resulting from being

4  associated with a company that: (1) does not have Board certified nutrition support pharmacists

5  managing the day to day care of its patients; (2) does not provide the breadth of services provided

6  by Nutrishare; (3) is not currently accredited by the ACHC or the JCAHO; (4) is misrepresenting

7  to the public that NutriThrive is accredited by the ACHC; and (5) is only one branch of a large

8  organization that is susceptible to the failings of other "generalist" infusion pharmacies.

9  (Okamoto Decl., ¶ 12, 19, 20.)

10     Most importantly, because the parties' products and services are medical in nature, there is

11  a real risk to the health and safety of consumers who are confused regarding the identity of their

12  TPN provider. Indeed, there may already be irreparable harm if doctors and nurses have based

13  their medical decisions on their confusion between Nutrishare and NutriThrive.

14     Third, in the absence of a preliminary injunction, Nutrishare's over fifteen-year

15  investment into the "Nutrishare" name will have been for naught. Nutrishare has spent millions

16  of dollars to market and promote the "Nutrishare" name, not including the over half a million

17  dollars it has donated to the Oley Foundation. (Okamoto Decl., ¶ 9.) Nutrishare's founders,

18  employees, and clinician team members have also spent countless hours of incalculable value

19  building up the reputation of the "Nutrishare" name. (*Id.*) Obviously, these expenditures of time

20  and money have proved successful, since Nutrishare has continued to enjoy growth in its

21  business. (*Id.*) Permitting BioRx to profit from Nutrishare's investment will essentially result in

22  a serious financial loss to Nutrishare.

23     Finally, NutriThrive is free-riding off Nutrishare's reputation to provide not only TPN

24  care, but enteral care, and is part of an organization that provides other infusion products and

25  services. Thus, NutriThrive is depriving Nutrishare of the opportunity to expand its own business

26  under the "Nutrishare" name to cover other products and services. *See Sands, Taylor, & Wood*

27  *Co., v. The Quaker Oats Co.,* 978 F.2d 947 *(*7th Cir. 1992*); Walter v. Mattel, Inc.*, 31 F. Supp. 2d

28  751, 757 (C.D. Cal. 1998); *see also Tom Doherty Assocs., Inc. v. Saban Ent't, Inc.*, 60 F.3d 27,

925020.5                                    19

1   37-38 (2d Cir. 1995) (in trademark licensing case, deprivation of opportunity to expand business

2   is irreparable harm); *Rent-a-Center, Inc. v. Canyon Television & Appliance*, 944 F.2d 597, 603

3   (9th Cir. 1991) ("intangible injuries, such as damage to ongoing recruitment efforts and goodwill,

4   qualify as irreparable harm").

5           Thus, even though a showing of irreparable harm is not required, it clearly has already

6   occurred.

7   **C.    The Balance of the Hardships Strongly Tips in its Favor**

8           Here, the balance of hardships tips sharply in favor of Nutrishare.  Nutrishare has already

9   discussed at great length the irreparable harm it will sustain should a preliminary injunction not

10  issue.  By contrast, any harm suffered by BioRx as a result of a preliminary injunction would be

11  *de minimis*.  BioRx been using the "NutriThrive" name for a short time, less than a year.

12  (Okamoto Decl, ¶ 13.)  And while BioRx may have announced that it intended to launch

13  NutriThrive nearly a year ago, NutriThrive did not have a single customer at the time, and did not

14  have a web-site until it was officially launched in November, 2007 – only six months ago.  (*Id.*, ¶

15  15.)  Moreover, and perhaps more importantly, any expenses incurred by BioRx in connection

16  with its new name could have been avoided had it simply chosen a name not confusingly similar

17  to the federally registered trademark "Nutrishare" – a trademark BioRx should have known about

18  from day one.  Nutrishare should not be made to suffer great harm as a direct result of BioRx's

19  incompetence and/or carelessness in choosing a new name, or its arrogant refusal to change its

20  name in light of the rights granted to Nutrishare through its registered trademarks.  That BioRx

21  may have expended money marketing "NutriThrive" is of no consequence, since BioRx was

22  undisputedly aware of the trademark infringement issue and chose to ignore it.  *See Watts Health*

23  *Systems, Inc. v. United Healthcare Corp.*, 960 F. Supp. 1431, 1437 (C.D. Cal. 1996) (rejecting

24  argument by infringer that it would suffer great harm if an injunction issued due to its substantial

25  expenditures of money in connection with its new name, and stating that "any monies expended

26  by United in promoting, advertising or otherwise using the 'United Healthcare' mark was

27  accomplished at its own peril").

28  / / /

**D.    A Preliminary Injunction Will Protect the Public Interest**

Where the conflicting marks are used in connection with medical goods and services, there is a strong public interest in avoiding the likelihood of confusion. *McLeod v. Hosmer-Dorrance, Inc.*, 1976 U.S. Dist. LEXIS 12289, 192 U.S.P.Q. 683, at *8 (C.D. Cal. 1976) ("The product in question here is a medical device used in the care and treatment of serious injury; as such, there is even a greater public interest in insuring that no confusion exists as to the source of plaintiff's and defendant's products") (citations omitted); *see also In Re Merck. & Co.* 1982 TTAB LEXIS 35 (TTAB 1992); *Ethicon, Inv. v. American Cyanamid Company* 192 U.S.P.Q. 647 (TTAB 1976).

In this case, because both parties are in the medical field, the consequences could be particularly dire if medical decisions are made based on confusion between Nutrishare and NutriThrive.  It is particularly likely that such a mistake could occur in this case, given that one patient was almost mistakenly released to NutriThrive's care.  (*See* Wallin Decl.)  Therefore, a preliminary injunction is vital to protecting the public interest.

## IV.    CONCLUSION

Nutrishare is exactly the type of company the trademark laws are designed to protect.  Its founders have devoted nearly two decades of their lives and millions of dollars into building a brand name that distinguishes their company from others in the TPN industry, only to now be faced with actual and imminent consumer confusion as a result of BioRx's "NutriThrive" division and marketing blitz.  Not only has Nutrishare already suffered from this confusion, but it will continue to suffer from BioRx's use of the confusingly similar "NutriThrive" name to market products and services nearly identical to Nutrishare's products and services using the identical marketing channels.  More importantly, BioRx's actions jeopardize the health and well-being of TPN patients nationwide.  Under either form of the test for a preliminary injunction, Nutrishare is therefore entitled to an order enjoining BioRx and its agents, servants, and employees, and all persons acting under, in concert with, or for it from:

a.    Using the name "NutriThrive," or any variation of the term "nutri," as a source identifier for itself, any related entities, or the products and services it offers;

1       b.     Using the domain name www.nutrithrive.com, or any other domain name

2  involving the term "nutri" or any variation thereof;

3       c.     Making any references to the term "NutriThrive" on any websites, including but

4  not limited to www.nutrithrive.com, www.biorx.com, and any other websites;

5       d.     Causing likelihood of confusion, deception, or mistake as to the source, nature, or

6  quality of Defendant's products or services; and

7       e.     Otherwise infringing Plaintiff's "Nutrishare" mark.

8  Per the requirements of Local Rule 65-231(d)(3), Nutrishare does not at this time believe it will

9  be necessary to present oral testimony at the hearing on this motion, and estimates that two hours

10  will be required for the hearing on this motion.

11  DATED:  June 24, 2008            DOWNEY BRAND LLP

12

13                      By:        /s/ Michael J. Thomas

14                         MICHAEL J. THOMAS
                            Attorney for Plaintiff

15                           Nutrishare, Inc

16

17

18

19

20

21

22

23

24

25

26

27

28