1    DOWNEY BRAND LLP
     MICHAEL J. THOMAS (Bar No. 172326)
2    APARNA RAJAGOPAL-DURBIN (Bar No. 218519)
     555 Capitol Mall, Tenth Floor
3    Sacramento, CA  95814-4686
     Telephone:    (916) 444-1000
4    Facsimile:     (916) 444-2100
     E-mail: mthomas@downeybrand.com
5    E-mail: adurbin@downeybrand.com

6    Attorneys for Plaintiff
     Nutrishare, Inc.

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11   Nutrishare, Inc., a California corporation,      Case No.  2:08-CV-01252-WBS-EFB

12                    Plaintiff,                       **OPPOSITION TO MOTION TO DISMISS
                                                       OR TRANSFER VENUE**
13         v.

14   BioRx, LLC, an Ohio Limited Liability            **ORAL ARGUMENT REQUESTED**
     Company,
15                                                     Date:         August 11, 2008
                     Defendant.                        Time:         2:00 p.m.
16                                                     Dept:         Courtroom 5
                                                       Judge:        Hon. William B. Shubb
17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ...................................................................................................1

II.   BIORX'S CONTACTS WITH CALIFORNIA ......................................................3

A.    BioRx is "licensed to provide products and services in most states." ...................3

B.    BioRx's "clinical staff reaches patients and physicians in all 50 states." ...............3

C.    BioRx has Obtained Two Licenses to Conduct Business in California as a "Non-Resident" Pharmacy ..............................................................................3

D.    BioRx has an Agent for Service of Process in Sacramento ...................................4

E.    BioRx has Current and Former "NutriThrive" Customers in California, Including within the Eastern District ....................................................................4

F.    BioRx and NutriThrive have an Interactive Web-site for NutriThrive in this Judicial District ...........................................................................................5

G.    NutriThrive has Informed Callers it is Will Serve California Residents and has Mailed its "Patient Orientation" Packet to California Residents.....................5

H.    NutriThrive has Relationships with Nursing Agencies within California .............5

I.    NutriThrive Attended a Key Marketing Event in California, where it Marketed to and Solicited California Residents ........................................................6

J.    BioRx has Exhibited at Other Conferences in California ....................................7

K.    BioRx has Business Partners in California..........................................................7

L.    BioRx has Sales Representatives Focused on Western Business.........................7

M.    BioRx May Have Customers, Partners, Suppliers, and Referring Medical Professionals for its Other Product Lines in California ........................................8

III.  ARGUMENT .......................................................................................................8

A.    There is More Than Sufficient Contact Between BioRx and the State of California to Warrant Jurisdiction in This Court....................................................8

      1.    This Court has General Jurisdiction over BioRx .......................................9

      2.    At a Minimum, This Court has Specific Jurisdiction over BioRx ............10

            a.    BioRx has Purposefully Availed Itself of the Benefits and Privileges of California in Connection with its Infringing Products and Services............................................................................11

            b.    BioRx has Purposefully Directed its Infringing Activities Towards California.......................................................................14

                  (1)   BioRx's Intentionally Infringed Nutrishare's mark knowing Nutrishare is Located in California ...................................15

i

**TABLE OF CONTENTS**
**(continued)**

Page

(2)    BioRx Shipped Infringing Products to California Residents ................................................................16

(3)    BioRx Maintains an Interactive Web-site that Reaches Out to California Residents ....................................................16

c.    Nutrishare's Claims "Arise Out Of" BioRx's Minimum Contacts 19

3.    Exercise of Jurisdiction in this Forum Is Reasonable ...............................21

B.    Venue is Proper in the Eastern District .................................................................24

1.    Venue is Proper under 28 U.S.C. § 1391(b)(1)......................................24

2.    Venue is Proper under 28 U.S.C. § 1391(b)(2)......................................25

C.    BioRx has Failed to Demonstrate Why this Matter Should Be Transferred to San Diego ................................................................................................26

D.    If The Court Does Not Deem There to Be Sufficient Jurisdictional Evidence, It Should Permit Limited Jurisdictional Discovery .............................27

IV.    CONCLUSION ................................................................................................27

1

## TABLE OF AUTHORITIES

2

Page

3

## FEDERAL CASES

4
*Agilent Techs., Inc. v. Elan Microelectronics Corp.*,
    2005 U.S. Dist. LEXIS 34305 (N.D. Cal. 2005) ................................................................ 8

5

*AMF Inc. v. Sleekcraft Boats*,
6     599 F.2d 341 (9th Cir. 1979) ....................................................................................... 20

7
*AT&T v. Compagnie Bruxelles Lambert*,
    94 F.3d 586 (9th Cir. 1996) .......................................................................................... 8

8
*Ballard v. Savage*,
9     65 F.3d 1495 (9th Cir. 1995) ...................................................................................8, 12

10
*Bancroft & Masters, Inc. v. Augusta Nat'l Inc.*,
    223 F.3d 1082 (9th Cir. 2000) ..............................................................................9, 11, 18

11

*Bensusan Restaurant Corp., v. King*,
12     937 F. Supp. 295 (S.D.N.Y.1996) ................................................................................. 17

13
*Blumenthal v. Drudge*,
    992 F. Supp. 44 (D.D.C. 1998) ..................................................................................... 17

14
*Burger King Corp. v. Rudzewicz*,
15     471 U.S. 462 (1985) .........................................................................................11, 14, 22

16
*Calder v. Jones*,
    465 U.S. 783 (1984) .........................................................................................14, 15, 16

17
*Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*,
18     106 F.3d 289 (9th Cir. 1997) ................................................................................11, 15

19
*CompuServe, Inc. v. Patterson*,
    89 F.3d 1257 (6th Cir.1996) ......................................................................................... 17

20
*Core-Vent Corp. v. Nobel Indus. AB*,
21     11 F.3d 1482 (9th Cir. 1993) ....................................................................................... 23

22
*Corporate Investment Business Brokers v. Melcher*,
    824 F.2d 786 (9th Cir. 1987) ....................................................................................... 22

23
*Cybersell, Inc. v. Cybersell, Inc.*,
24     130 F.3d 414 (9th Cir. 1997) ................................................................................16, 17

25
*Data Disc, Inc. v. Systems Technology Associates, Inc.*,
    557 F.2d 1280 (9th Cir. 1977) ..................................................................................... 27

26
*Decker Coal Co. v. Commonwealth Edison Co.*,
27     805 F.2d 834 (9th Cir. 1986) ....................................................................................26, 27

28

iii

**TABLE OF AUTHORITIES**
(continued)

Page

*Denver & Rio Grande Western R.R. Co. v. Brotherhood of Railroad Trainmen*,
    387 U.S. 556 (1967) ........................................................................................ 24

*Digital Equipment Corp. v. Altavista Technology, Inc.*,
    960 F. Supp. 456 (D. Mass. 1997) ................................................................. 18

*Doe v. Unocal*,
    248 F.3d 915 (9th Cir. 2001) ............................................................................ 8

*Dole Food Co., Inc. v. Watts*,
    303 F.3d 1104 (9th Cir. 2002) .......................................................................... 8

*Dreamwerks Production Group, Inc. v. SKG Studio*,
    142 F.3d 1127 (9th Cir. 1998) ........................................................................ 20

*E. & J. Gallo Winery v. Gallo Cattle Co.*,
    967 F.2d 1280 (9th Cir. 1992) .................................................................... 20, 21

*Ellis v. Costco Wholesale Corp.*,
    372 F. Supp. 2d 530 (N.D. Cal. 2005) ............................................................ 26

*Entrepreneur Media, Inc. v. Smith*,
    279 F.3d 1135 (9th Cir. 2002) ........................................................................ 20

*Fields v. Sedgwick Assoc. Risks, Ltd.*,
    796 F.2d 299 (9th Cir. 1986) ............................................................................ 8

*Fleischmann Distilling Corp. v. Maier Brewing Co.*,
    314 F.2d 149 (9th Cir. 1963) ...................................................................... 20, 21

*Flotsam of Cal., Inc. v. Huntington Beach Conf. & Visitors Bureau*,
    2007 U.S. Dist. LEXIS 9472 (N.D. Cal. 2007) .............................................. 25

*George Kessel Int'l, Inc. v. Classic Wholesales, Inc.*,
    2007 U.S. Dist. LEXIS 83261 (D. Ariz. 2007) ........................................... 11, 16

*Gulf Oil Corp. v. Gilbert*,
    330 U.S. 501 (1947) ........................................................................................ 26

*Hanson v. Denckla*,
    357 U.S. 235 (1958) ........................................................................................ 10

*Hatch v. Reliance Ins. Co.*,
    758 F.2d 409 (9th Cir. 1985) .......................................................................... 26

*Helicopteros Nacionales de Colombia, S.A. v. Hall*,
    466 U.S. 408 (1984) .......................................................................................... 9

*Heroes, Inc. v. Heroes Found.*,
    958 F. Supp. 1 (D.D.C. 1996) ......................................................................... 17

iv

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3

*Hirsch v. Blue Cross, Blue Shield,*
    800 F.2d 1474 (9th Cir. 1986) ....................................................................... 9

4

*Hope v. Otis Elevator Co.,*
    389 F. Supp. 2d 1235 (E.D. Cal. 2005) ........................................................ 26

5

6

*In re Corning Glass Works,*
    229 USPQ 65 (TTAB 1985) ......................................................................... 21

7

*In re Jeep Corp.,*
    222 USPQ 333 (TTAB 1984) ....................................................................... 21

8

9

*In re Martin's Famous Pastry Shoppe, Inc.,*
    748 F.2d 1565 (Fed. Cir. 1984) .................................................................... 21

10

*Inset Systems, Inc. v. Instruction Set,*
    937 F. Supp. 161 (D. Conn. 1996) ............................................................... 17

11

12

*Int'l Shoe Co. v. Washington,*
    326 U.S. 310 (1945) ................................................................................9, 12

13

14

*IO Group, Inc. v. Pivotal,*
    No. C 03-5286 MHP, 2004 U.S. Dist. LEXIS 6673, (N.D. Cal. Apr. 19, 2004) ................ 15

15

*Keeton v. Hustler Magazine, Inc.,*
    465 U.S. 770 (1984) ..................................................................................... 14

16

17

*Mahroom v. Best Western Int'l, Inc.,*
    2007 U.S. Dist. LEXIS 56006, *7 (N.D. Cal. 2007) ...............................10, 13

18

*Maritz, Inc. v. Cybergold, Inc.,*
    947 F. Supp. 1328 (E.D.Mo.1996) ...........................................................17, 18

19

20

*Mattel, Inc. v. MCA Records, Inc.,*
    296 F.3d 894 (9th Cir. 2002) ........................................................................ 14

21

*MCA Records, Inc. v. Charly Records, Ltd.,*
    1997 U.S. App. LEXIS 3684, *8 (9th Cir. 1997) .....................................11, 16

22

23

*McGee v. International Life Ins. Co.,*
    355 U.S. 220 (1957) ..................................................................................10, 16

24

*Menken v. Emm,*
    503 F.3d 1050 (9th Cir. Ariz. 2007) ............................................................. 23

25

26

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.,*
    243 F.Supp.2d 1073 (C.D. Cal. 2003) .......................................................... 15

27

*Morgan Stanley High Yield Secs., Inc. v. Jecklin,*
    2006 U.S. Dist. LEXIS 53489 (D. Nev. 2006) ............................................. 12

28

v

1

**TABLE OF AUTHORITIES**
(continued)

2

Page

3    *Nissan Motor Co. v. Nissan Computer Corp.*,
      246 F.3d 675, 2000 U.S. App. LEXIS 33937 (9th Cir. Dec. 26, 2000). ....................11, 15
4
     *On-line Careline Inc. v. America Online Inc.*,
5     229 F.3d 1080 (Fed. Cir. 2000).................................................................................... 20

6    *Panavision Int'l, L.P. v. Toeppen*,
      141 F.3d 1316 (9th Cir. 1998) ................................................... 9, 11, 15, 17, 18
7
     *Pebble Beach Co. v. Caddy*,
8     453 F.3d 1151 (9th Cir. 2006) ..............................................................8, 9, 16

9    *Perkins v. Benguet Consol. Mining Co.*,
      342 U.S. 437 (1952) .................................................................................. 9
10
     *Plant Food Co-Op v. Wolfkill Feed & Fertilizer Corp.*,
11    633 F.2d 155 (9th Cir. 1980) ............................................................... 14

12   *Radical Prods., Inc. v. Sundays Distrib.*,
      821 F. Supp. 648 (W.D. Wash. 1992) ................................................. 25
13
     *Rio Props. v. Rio Int'l Interlink*,
14    284 F.3d 1007 (9th Cir. 2002) ........................................................... 18

15   *Schwarzenegger v. Fred Martin Motor Co.*,
      374 F.3d 797 (9th Cir. 2004) ...............................................11, 12, 14
16
     *Sher v. Johnson*,
17    911 F.2d 1357 (9th Cir. Cal. 1990) ...............................................21, 22

18   *Sidco Indus., Inc. v. Wimar Tahoe Corp.*,
      768 F. Supp. 1343 (D. Or.1991) ......................................................... 25
19
     *Sinatra v. National Enquirer, Inc.*,
20    854 F.2d 1191 (9th Cir. 1988) .......................................................22, 23

21   *Stewart Org., Inc. v. Ricoh Corp.*,
      487 U.S. 22 (1988) ........................................................................... 26
22
     *Sykes Lab., Inc. v. Kalvin*,
23    610 F. Supp. 849 (C.D. Cal. 1985).................................................... 25

24   *Telco Communications v. An Apple A Day*,
      977 F. Supp. 404 (E.D. Va. 1997)...................................................... 18
25
     *Tillamook Country Smoker v. Tillamook County Creamery Ass'n*,
26    311 F. Supp. 2d 1023 (D. Or. 2004)................................................... 21

27   *Tuazon v. R.J. Reynolds Tobacco Co.*,
      433 F.3d 1163 (9th Cir. 2006) ............................................................ 9

28

vi

**TABLE OF AUTHORITIES**
(continued)

Page

*United States Aluminum Corp. v. Kawneer Co.*,
  694 F. 2d 193 (9th Cir. 1982) ........................................................... 25

*Wells v. Cingular Wireless LLC*,
  2006 U.S. Dist. LEXIS 73664 (N.D. Cal. 2006)................................. 24

*World-Wide Volkswagen Corp. v. Woodson*,
  444 U.S. 286 (1980) .........................................................10, 11, 14

*Zippo Mfr. Co. v. Zippo Dot Com, Inc.*,
  952 F. Supp. 1119 (W.D. Pa. 1997) ................................................ 17

**FEDERAL STATUTES**

28 U.S.C. § 1391(b)(1)........................................................................ 24

28 U.S.C. § 1391(b)(2)....................................................................24, 25

28 U.S.C. § 1391(c) ............................................................................ 24

28 U.S.C. § 1404 ................................................................................ 26

**STATE STATUTES**

Cal. Bus. & Prof. Code § 4086 ............................................1, 4, 10, 13

Cal. Bus. & Prof. Code § 4112 ................................................1, 4, 13

Cal. Bus. & Prof. Code § 4123 ........................................................ 12

Cal. Bus. & Prof. Code §§ 4127 *et seq.* ........................................ 12

Cal. Bus. & Prof. Code §§ 4300 *et seq.* .............................1, 4, 10, 13

Cal. Code of Civ. Proc. § 410.10 ...................................................... 9

**FEDERAL RULES**

Fed. Rul. Civ. Proc. 4(k)(2) .............................................................. 9

**STATE REGULATIONS**

Cal Code Regs. §§ 1751 *et seq.* ....................................................1, 12

**OTHER AUTHORITY**

4 J. Thomas McCarthy,
  McCarthy on Trademarks and Unfair Competition §24:13 (3d ed. 2008) ........................ 20

Trademark Manual of Examining Procedure § 1201(a)(i)................................20, 21

OPPOSITION TO MOTION TO DISMISS OR TRANSFER

## I.    INTRODUCTION

Defendant BioRx – after applying for and obtaining two licenses with the California Board of Pharmacy located in Sacramento permitting it to conduct business in California, including to ship its NutriThrive products to California residents in their homes, after designating an agent for service of process in Sacramento in its pharmacy license applications, and after admitting that it has customers for its NutriThrive products within California – now moves to dismiss or transfer this trademark infringement action on the grounds that it "has no contacts with this State" and "no contacts in this district." (*See* Memo of Points & Authorities in support of Defendant's Motion to Dismiss or Transfer, filed 7/23/08 (hereinafter "Motion") at 1:7-8; 2:26.)

It is baffling how BioRx could possibly argue that it is not subject to personal jurisdiction or venue here in light of the overwhelming evidence to the contrary.  BioRx's internally inconsistent moving brief and its president's declaration are replete with, on the one hand bald and patently false statements eschewing any contact with this state or district, and on the other hand admissions that BioRx does indeed do business in this State.  Indeed, investigations have revealed that BioRx has such extensive contacts with California and this district that jurisdiction – and therefore venue – is more than proper in this Court.

Most compelling is the fact that, contrary to its statement that it "does not do business in California" (motion at 1), BioRx specifically applied for and obtained two licenses in Sacramento authorizing it to conduct business as a non-resident pharmacy and to conduct sterile compounding activities within California.  (Declaration of Rodney Okamoto filed herewith (hereinafter "Okamoto Decl."), Ex. C.)  Furthermore, contrary to BioRx's claim that it "has no agent for service of process in this state" (motion at 1), as a prerequisite to obtaining its pharmacy licenses, and under the California pharmacy law, BioRx necessarily submitted to the jurisdiction of California courts and the Board of Pharmacy in Sacramento and appointed Business Filings, Inc, located at 1232 Q Street, Sacramento, as its agent for service of process.  (Declaration of Aparna Rajagopal-Durbin filed herewith (hereinafter "Durbin Decl.," ¶ 6, Ex. E.); *see also* Cal. Bus. & Prof. Code §§ 4086, 4300 *et seq.*, 4112.  These licenses have authorized BioRx, from a licensure standpoint, to conduct its infringing activities in California as "NutriThrive," including to ship

940766.2

1

1   total parenteral nutrition and enteral nutrition products bearing the infringing "NutriThrive" mark

2   to its California customers.  Cal Code Regs. §§ 1751 *et seq.*

3           BioRx's claim that it "has never sought to obtain clients or business directly from the state

4   of California," (motion at 2:5-6.) are likewise specious.   Nutrishare knows of at least four BioRx

5   customers in this state, including within this very district, who have received NutriThrive

6   products and services.  (Okamoto Decl., ¶ 6, Ex. D, ¶ 11; Declaration of Craig Rielly in support

7   of BioRx's Motion to Dismiss and/or Transfer Venue filed 6/16/08, ("hereinafter Rielly Decl.")

8   ¶¶ 12, 13.)  And NutriThrive may be procuring more California customers this very moment.

9   Less than three months ago, NutriThrive fielded multiple calls from Nutrishare investigators who

10  inquired regarding whether it would provide its products and services within California.

11  (Okamoto Decl., ¶ 13; Declaration of Kathryn Bundy filed herewith (hereinafter "Bundy Decl."),

12  ¶ 3.)  In each instance, NutriThrive's response was a resounding "yes." (*Id.*)  In one instance,

13  NutriThrive actually sent its "Patient Orientation" packet, including a thick binder and

14  promotional materials, to the California caller.  (Bundy Decl., ¶ 3.)  Less than a month ago,

15  NutriThrive was pounding the pavement in San Diego marketing to, soliciting, and aggressively

16  pursuing California customers.  (Okamoto Decl., ¶¶ 7-10, 11; Messina Decl.,  ¶ 4; Bundy Decl.,

17  ¶¶ 4-5.)  BioRx's own president has admitted that NutriThrive has at least two California

18  customers who were procured  "as a result of the customers contacting BioRx through its internet

19  website." (Rielly Decl., ¶¶ 12, 13.)  By this statement, Mr. Reilly also has admitted that BioRx

20  has an interactive web-site for its NutriThrive product line which is accessible by any person in

21  this judicial district.  This web-site on multiple pages extols BioRx's "reach" within all 50 states

22  and boasts that BioRx is licensed in most states.  (Okamoto Decl., Ex A.)

23           This is only the tip of the iceberg, gleaned by nothing more than a few phone calls,

24  attendance at a conference, perusal of BioRx's web-sites, and keyword searches on

25  www.google.com.  Nutrishare has not yet been permitted to conduct any formal discovery.

26  Nevertheless, even the limited information that Nutrishare has thus far uncovered demonstrates

27  without a doubt that both jurisdiction and venue are proper in this Court.  BioRx's motion should

28  therefore be summarily denied.  In the event that the Court does not find the evidence gathered

1   thus far to be sufficient, Nutrishare requests that the Court at least permit additional limited

2   jurisdictional discovery prior to ruling on BioRx's motion.

3                **II.    BIORX'S CONTACTS WITH CALIFORNIA**

4        Through Nutrishare's initial investigations, and without having had the benefit of

5   discovery, Nutrishare has learned that BioRx has <u>at least</u> the following contacts with the State of

6   California and this judicial district.

7   **A.**    **BioRx is "licensed to provide products and services in most states."**

8        Contrary to BioRx's statements that it "has never sought to obtain clients or business

9   directly from the State of California," (motion at  4:12), the "About Us" page on BioRx's

10   interactive web-site, <u>www.biorx.net</u>, beckons to California customers immediately below and in

11   the same space the "NutriThrive" logo and description, as follows:

12

> **NUTRITHRIVE**               Improving life on nutrition support.
>
> BioRx is licensed to provide products and services in most states.
>
> Call us at **866-44-BIORX** to inquire as to service availability in your area.

16   (Okamoto Decl., Ex. B.)

17   **B.**    **BioRx's "clinical staff reaches patients and physicians in all 50 states."**

18        The "BioRx News" page likewise reaches out to California customers.  In a press release

19   about its immunoglobulin services for patients suffering from immune deficiency disorders,

20   BioRx states, "As one of the nation's fastest growing providers of IgG and other specialty

21   pharmaceuticals, the company's clinical staff <u>reaches patients and physicians in all 50 states</u>. To

22   learn more about BioRx and its products and services visit <u>www.biorx.net</u>."  (Okamoto Decl., Ex.

23   A.) (emphasis added).

24   **C.**    **BioRx has Obtained Two Licenses to Conduct Business in California as a "Non-**
            **Resident" Pharmacy.**

25

26        Pursuant to the requirements of the California Pharmacy Law codified in the Business and

27   Professions Code, BioRx has specifically applied for and obtained, with the California Board of

28   Pharmacy, located at 1625 N Market Blvd, N219, <u>Sacramento</u>, California, 95834, two licenses

1  authorizing it to distribute pharmaceuticals within California and conduct sterile compounding

2  activities within California as an non-resident pharmacy.  (Okamoto Decl., Ex. C.)  These licenses

3  issued in September 2007 and July 2008, respectively.  (*Id.*)  As will be explained in more detail

4  below, although NutriThrive has not separately obtained licenses, NutriThrive, as a d/b/a of

5  BioRx, requires and necessarily must rely on BioRx's licenses in order to provide any of its

6  products or services to California residents.

7  **D.**    **BioRx has an Agent for Service of Process in Sacramento.**

8          Contrary to BioRx's claim that "it has no agent for service of process in the state" (motion

9  at 1:6), BioRx has appointed Business Filings, Inc., located at 1232 Q. Street, 1st Floor,

10  Sacramento, California, as its agent for service of process in California pursuant to the

11  requirements of California pharmacy law.  (Durbin Decl., Ex. E; *see also* Cal. Bus. & Prof. Code

12  §§ 4086, 4300 *et seq.*, 4112.)

13  **E.**    **BioRx has Current and Former "NutriThrive" Customers in California, Including**
          **within the Eastern District.**

14

15          Discussions on on-line consumer forum www.parent-2-parent.com indicate that

16  NutriThrive has customers in Redding, California, within the Eastern District.  (Okamoto Decl., ¶

17  6, Ex. D.)  These postings indicate that Jessi, mother of two boys, Jaxson and Joshua, is an active

18  participant on the forum has been posting messages on the forum since at least February, 2008,

19  has posted at least 500 messages to the forum since mid-April, and posts numerous messages

20  nearly every day.  (Durbin Decl., ¶ 5.)   In mid-April, Jessi posted a message indicating she had

21  switched her son's home infusion provider to NutriThrive.  (Okamoto Decl., ¶ 6, Ex. D.)

22  Unfortunately, Nutrishare has been unable to determine Jessi's full name or address.  (Durbin

23  Decl., ¶ 5.)  However, if the Court requires additional evidence regarding the Redding family,

24  Nutrishare requests that the Court permit Nutrishare to conduct limited jurisdictional discovery in

25  order to confirm that Jessi and her family are indeed NutriThrive customers.

26          At the Oley Conference held in San Diego on June 26 through June 29, 2008, Nutrishare

27  learned that NutriThrive has had at least one additional TPN customer in California.  (Okamoto

28  Decl, ¶ 11.)  This customer, Rosemarie Mielke of Lancaster, California, subsequently changed

940766.2                                                   4

1  her home infusion provider to Crescent Healthcare.  (*Id.*)

2      Nutrishare learned from BioRx's most recent court filing that NutriThrive has at least two

3  additional customers who live in California.  In his July 16, 2008 Declaration, BioRx's president

4  Phillip Rielly stated.

5      NutriThrive does . . . have two customers located in California who receive
    Enteral Nutrition products from BioRx.  . . . BioRx delivers product to these
6      customers on a monthly basis by federal express delivery from Cincinnati, Ohio.

7  (Rielly Decl., ¶¶ 12, 13.)

8  **F.    BioRx and NutriThrive have an Interactive Web-site for NutriThrive in this Judicial**
    **District.**
9

10      BioRx and NutriThrive have an interactive web-site accessible to all Internet users in

11  California, including those in the Eastern District.  (Okamoto Decl., Ex. A, B.)  In the words of

12  BioRx's own president, NutriThrive obtained at least two California customers "as a result of

13  these customers contacting BioRx through its internet website."  (Rielly Decl., ¶ 13.)  Indeed,

14  anybody in California can, through www.nutrithrive.com, request NutriThrive products and

15  services, refer patients to NutriThrive, sign up to become a "NutriThrive consumer," and

16  participate in on-line discussions with NutriThrive's customers, clinicians and "consumer

17  advocates."  (Okamoto Decl., Ex. B.)

18  **G.    NutriThrive has Informed Callers it is Will Serve California Residents and has**
    **Mailed its "Patient Orientation" Packet to California Residents.**
19

20      NutriThrive has represented to callers that it is permitted to conduct business in California

21  and will send its informational packets to TPN consumers in California.  (Okamoto Decl., ¶ 13;

22  Bundy Decl., ¶ 3.).  NutriThrive also actually sent a "Patient Orientation" packet containing its

23  promotional materials and business card to a TPN consumer who lives in California. (Bundy

24  Decl., Ex. A.)

25  **H.    NutriThrive has Relationships with Nursing Agencies within California.**

26      NutriThrive also represented to one caller that, although it is based on Ohio, it has

27  established relationships with local nursing agencies in California.  (Bundy Decl., ¶ 3.)

28

940766.2                                  5

**I.      NutriThrive Attended a Key Marketing Event in California, where it Marketed to and Solicited California Residents.**

As BioRx's president has admitted, NutriThrive attended the 2008 Oley Conference held at the Mission Valley Marriott Hotel in San Diego between June 26 and June 29, 2008, where NutriThrive actively marketed products and services bearing the mark in dispute.  This is a key marketing event for national home infusion companies.  (Rielly Decl., ¶ 14.)  This was an especially important marketing event for NutriThrive, as evidenced by the following announcement  emblazoned across the center of its home page at www.nutrithrive.com:

**Annual OLEY Conference**    June 26–30

  Marriott San Diego
Mission Valley, California

  www.oley.org or
(800)776-6539

(*See* Okamoto Decl., Ex. B.)

In fact, on the day Nutrishare's Complaint, summons, and preliminary injunction papers were served, both Nutrishare and NutriThrive were attending the Oley Conference (Okamoto Decl., ¶ 7.)  There were approximately 200 conference attendees, the majority of whom are home infusion consumers, and several of whom are California residents  (*Id.*)  There were twenty-two companies that exhibited their products and/or services at booths in the exhibit hall.  (*Id.*, Ex. E.)  Eleven of those companies were home infusion providers.  (*Id.*)  Nine of those companies were national (versus local/regional) home infusion providers.  (*Id.*)  Nutrishare and BioRx d/b/a NutriThrive were two of the nine national home infusion providers.  (*Id.*)  At the conference, NutriThrive's name was prominently displayed on a banner hanging at the entryway to the conference facilities, immediately below Nutrishare's name in the same font size, color, and typeface.  (*Id.*, Ex. F.)  This banner was displayed throughout the duration of the conference.  (*Id.*, ¶ 8, Ex. F.)  In the exhibition hall, which was the only place where home infusion companies were permitted to display and market their products, both Nutrishare and NutriThrive had prominent booths, each at one of the two back corners of the hall.  (*Id.*, ¶ 9, Ex. G.)  NutriThrive's booth was staffed by, among others, Donna Noble (the mother of Nutrishare's former customer).  (*Id.*, ¶ 9.) At NutriThrive's booth, conference attendees and/or exhibitors were provided with NutriThrive's promotional materials.  (*Id.*)

On the Friday and Saturday of the conference, there was a conference-wide luncheon. Friday's lunch was sponsored by NutriThrive. On the day of this luncheon, NutriThrive's name was prominently displayed throughout the day on placards placed on the lunch buffet tables. (*Id.*, ¶ 10; Bundy Decl., ¶ 4.)

During the conference, a California resident, Kerry Stone of La Jolla, California, became confused and erroneously believed that the Friday luncheon was sponsored by Nutrishare. (*See* Declaration of Kerry Stone, filed 7/15/08). Also during the conference, another California resident, Sheila Messina of San Jose, California, noticed NutriThrive's booth and was curious about the new company. (Messina Decl., ¶¶ 3-4.) Yet another California resident, Kathryn Bundy of Los Angeles, California, felt uncomfortable when NutriThrive aggressively solicited her outside the allotted marketing period in contravention of Oley Foundation rules. (Bundy Decl., ¶ 5.)

**J.    BioRx has Exhibited at Other Conferences in California.**

Based only on a search on www.google.com, Nutrishare has been able to identify at least two other conferences in California where BioRx was in attendance and had an exhibition booth. BioRx was an exhibitor in the 2005 annual meeting of the American Association of Neuromuscular and ElectroDiagnostic Medicine, which was held in Monterey, California. (Durbin Decl., Ex. A .) Furthermore, on the same day as the Oley Conference this year, BioRx was in attendance and marketing its products and services at the San Francisco-based Neuropathy Action Foundation's "Neuropathy Action Awareness Day," held at the University of California San Francisco's Mission Bay Conference Center. (*Id.*, Ex. B.)

**K.    BioRx has Business Partners in California.**

A www.google.com search also revealed that BioRx worked with Bayer Healthcare, based in Berkeley, California, to publish a children's book on hemophilia entitled "The Great Inhibitor," in July, 2006. (*Id.*, Ex. C.)

**L.    BioRx has Sales Representatives Focused on Western Business.**

Nutrishare has also learned that, as of 2006, BioRx had a Director of Business Development for the West, Julie Winston. (*Id.*, Ex. D.) Obviously its efforts have succeeded, as

1  BioRx has developed business in California.

2  **M.   BioRx May Have Customers, Partners, Suppliers, and Referring Medical**
   **Professionals for its Other Product Lines in California.**

3

4       In its brief, BioRx admits to having three product lines outside the enteral and parenteral

5  nutrition products and services offered by its NutriThrive division.  However, noticeably absent

6  from the brief is any mention of whether BioRx has any customers, partners, suppliers, or

7  referring physicians for these other product lines.  Given that BioRx has obtained two licenses to

8  conduct all of its home infusion activities within this State, it is highly likely that BioRx has

9  contacts with respect to its non-TPN products lines within California, and perhaps within this

10 district.  Should the Court require additional evidence to resolve BioRx's motion, Nutrishare

11 requests that it grant Nutrishare leave to serve limited jurisdictional discovery in order to

12 ascertain these contacts, which would support a finding of general jurisdiction.  The nature of this

13 discovery is outlined in greater detail in section III(D) below.

14                          **III.   ARGUMENT**

15 **A.   There is More Than Sufficient Contact Between BioRx and the State of California to**
   **Warrant Jurisdiction in This Court.**

16

17      To establish jurisdiction, BioRx need only make a *prima facie* showing of facts that, if

18 true, would support jurisdiction over the defendant.  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151,

19 1154 (9th Cir. 2006); *Doe v. Unocal*, 248 F.3d 915, 922 (9th Cir. 2001); *Ballard v. Savage*, 65

20 F.3d 1495, 1498 (9th Cir. 1995); *Fields v. Sedgwick Assoc. Risks, Ltd.*, 796 F.2d 299, 301 (9th

21 Cir. 1986); *see also Agilent Techs., Inc. v. Elan Microelectronics Corp.*, 2005 U.S. Dist. LEXIS

22 34305, *8-10 (N.D. Cal. 2005).  Moreover, for the purpose of a motion to dismiss for lack of

23 jurisdiction, the Court should resolve all disputed facts in favor of the plaintiff, here, Nutrishare.

24 *Dole Food Co., Inc. v. Watts*, 303 F.3d 1104, 1108 (9th Cir. 2002); *Pebble Beach Co.*, 453 F.3d at

25 1154 (citing *Doe*, 248 F.3d at 922); *AT&T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 588

26 (9th Cir. 1996).

27      The general rule is that personal jurisdiction over a defendant is proper if it is permitted by

28 a long-arm statute and if the exercise of that jurisdiction does not violate federal due process.

940766.2                                    8

1   *Pebble Beach Co.*, 453 F.3d at 1155 (citations omitted).  Here, both the California and Federal

2   long-arm statutes – Cal. Code of Civ. Proc. Section 410.10 and Federal Rule of Civil Procedure

3   4(k)(2) – require compliance with due process requirements.  *Id.*  Consequently, whether or not

4   this Court has personal jurisdiction over BioRx hinges on due process.

5          The Due Process Clause permits a court to exercise personal jurisdiction over an out-of-

6   state defendant when the defendant has such "minimum contacts" with the forum state that

7   maintenance of the suit would not offend "traditional notions of fair play and substantial justice."

8   *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).  Personal jurisdiction may be either

9   general or specific.  *Panavision Int'l, L.P. v. Toeppen*, 141 F.3d 1316, 1320 (9th Cir. 1998).  As

10  demonstrated below, BioRx's laundry list of contacts with the State of California meets both the

11  requirements for general and specific jurisdiction.

12         **1.      This Court has General Jurisdiction over BioRx.**

13         BioRx will be subject to the general jurisdiction of this Court if the quality and nature of

14  its contacts with California are so "substantial, continuous, and systematic" that due process is not

15  offended.  *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-16 (1984).  To

16  determine whether there is general jurisdiction, courts examine "whether defendant makes sales,

17  solicits or engages in business in the state, serves the state's markets, designates an agent for

18  service of process, holds a license, or is incorporated there." *Bancroft & Masters, Inc. v. Augusta*

19  *Nat'l Inc.*, 223 F.3d 1082, 1086 (9th Cir. 2000) (citing *Hirsch v. Blue Cross, Blue Shield*, 800

20  F.2d 1474, 1478 (9th Cir. 1986)).  Courts have also considered whether the defendant has

21  physical facilities or bank accounts in the state, or has conducted meetings in the state.  *Perkins v.*

22  *Benguet Consol. Mining Co.*, 342 U.S. 437, 445 (1952).

23         The evidence uncovered thus far establishes that BioRx's contacts with California have

24  been substantial, continuous, and systematic.  BioRx applied for two licenses to conduct

25  pharmacy-related activities in this state, which issued on September 11, 2007 and July 8, 2008.

26  (Okamoto Decl., Ex. C; *see also Tuazon v. R.J. Reynolds Tobacco Co.,* 433 F.3d 1163, 1174 (9th

27  Cir. 2006) (finding general jurisdiction over nonresident defendant based on license to do

28  business in the forum.))  In obtaining these licenses, BioRx also submitted to the general

940766.2                                         9

1 jurisdiction of California courts and the California Board of Pharmacy.  *See* Cal. Bus. & Prof.

2 Code §§ 4300 *et seq.*; 4086.  Also in connection with obtaining its business licenses, BioRx

3 designated an agent for service of process in Sacramento, California in its license applications.

4 (Durbin Decl., Ex. E.)  Thus, BioRx's claims that it "has no agent for service of process in this

5 state" (motion at 1:6-7) is patently false.  Based solely on its appointment of this agent, BioRx is

6 subject to jurisdiction in California.  *Mahroom v. Best Western Int'l, Inc.*, 2007 U.S. Dist. LEXIS

7 56006, *7 (N.D. Cal. 2007) (finding general jurisdiction where defendant "regularly conducts

8 business in California, and it even has a registered agent in California who is allowed to receive

9 service of process").

10  Although Nutrishare has not yet determined when BioRx began conducting business in

11 California, Nutrishare has learned that BioRx has frequently attended meetings and conferences

12 in California, dating as far back as 2005.  (Durbin Decl., ¶ 2.)  BioRx also has business partners in

13 this state, including Bayer Healthcare (which relationship dates back to at least 2006) and local

14 nursing agencies.  (Durbin Decl., ¶ 3; Bundy Decl., ¶ 3.)  BioRx also has at least four customers

15 in California for its NutriThrive products and services.  (Rielly Decl.., ¶¶ 12, 13; Okamoto Decl.,

16 ¶ 11.)  BioRx also may have customers for its other product lines, including its hemophilia and

17 immunoglobulin services, in California.  And as with its NutriThrive products and services,

18 BioRx may have contracts or relationships with local nursing agencies, other medical

19 professionals, and vendors with respect to these other product lines.  BioRx may also have

20 California-based employees and/or sales representatives for these other services.  All of these

21 contacts, if they exist, would support a finding of general jurisdiction.  If the Court requires

22 evidence of such contacts, Nutrishare requests leave to conduct limited jurisdictional discovery to

23 ascertain the nature and extent of these contacts with California.

24  Based on the above evidence, this Court has general jurisdiction over BioRx.

25  **2. At a Minimum, This Court has Specific Jurisdiction over BioRx.**

26  BioRx will be subject to the specific jurisdiction of this Court if the facts of this lawsuit

27 are related to or arise out of its "minimum contacts" with California.  *McGee v. International Life*

28 *Ins. Co.*, 355 U.S. 220 (1957); *Hanson v. Denckla*, 357 U.S. 235, 251 (1958); *World-Wide*

1  *Volkswagen Corp. v. Woodson*, 444 U.S. 286 313 (1980).

2          The Ninth Circuit has held that specific jurisdiction exists if (1) the defendant has

3  performed some act or consummated some transaction within the forum or otherwise

4  purposefully availed itself of the privileges of conducting activities in the forum; (2) the

5  plaintiff's claims arise out of or results from defendants forum-related activities; and (3) the

6  exercise of jurisdiction is reasonable. *Bancroft & Masters, Inc. v. Augusta Nat. Inc.* 223 F.3d

7  1082, 55 U.S.P.Q.2d 1941 (9th Cir. 2000); *see also Burger King Corp. v. Rudzewicz*, 471 U.S.

8  462, 475, 85 L. Ed. 2d 528, 105 S. Ct. 2174 (1985). The first part of this test has been further

9  subdivided into two distinct questions: whether BioRx either (1) "purposefully availed" itself of

10  the privilege of conducting activities in the forum, or (2) "purposefully directed" its activities

11  toward the forum. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802 (9th Cir. 2004).

12          In the context of a trademark infringement action, the Ninth Circuit has held that specific

13  jurisdiction exists when the plaintiff alleges that defendant intentionally infringed plaintiff's

14  rights knowing that plaintiff was located in the forum state. *Columbia Pictures Television v.*

15  *Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 289 (9th Cir. 1997); *Panavision Intern.,*

16  *L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998); *Nissan Motor Co. v. Nissan Computer*

17  *Corp.*, 246 F.3d 675, 2000 U.S. App. LEXIS 33937, *2 (9th Cir. Dec. 26, 2000).  The case for

18  specific jurisdiction becomes even compelling if the alleged infringer advertises or sells its

19  allegedly infringing products in the forum state. *See, e.g., MCA Records, Inc. v. Charly Records,*

20  *Ltd.*, 1997 U.S. App. LEXIS 3684, *8 (9th Cir. 1997); *George Kessel Int'l, Inc. v. Classic*

21  *Wholesales, Inc.*, 2007 U.S. Dist. LEXIS 83261, *16 (D. Ariz. 2007).

22          For the reasons set forth below, this Court has specific jurisdiction over BioRx.

23              **a.**    *BioRx has Purposefully Availed Itself of the Benefits and Privileges of*
                     *California in Connection with its Infringing Products and Services.*

24

25          The requirement of purposeful availment ensures that the defendant should reasonably

26  anticipate being haled into the forum State court based on its contacts. *World-Wide Volkswagen*

27  *Corp.*, 444 U.S. at  297. The purposeful availment test is met where "the defendant has taken

28  deliberate action within the forum state or if he has created continuing obligations to forum

940766.2                                         11

residents." *Ballard*, 65 F.3d at 1498.  Evidence of purposeful availment is typically action taking place in the forum that invokes the benefits and protections of the laws in the forum, such as executing or performing a contract.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 802, 803 (9th Cir. 2004).

There could be no more direct way of purposefully availing oneself of the benefits and privileges of California than applying for and obtaining a license authorizing one to conduct certain businesses within this state.  The Supreme Court best articulated this rationale in *International* Shoe when it stated:

> [T]o the extent that a corporation exercises the privilege of conducting activities within a state, it enjoys the benefits and protection of the laws of that state. The exercise of that privilege may give rise to obligations, and, so far as those obligations arise out of or are connected with the activities within the state, a procedure which requires the corporation to respond to a suit brought to enforce them can, in most instances, hardly be said to be undue.

*Int'l Shoe Co.,* 326 U.S. at 319.  Courts of this Circuit have followed suit.  For example, in ruling on a motion to dismiss a complaint against a company that had acquired a license to conduct gaming activities within Nevada, a court of this Circuit held:

> Defendants purposely availed themselves of the privilege of conducting activities in Nevada, and invoking the benefits and protections of Nevada's laws, . . . by acquiring a Nevada gaming license. . . . Both [Defendants] were registered as doing business in Nevada to aid in the [project that is the subject of Plaintiff's Complaint.] **Even if . . . Defendants . . . never conducted any business in Nevada besides obtaining a license, voluntary compliance with a state's corporation law is a contact which facilitates significant privileges for conducting activities within that state.** Furthermore, the business licenses . . . arise out of activities surrounding [the project that is the subject of Plaintiff's Complaint.]

*Morgan Stanley High Yield Secs., Inc. v. Jecklin*, 2006 U.S. Dist. LEXIS 53489, * 7-8  (D. Nev. 2006) (emphasis added).

In this case, BioRx has not only obtained one, but two licenses specifically authorizing it to conduct the activities from which Nutrishare's complaint arose: compounding total parenteral and enteral nutrition solutions and shipping them to California residents under the "NutriThrive" mark.  *See* Cal. Bus. & Prof. Code §§ 4123 (requiring that licensed pharmacies report

1  compounding drugs for parenteral therapy to the Board of Pharmacy), 4127 *et seq.* (specific

2  license required for sterile compounding activities); Cal Code Regs. §§ 1751 *et seq.* (in-home

3  parenteral therapy requires specific license and procedures).  Thus, under *Morgan Stanley High*

4  *Yield Secs., Inc.*, even if BioRx has not conducted any business in California other than obtaining

5  these licenses, it would meet the purposeful availment requirement.  That said, BioRx actually

6  marketed and sold its NutriThrive products and services in California under these licenses.

7  (Rielly Decl., ¶¶ 12-13; Okamoto Decl., ¶ 6, Ex. D; Bundy Decl., ¶¶ 3-5; Messina Decl., ¶¶ 3-4.)

8       In exchange for the benefits and privileges of these licenses, BioRx has agreed to be

9  subject to the jurisdiction of the California Board of Pharmacy in relation to violations of the law

10  requiring suspension or revocation of its pharmacy licenses.  Cal. Bus. & Prof. Code §§ 4300 *et*

11  *seq.*  Furthermore, BioRx has agreed to be subject to the jurisdiction of the courts of this State,

12  including the courts of this district, in matters related to its violations of pharmacy law.  For

13  example, if BioRx's Redding-based NutriThrive customers receive a NutriThrive TPN nutrient

14  solution that they allege is adulterated, the California Board of Pharmacy can commence

15  proceedings against BioRx in a Shasta County court – within this judicial district.  Cal Bus. &

16  Prof. Code § 4086 (proceedings may be brought "in the superior court in whose jurisdiction the

17  dangerous drug or dangerous device is located").  Thus, when BioRx obtained its licenses and

18  began shipping pharmaceutical products within this district, it consented to the jurisdiction of the

19  courts within this district.  This alone should lead to a finding of purposeful availment.

20       BioRx also was required to appoint an agent for service of process in this State who is

21  authorized to receive complaints related to BioRx's, and specifically NutriThrive's, violations of

22  the state pharmacy regulations.  Cal. Bus. & Prof. Code § 4112.  Pursuant to this requirement,

23  BioRx appointed an agent for service of process in Sacramento, California.  (Durbin Decl., Ex.

24  E.)  Under the law of this Circuit, BioRx's appointment of a California agent for service of

25  process is sufficient for a finding of personal jurisdiction.  *See Mahroom v. Best Western Int'l,*

26  *Inc.*, 2007 U.S. Dist. LEXIS 56006 (N.D. Cal. 2007) (finding personal jurisdiction where

27  defendant "regularly conducts business in California, and it even has a registered agent in

28  California who is allowed to receive service of process.")

1      Because BioRx has purposefully availed itself of the benefits and privileges of this State,

2   the Court should find that there is at least specific jurisdiction over BioRx in this forum.

3              **b.**    *BioRx has Purposefully Directed its Infringing Activities Towards*
                         *California.*
4

5      Not only has BioRx purposefully availed itself of the privileges of conducting business in

6   California, but it has also purposefully directed its activities to California.  The Supreme Court

7   has held that due process permits the exercise of personal jurisdiction over a defendant who

8   "purposefully directs" his activities at residents of a forum, even in the "absence of physical

9   contacts" with the forum.  *Burger King*, 471 U.S. at 476 (citing *Keeton v. Hustler Magazine, Inc.*,

10  465 U.S. 770, 774-75 (1984) (finding purposeful direction where defendant published magazines

11  in Ohio and circulated them in the forum state)); *see also Mattel, Inc. v. MCA Records, Inc.*, 296

12  F.3d 894, 899 (9th Cir. 2002) (finding purposeful direction where defendant distributed its pop

13  music albums from Europe in the forum state); *World-Wide Volkswagen*, 444 U.S. at 297-98

14  (noting that a "forum State does not exceed its powers under the Due Process Clause if it asserts

15  personal jurisdiction over a corporation that delivers its products into the stream of commerce

16  with the expectation that they will be purchased by consumers in the forum State"); *Plant Food*

17  *Co-Op v. Wolfkill Feed & Fertilizer Corp.*, 633 F.2d 155, 158-60 (9th Cir. 1980) (relying on this

18  language in *World-Wide Volkswagen* to hold that a Canadian fertilizer distributor that shipped

19  defective or mislabeled fertilizer to Montana may properly be subject to personal jurisdiction

20  there).

21      Evidence of purposeful direction generally consists of action taking place outside the

22  forum that is directed at the forum.  *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797,

23  802 (9th Cir. 2004).  This Circuit evaluates purposeful direction under the "Calder Effects test,"

24  in which specific jurisdiction exists even if the defendant has not purposefully availed itself of the

25  benefits of this state as long as the defendant: (1) committed an intentional act, (2) expressly

26  aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the

27  forum state. *Id.* at 803 (citing *Calder v. Jones*, 465 U.S. 783, 79 L. Ed. 2d 804, 104 S. Ct. 1482

28  (1984).)

**(1)** BioRx's Intentionally Infringed Nutrishare's mark knowing Nutrishare is Located in California.

Under the law of this Circuit, even if BioRx had not sent a single infringing product into California, BioRx nevertheless purposefully directed its activities towards this State merely by intentionally infringing Nutrishare's mark with full knowledge of Nutrishare, its location, and its mark. *See, e.g., Columbia Pictures Television v. Krypton Broadcasting of Birmingham, Inc.*, 106 F.3d 289 (9th Cir. 1997) ("[Plaintiff] alleged, and the district court found, that [defendant] willfully infringed copyrights owned by [plaintiff], which, as [defendant] knew, had its principal place of business in the Central District. This fact alone is sufficient to satisfy the 'purposeful availment' requirement."); *Panavision Intern., L.P. v. Toeppen*, 141 F.3d 1316, 1321 (9th Cir. 1998) (holding that the effects test was satisfied in a trademark infringement case as defendant knew that plaintiff would suffer harm in California, since "its principal place of business was in California, and the heart of the theatrical motion picture and television industry is located there"); *Nissan Motor Co.*, 2000 U.S. App. LEXIS 33937 at *2-3 ("Here, Nissan North America, a California resident, alleges that NCC intentionally infringed upon its trademark and that such harm was suffered primarily in its home forum. NCC claims there was no evidence it knew that Nissan North America was a California resident. But NCC admits that it received a certified letter from Nissan North America, which contained its California address, several years before it began advertising auto products on its webpage.  And NCC does not purport to have relied on a belief that Nissan North America was a resident of a different forum. Accordingly, the district court correctly concluded that NCC expressly aimed its allegedly infringing activities at California"); *IO Group, Inc. v. Pivotal*, No. C 03-5286 MHP, 2004 U.S. Dist. LEXIS 6673, *18 (N.D. Cal. Apr. 19, 2004) (concluding, in a copyright infringement case, that plaintiff "has adequately demonstrated that defendants published images belonging to a California company, affecting an industry primarily centered in California, knowing that harm would likely be felt in that state"); *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 243 F.Supp.2d 1073, 1090 (C.D. Cal. 2003) ("Plaintiffs have alleged that Sharman intentionally and materially contributed to the infringement of Plaintiffs' works, and that it did so with full knowledge that much of the harm from this

infringement would be suffered in California. This is sufficient to establish a prima facie case of purposeful availment under the effects test of Panavision").

(2)    BioRx Shipped Infringing Products to California Residents.

BioRx also purposefully directed its activities to California by procuring California customers for its NutriThrive products and services, establishing relationships with California nursing agencies in connection with its NutriThrive products and services, shipping its "NutriThrive" orientation packet to prospective and actual NutriThrive customers in California, and shipping infringing NutriThrive products into California.  (Rielly Decl., ¶¶ 12-13; Okamoto Decl., ¶¶ 6-13; Bundy Decl., ¶ 3-5.)  Even if BioRx sold only one NutriThrive product or service within this State, there would be sufficient purposeful direction for a finding of specific jurisdiction.  *See, e.g., MCA Records, Inc. v. Charly Records, Ltd.*, 1997 U.S. App. LEXIS 3684, *8 (9th Cir. 1997)  ("By advertising and selling allegedly infringing products in California, a party should reasonably expect to be haled into a California court to defend an infringement action."); *George Kessel Int'l, Inc. v. Classic Wholesales, Inc.*, 2007 U.S. Dist. LEXIS 83261, *16 (D. Ariz. 2007) (finding specific jurisdiction because plaintiff marketed and sold its infringing products in forum state) (citing *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223-24 (1957) (finding a single contract formed sufficient contacts for due process when contract had substantial connection to the forum state)).

(3)    BioRx Maintains an Interactive Web-site that Reaches Out to California Residents.

BioRx's "purposeful direction" also originates from BioRx's maintenance of an active web-site through which BioRx can, and in fact already has, procured NutriThrive customers.

This Circuit is all-too-familiar with the long line of cases discussing the level of "interactivity" of a web-site.  On the one hand, a passive web-site and a domain name, without anything else done "to encourage residents of the forum state" is insufficient for a finding of jurisdiction in this forum.  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1156 (9th Cir. 2006) (no personal jurisdiction where web-site operator registered domain name and posted passive web-site without anything more); *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418-20 (9th Cir.

16

1  1997) (same); *see also Bensusan Restaurant Corp., v. King*, 937 F. Supp. 295, 297

2  (S.D.N.Y.1996) (no personal jurisdiction where defendant's web-site contained only general

3  information and user had to call the number on the web-site to get further information.)

4          On the other hand, interactive web-sites subject the web-site operator to specific

5  jurisdiction in any forum where the web-site users can "exchange information with the host

6  computer." *Cybersell, Inc. v. Cybersell, Inc.*, 130 F.3d 414, 418 (9th Cir. 1997).  Examples

7  include web-sites that encourage residents of the forum state to contact them, procure customers

8  through their web-site, develop mailing lists based on web-site solicitations, and directly target

9  customers of the forum.  *See Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998);

10  *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1264- 66 (6th Cir.1996) (finding personal

11  jurisdiction where web-site operator uploaded software on the web-site for residents in forum

12  state to use, knowingly entering into a contract with forum state residents, and "deliberately and

13  repeatedly" transmitted files to the forum state); *Zippo Mfr. Co. v. Zippo Dot Com, Inc.*, 952 F.

14  Supp. 1119, 1126 (W.D. Pa. 1997) (finding personal jurisdiction where defendant contracted with

15  forum state residents and Internet Access Providers and "exchanges information" with forums

16  state residents via its web-site.);  *Maritz, Inc. v. Cybergold, Inc.*, 947 F. Supp. 1328, 1333-34

17  (E.D.Mo.1996) (finding personal jurisdiction where defendant encouraged users to add their

18  address to a mailing list that basically subscribed the user to defendant's service on the grounds

19  that defendant's conduct amounted to "active solicitations" and "promotional activities" designed

20  to "develop a mailing list of Internet users" and that the defendant "indiscriminately responded to

21  every user" who accessed the site.); *Inset Systems, Inc. v. Instruction Set*, 937 F. Supp. 161, 165

22  (D. Conn. 1996) (finding personal jurisdiction where web-site was always accessible to forum

23  state residents and defendant maintained a toll free number.); *Heroes, Inc. v. Heroes Found.*, 958

24  F. Supp. 1 (D.D.C. 1996) (finding personal jurisdiction where web page solicited contributions,

25  provided toll-free telephone number, and used the allegedly infringing trademark and logo);

26  *Blumenthal v. Drudge*, 992 F. Supp. 44, 56 (D.D.C. 1998) (finding jurisdiction over defendant

27  Matt Drudge because his web-site allows forum state residents to directly e-mail Drudge, thus

28  permitting an "exchange of information with the host computer.")

1    NutriThrive's web-site falls squarely within this Circuit's definition of an "interactive"

2    web-site because it  "permits users to exchange information with the host computer."

3    Specifically, on the "Discussion Board" page, any user within California and the Eastern District

4    can post messages or chat on-line with one of NutriThrive's "consumer advocates" – NutriThrive

5    employees who are also consumers of its products and/or services.  (Okamoto Decl., Ex. B.)  This

6    function is similar to the web-site in *Blumenthal v. Drudge*, 992  F. Supp. 44, 56 (D.D.C. 1988),

7    which permitted users to contact the defendant on-line.  Furthermore, on the "Referral" page, any

8    user can sign up to become a "NutriThrive consumer" or refer a patient to become a "NutriThrive

9    consumer."  (Okamoto Decl., ¶ B.)   Likewise, on BioRx's "Contact Us" page, any user within

10   California and the Eastern District can request further information regarding BioRx's services.

11   (Okamoto Decl., A.)  These functions are like the web-site in *Maritz, Inc.*, where users were

12   encouraged to provide defendant with their information on-line so that defendant could send them

13   further information and subscribe the user to its services.  *Maritz, Inc.*,  947 F. Supp. at 1332-33.

14       Even if the Court were to construe BioRx's NutriThrive web-site as passive, "operating

15   even a passive website in conjunction with 'something more' – such as actively encouraging

16   residents of the forum state – is sufficient to confer personal jurisdiction." *See, e.g. Rio Props. v.*

17   *Rio Int'l Interlink*, 284 F.3d 1007, 1020 (9th Cir. 2002) (finding personal jurisdiction because, in

18   addition to running passive web-site, Defendant ran radio and print advertisements in forum

19   state); *Panavision Int'l v. Toeppen*, 141 F.3d 1316, 1322 (9th Cir. 1998); *Bancroft & Masters,*

20   *Inc. v. Augusta National Inc.,* 223 F.3d 1082, 1088 (9th Cir. 2000) (finding personal jurisdiction

21   when "individualized targeting was present."); *Telco Communications v. An Apple A Day*, 977 F.

22   Supp. 404, 407 (E.D. Va. 1997) (finding personal jurisdiction where defendant posted web-site

23   advertisement, which could be accessed by forum state residents 24 hours a day, and ran two or

24   three press releases in the forum); *Digital Equipment Corp. v. Altavista Technology, Inc.*, 960 F.

25   Supp. 456, 462 (D. Mass. 1997) (maintenance of web site that can be accessed by Massachusetts

26   citizens 24 hours a day coupled with other contacts is persistent course of conduct sufficient to

27   confer personal jurisdiction).   In this case, even if BioRx's and NutriThrive's web-site were

28   considered "passive," it does "something more" by actively "encouraging residents of the forum

940766.2                                      18

1    state," touting its licenses to conduct business in most states and boasting a clinical staff that

2    "reaches all 50 states."  (Okamoto Decl., Ex. A.)  NutriThrive's web-site also targets residents of

3    California by featuring as the centerpiece of its home page an announcement regarding the San

4    Diego Oley Conference. (*Id.*, Ex. B.) As noted above, BioRx's efforts to encourage California

5    residents have succeeded, as BioRx has customers in California.

6         For these reasons, BioRx's purposeful directed its infringing activities to this forum.

7              **c.    Nutrishare's Claims "Arise Out Of" BioRx's Minimum Contacts.**

8         Nutrishare's Complaint alleges causes of action for trademark infringement and unfair

9    competition.  (*See* Complaint filed 6/4/08.)  These causes of action directly "arise out of" BioRx's

10   contacts with the State of California, including its advertising and marketing of NutriThrive

11   products, its maintenance of an interactive web-site for its NutriThrive products, its

12   representations to California customers that it will provide NutriThrive products to California

13   residents, its mailing of NutriThrive promotional materials (including a Patient Orientation

14   packet) to California customers, and its shipment of the infringing NutriThrive products to

15   California residents pursuant to its licenses with the California Board of Pharmacy.

16        BioRx's argument that Nutrishare's claims do not "arise out of" BioRx's California

17   contacts hinges on the misplaced notion that this Court should disregard any of BioRx's contacts

18   with this State related to its non-TPN products – including the fact that it has at least two

19   customers within this State for the NutriThrive enteral nutrition products – because its California

20   customers "utilize products that are not competitive with the TPN products offered by Plaintiff."

21   (Motion at 2:13-14.)  This argument constitutes and attempt to mislead the Court with a red

22   herring.

23        As an initial matter, BioRx's argument has no factual basis.  First, the overwhelming

24   evidence showing that BioRx does in fact have customers for the NutriThrive TPN products

25   within this State, and indeed, within this district.  (Okamoto Decl., ¶ 6, Ex. D, ¶ 11, Rielly Decl.,

26   ¶¶ 12-13.)  Second, Nutrishare also provides enteral nutrition products and services to its TPN

27   customers.  (Okamoto Decl., ¶ 14.)  The products and services offered by the parties are therefore

28   competitive.

1    More importantly, BioRx's argument has no legal basis.  Under controlling law – which

2  BioRx entirely ignores – BioRx's sales of even completely unrelated and noncompetitive

3  products under the "NutriThrive" name can give rise to trademark infringement and unfair

4  competition, as long as there is a likelihood of confusion about the source, affiliation,

5  sponsorship, or relationship of the products and services offered by the two parties.

6    Competition between the parties is but one of eight factors the Court must evaluate to

7  determine whether the relevant consuming public is likely to be confused.  *AMF Inc. v. Sleekcraft*

8  *Boats*, 599 F.2d 341, 348 (9th Cir. 1979).  In fact, the *Sleekcraft* test was developed for the very

9  purpose of determining if there is infringement when the products "are not in direct competition"

10  *Id.* at 348 (emphasis added).  McCarthy's treatise on trademark law also echoes the sentiment that

11  "The vast majority of modern decisions have adopted the rule that competition is not necessary

12  between the parties for there to be a likelihood of confusion."   4 J. Thomas McCarthy, <u>McCarthy</u>

13  <u>on Trademarks and Unfair Competition</u> §24:13 (3d ed. 2008).  The Trademark Manual of

14  Examining Procedure, published by the United States Patent and Trademark Office, likewise

15  provides:

16    The goods or services do not have to be identical or even competitive in order to
17    determine that there is a likelihood of confusion. . . . The issue is not whether the goods
     will be confused with each other, but rather whether the public will be confused about
18    their source.

19  TMEP § 1201(a)(i).

20    Following this rationale, numerous courts of this and other circuits have held there to be

21  infringement notwithstanding that the parties' products and/or services were not competitive.  *See*

22  *e.g. Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002) (ENTREPRENEUR

23  for public relations company held likely to be confused with ENTREPRENEUR for magazine);

24  *Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131-32 (9th Cir. 1998)

25  (DREAMWORKS for film studio held likely to be confused with DREAMWERKS for company

26  that promotes science fiction merchandise and organizes Star Trek conventions); *E. & J. Gallo*

27  *Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (GALLO for cheese held likely

28  to be confused with GALLO for wine and salame). *Fleischmann Distilling Corp. v. Maier*

OPPOSITION TO MOTION TO DISMISS OR TRANSFER

1  *Brewing Co.,* 314 F.2d 149, 151 (9th Cir. 1963) (BLACK AND WHITE for beer held likely to be

2  confused with BLACK AND WHITE for whisky); *On-line Careline Inc. v. America Online Inc.,*

3  229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000) (ON-LINE TODAY for Internet connection

4  services held likely to be confused with ONLINE TODAY for Internet content); *In re Martin's*

5  *Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984) (MARTIN'S for

6  wheat bran and honey bread held likely to be confused with MARTIN'S for cheese); *In re*

7  *Corning Glass Works*, 229 USPQ 65 (TTAB 1985) (CONFIRM for a buffered solution

8  equilibrated to yield predetermined dissolved gas values in a blood gas analyzer held likely to be

9  confused with CONFIRMCELLS for diagnostic blood reagents for laboratory use); *In re Jeep*

10  *Corp.*, 222 USPQ 333 (TTAB 1984) (LAREDO for land vehicles and structural parts therefor

11  held likely to be confused with LAREDO for pneumatic tires).  Under this law, even if

12  NutriThrive sold no TPN products – which is not true – its activities could still constitute

13  infringement as long as the public is likely to be confused.

14        Furthermore, even if NutriThrive sold only enteral nutrition products – which is also not

15  true – its activities could still constitute infringement as long as the parties' products are "likely to

16  be encountered by the same persons in situations that would create the incorrect assumption that

17  the originate from the same source."  TMEP § 1201(a)(i).  *E. & J. Gallo Winery*, 967 F.2d at 1291

18  (GALLO salame and cheese are "are sold in the same deli cases in grocery stores"); *Tillamook*

19  *Country Smoker v. Tillamook County Creamery Ass'n*, 311 F. Supp. 2d 1023, 1042 (D. Or. 2004)

20  (defendant's TILLAMOOK cheese and plaintiff's TILLAMOOK smoke meats "appear in the

21  same supermarkets and thus are likely to be encountered by consumers during the same shopping

22  trip").  BioRx cannot deny that its NutriThrive enteral products and services and Nutrishare's

23  TPN products and services are likely to be encountered by the same consumer in the marketplace;

24  that is, BioRx and Nutrishare would be in the same proverbial "aisle" of an on-line drug store.

25        For the foregoing reasons, this Court has specific jurisdiction over BioRx because

26  Nutrishare's claims "arise out of" all of BioRx's contacts with this state related to any and all

27  products and services sold under the "NutriThrive" name – TPN, enteral, or otherwise.

28

3.    **Exercise of Jurisdiction in this Forum Is Reasonable.**

Because Nutrishare has proffered sufficient evidence to establish a *prima facie* case of both general and specific jurisdiction, personal jurisdiction is presumptively reasonable, and BioRx bears the burden of "present[ing] a compelling case" that the exercise of jurisdiction would be so unreasonable as to violate due process. *Burger King Corp.*, 471 U.S. at 477; *Sher v. Johnson*, 911 F.2d 1357, 1364 (9th Cir. Cal. 1990). In determining the reasonableness of jurisdiction, this Circuit has identified the following factors to consider: the extent of the defendant's purposeful interjection into the forum state; the burden on the defendant of defending in the forum state; the extent of conflict with the sovereignty of the defendant's state; the forum state's interest in adjudicating the dispute; the most efficient forum for judicial resolution of the dispute; the importance of the chosen forum to the plaintiff's interest in convenient and effective relief; and the existence of an alternative forum. *Sher*, 911 F.2d at 1364; *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1198-99 (9th Cir. 1988).

BioRx has not examined any of these factors in its moving brief. Therefore, it has failed to meet its burden of "presenting a compelling case" of unreasonableness, and the Court should presume that jurisdiction is reasonable. Even if the Court were to examine the above factors, it is clear that the exercise of personal jurisdiction is reasonable.

The first factor, "purposeful interjection, is analogous to the purposeful availment factor discussed above. *Sinatra*, 854 F.2d at 1199; *see Corporate Investment Business Brokers v. Melcher*, 824 F.2d 786, 790 (9th Cir. 1987) ("Ninth Circuit cases give the 'purposeful interjectment' factor no weight once it is shown that the defendant purposefully directed its activities to the forum state. . ."). Thus, for the reasons detailed above, it does not weigh against jurisdiction.

Regarding the second factor, BioRx makes no argument as to why the exercise of jurisdiction would be burdensome, and in fact, concedes that it would be willing to litigate this matter in the U.S. District Court for the Southern District of California, (motion at 5:24-27), which is just as distant from BioRx's headquarters as is this Court. Furthermore, given that BioRx has already consented to the jurisdiction of the California Board of Pharmacy and

1  California courts with respect to issues arising from its pharmacy licenses and designated an

2  agent for service of process in Sacramento, it would not be unreasonably more burdensome for

3  BioRx to also be subject to jurisdiction of the courts of this State with respect to issues arising

4  from its infringing pharmacy operation.  Moreover, BioRx touts being a "national" home infusion

5  pharmacy with licenses in "most states" and a staff that "reaches all 50 states."  (Okamoto Decl.,

6  Ex. A)  Thus, BioRx cannot now claim that it would suffer a great burden having to litigate in

7  any one of these 50 states.  Finally, although it may at one time have been more burdensome for

8  BioRx to litigate in California than in Ohio, where it has its principal place of business, "with the

9  advances in transportation and telecommunications and the increasing interstate practice of law,

10  any burden is substantially less than in days past."  *Menken v. Emm*, 503 F.3d 1050, 1060 (9th

11  Cir. Ariz. 2007).  Thus, the second factor does not weigh in BioRx's favor.

12       The third factor, conflict with sovereignty of defendant's state, is inapplicable in this

13  instance because there is no conflict between the sovereignty of Ohio and California.

14       The fourth factor, the forum state's interest in adjudicating this dispute, weighs in favor of

15  Nutrishare.  This Circuit previously has ruled that "California maintains a strong interest in

16  providing an effective means of redress for its residents tortiously injured by commercial

17  misappropriation." *Sinatra*, 854 F.2d at 1200. As Nutrishare is a California corporation with its

18  principle place of business in California and is alleging that it has been tortiously injured by

19  BioRx's trademark infringement,  California's interest weights in favor of jurisdiction.

20       The fifth factor, efficiency of adjudication within this forum, focuses on "where the

21  witnesses and the evidence are likely to be located." *Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d

22  1482, 1489 (9th Cir. 1993).  Nutrishare is based in California and nearly all of Nutrishare's

23  witnesses reside in California.  Evidence related to Nutrishare's state law claims is also primarily

24  located in California. Thus, this factor favors Nutrishare.

25       The convenience and effectiveness of relief for the plaintiff comprise the sixth factor.

26  This forum is the only forum in which Nutrishare will be able to effectively litigate its state law

27  unfair competition claims.  Thus, this factor favors Nutrishare.

28       The final factor, the availability of an alternate forum, likewise weighs in Nutrishare's

1    favor.  Although BioRx presumably believes that this lawsuit should have been filed in federal

2    court in Ohio, "whether another reasonable forum exists becomes an issue only when the forum

3    state is shown to be unreasonable." *Sinatra*, 854 F.2d at 1201 (citation omitted).  In this case,

4    BioRx cannot show that exercise of jurisdiction in this forum would be unreasonable.

5          Taking all of the factors as a whole, BioRx has failed to make any case, let alone "a

6    compelling case," that the exercise of specific jurisdiction is so unreasonable as to violate due

7    process.

8    **B.     Venue is Proper in the Eastern District.**

9          Venue is proper in the Eastern District under 28 U.S.C. § 1391(b)(1) and (2), which

10   provide that, in a federal question case, venue is proper either where: (1) BioRx  "resides"; or (2)

11   "a substantial part of the events or omissions" on which Nutrishare's claims are based occurred.

12         **1.     Venue is Proper under 28 U.S.C. § 1391(b)(1).**

13         With respect to the residence-based venue provision, BioRx argues that it "does not reside

14   in California, but rather in Ohio."  (Motion at 5:12.)  In making this argument, BioRx fails to

15   acknowledge that the key venue provision in the U.S. Code provides that, "a defendant that is a

16   corporation shall be deemed to reside <u>in any judicial district in which it is subject to personal</u>

17   <u>jurisdiction at the time the action is commenced</u>."  28 U.S.C. § 1391(c) (emphasis added).  Courts

18   have extended this venue provision to apply to entities other than corporations, including limited

19   liability companies such as BioRx.  *Denver & Rio Grande Western R.R. Co. v. Brotherhood of*

20   *Railroad Trainmen*, 387 U.S. 556, 559–560 (1967); *Wells v. Cingular Wireless LLC*, 2006 U.S.

21   Dist. LEXIS 73664, *4 (N.D. Cal. 2006).  Thus, in the case of an entity defendant such as BioRx,

22   the federal venue statute has conflated the jurisdiction and venue inquiry into essentially the same

23   inquiry:  venue is proper in the Eastern District of California if there is jurisdiction over BioRx in

24   this district. 28 U.S.C. § 1391(c).

25         Nutrishare has already elaborated in great detail why BioRx is subject to specific

26   jurisdiction within this district.  Specifically, as already explained, BioRx is subject to general

27   jurisdiction in this district because: BioRx has already consented to the jurisdiction of the

28   California Board of Pharmacy, located in this district, as well as the courts within the Eastern

1  District of California; BioRx appointed an agent for service of process in Sacramento, California,

2  as a prerequisite to obtaining its two licenses to conduct business in this State; and discovery

3  likely will show that BioRx also has contacts with the Eastern District with respect to its non-

4  TPN product lines. *See supra* at III(A)(1). With respect to specific jurisdiction, BioRx has

5  purposefully availed itself of the privileges of conducting business within this district by not only

6  obtaining a license in this district to conduct its NutriThrive business within this district, but by

7  appointing an agent for service of process in this district and actually serving customers within

8  this district. *See supra* at III(A)(2)(a). BioRx has also purposefully directed its activities to this

9  district by intentionally infringing Nutrishare's mark with knowledge of Nutrishare's location,

10  agreeing to ship NutriThrive products and brochures to customers within this district, actually

11  shipping NutriThrive products to this district, and operating an interactive web-site that "reaches"

12  this and every other district within California. *See supra* at III(A)(2)(b). Therefore, venue is

13  proper in this Court.

14       **2.**     **Venue is Proper under 28 U.S.C. § 1391(b)(2).**

15      Venue is also proper under the venue provision that is based on where "a substantial part

16  of the events or omissions" giving rise to Nutrishare's claims occurred. Courts of this Circuit

17  have held that in a trademark infringement case, a "substantial part" of the events triggering

18  infringement occurs either where the plaintiff trademark owner is located or where the

19  infringement, *i.e.*, the likelihood of confusion, occurs. *Sidco Indus., Inc. v. Wimar Tahoe Corp.*,

20  768 F. Supp. 1343, 1346-47 (D. Or.1991) (holding venue proper in Nevada where infringer was

21  located or in Oregon where confusion was likely to occur); *United States Aluminum Corp. v.*

22  *Kawneer Co.*, 694 F. 2d 193, 195 (9th Cir. 1982) (holding venue proper where alleged patent

23  infringement occurred); *Flotsam of Cal., Inc. v. Huntington Beach Conf. & Visitors Bureau*, 2007

24  U.S. Dist. LEXIS 9472, *3 (N.D. Cal. 2007) (holding venue proper in Northern District of

25  California when defendant, based in Southern California, sold infringing t-shirts in the Northern

26  District); *Radical Prods., Inc. v. Sundays Distrib.*, 821 F. Supp. 648, 649-50 (W.D. Wash. 1992)

27  (holding venue proper when defendant mailed brochures for infringing products to district in

28  which action was filed); *Sykes Lab., Inc. v. Kalvin*, 610 F. Supp. 849, 860 n.8 (C.D. Cal. 1985)

940766.2                                                 25

1   (holding venue proper where the "passing off" or likelihood of confusion occurred).

2          In this case, Nutrishare is located within the Eastern District and BioRx's infringing

3   activities – including the mailing of brochures for its infringing products and the mailing of the

4   infringing products – occurred within the Eastern District.  Therefore, venue is proper in this

5   district under 28 U.S.C. § 1391(b)(2).

6

7   **C.      BioRx has Failed to Demonstrate Why this Matter Should Be Transferred to San Diego.**

8

9          Only two short sentences are devoted to BioRx's motion to transfer venue.  (Motion at

10  5:24-27.)  In these sentences, BioRx argues that this action should be transferred to the U.S.

11  District Court for the Southern District of California because that is where it has "limited

12  contacts." (*Id.*)  This argument falls woefully short of the requirements of the venue transfer

13  statute, 28 U.S.C. § 1404.  In fact, BioRx does not even cite this statute, let alone explain why this

14  action should be transferred to federal court in San Diego.

15         A district court has discretion to adjudicate motions for transfer according to an

16  "individualized, case-by-case consideration of convenience and fairness." *Stewart Org., Inc. v.*

17  *Ricoh Corp.*, 487 U.S. 22, 29 (1988).  In order for a district court to transfer an action under 28

18  U.S.C. § 1404, the Court must find that: (1) the transferee court is one where the action "might

19  have been brought," and (2) that the convenience of the parties and witnesses and the interest of

20  justice favor transfer.  *Hatch v. Reliance Ins. Co.*, 758 F.2d 409, 414 (9th Cir. 1985).  The second

21  part of this test involves an analysis of the following factors: (a) plaintiff's choice of forum; (b)

22  convenience of the parties and witnesses; (c) ease of access to sources of proof; (d) local interest

23  in the controversy; (e) familiarity of each forum with applicable law; and (f) relative congestion

24  in each forum.  *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th Cir. 1986)

25  (citing *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508-509 (1947)).

26         Typically, a court should give the plaintiff's choice of forum "great deference" unless the

27  defendant can show that other factors of convenience clearly outweigh the plaintiff's choice of

28  forum.  *Ellis v. Costco Wholesale Corp.*, 372 F. Supp. 2d 530, 537 (N.D. Cal. 2005) ("Where

940766.2

26

1    venue is governed by a more permissive standard, a plaintiff's choice is entitled to greater

2    deference as a matter of law.")  BioRx "must make a strong showing of inconvenience to warrant

3    upsetting plaintiff's choice of forum."  *Hope v. Otis Elevator Co.*, 389 F. Supp. 2d 1235, 1243

4    (E.D. Cal. 2005) (quoting *Decker Coal Co. v. Commonwealth Edison Co.*, 805 F.2d 834, 843 (9th

5    Cir. 1986)).

6         Because BioRx has not discussed any of the factors above, it has failed to meet its burden

7    and Nutrishare's choice of forum should prevail.

8    **D.    If The Court Does Not Deem There to Be Sufficient Jurisdictional Evidence, It
          Should Permit Limited Jurisdictional Discovery.**

9

10        Finally, if the Court believes there to be inadequate evidence regarding BioRx's contacts

11   with this State and/or district, it should permit Nutrishare to conduct limited jurisdictional

12   discovery to aid it in determining whether personal jurisdiction exists.  *Data Disc, Inc. v. Systems*

13   *Technology Associates, Inc.*, 557 F.2d 1280, 1285 n.1 (9th Cir. 1977).  In this discovery,

14   Nutrishare would seek, *inter alia*, (a) identification of and possible depositions of BioRx's and

15   NutriThrive's customers, partners, and suppliers within California and this district (and

16   specifically, the family in Redding); (b) identification of and possible depositions of medical

17   professionals, including healthcare facilities, physicians, nurses, pharmacists, and nursing

18   agencies in California with whom BioRx and NutriThrive have had a business relationship; (c)

19   financial data related to BioRx's and NutriThrive's sales of products and services within

20   California and this district; (d) historical data on BioRx's and NutriThrive's activities within

21   California and this district (including conference and meeting attendance); (e) documents related

22   to BioRx's and NutriThrive's marketing within California, including in publications circulated in

23   California and/or published in California; (f) documents related to BioRx's and NutriThrive's

24   application for pharmacy licenses, accreditations, permits, certifications, or other business-related

25   authorizations within California and this district, including before the Board of Pharmacy located

26   at 1625 N Market Blvd, N219, Sacramento, California, 95834.

27   / / /

28   / / /

940766.2

OPPOSITION TO MOTION TO DISMISS OR TRANSFER

1

## IV.    <u>CONCLUSION</u>

2    In light of the above, BioRx – a national company with California business licenses –

3    cannot in good faith maintain that it has "no contacts with California" or this District.  BioRx's

4    numerous contacts with California establish that it has such significant, continuous, and sustained

5    connections with this state to warrant even the exercise of general jurisdiction.  Even BioRx's

6    "minimum" contacts demonstrate that it should at least be subject to the specific jurisdiction of

7    this State.  Finally, not only is venue proper in this district due to BioRx's contacts with this

8    district, but BioRx has failed to meet its burden of both proving that venue is improper here or

9    that the case should be transferred elsewhere.  For the foregoing reasons, Nutrishare respectfully

10   requests that the Court deny BioRx's Motion to Dismiss or Transfer this action.

11

12   Dated:    July 28, 2008                    DOWNEY BRAND LLP

13

14                                             By:_____/s/ Michael J. Thomas_____
                                                      MICHAEL J. THOMAS
15                                                    Attorney for Plaintiff
                                                      Nutrishare, Inc

16

17

18

19

20

21

22

23

24

25

26

27

28

940766.2

OPPOSITION TO MOTION TO DISMISS OR TRANSFER