1  DOWNEY BRAND LLP
   MICHAEL J. THOMAS (Bar No. 172326)
2  APARNA RAJAGOPAL-DURBIN (Bar No. 218519)
   555 Capitol Mall, Tenth Floor
3  Sacramento, CA  95814-4686
   Telephone:     (916) 444-1000
4  Facsimile:      (916) 444-2100
   E-mail: mthomas@downeybrand.com
5  E-mail: adurbin@downeybrand.com

6  Attorneys for Plaintiff
   Nutrishare, Inc.
7

8                  UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10

11 Nutrishare, Inc., a California corporation,        Case No.  2:08-CV-01252-WBS-EFB

12              Plaintiff,                            **REPLY IN SUPPORT OF MOTION FOR
                                                     PRELIMINARY INJUNCTION**
13      v.

14 BioRx, LLC, an Ohio Limited Liability             **ORAL ARGUMENT REQUESTED**
   Company,
15                                                   Date:       August 18, 2008
                Defendant.                           Time:       2:00 p.m.
16                                                   Dept:       Courtroom 5
                                                     Judge:      Hon. William B. Shubb
17

18

19

20

21

22

23

24

25

26

27

28

944404.2

1

**TABLE OF CONTENTS**

2

**Page**

3   I.      INTRODUCTION ...................................................................................................1

4   II.     LEGAL ARGUMENT ...........................................................................................2

5           A.      NUTRISHARE IS LIKELY TO SUCCEED ON THE MERITS OF ITS
                    CLAIMS ......................................................................................................2

6                   1.      Nutrishare Has Established a "Likelihood of Confusion." ..........2

7                           a.      Strength of the Mark .........................................................2

8                           b.      Similarity of the Marks .....................................................7

9                           c.      Evidence of Actual Confusion...........................................8

10                          d.      Degree of Purchaser Care ................................................10

11                          e.      Intent to Deceive Consumers...........................................12

                            f.      Proximity of the Products and Services Offered by the Parties .....12

                    2.      BioRx's Federal Trademark Application for "NutriThrive" Is Not a
                            Defense to this Action .................................................................15

12                          a.      NutriThrive's Notice of Allowance is Not a Defense to Trademark
                                    Infringement ...................................................................15

13

14                          b.      That Nutrishare Has Not Yet Challenged the NutriThrive Mark at
                                    the USPTO is Also Not a Defense to Trademark Infringement .....16

15                  3.      BioRx Cannot Establish an Affirmative Defense of Laches ....................17

16                          a.      There is a Strong Presumption that Laches is Inapplicable Because
                                    Nutrishare Filed its Lawsuit Within Four Years ........................17

17                          b.      Laches is also Inapplicable Under the Six E-Systems Factors.......18

18                          c.      The doctrine of Inevitable Confusion Also Bars BioRx's laches
                                    defense.................................................................................22

19          B.      NUTRISHARE WILL SUFFER IRREPARABLE HARM UNLESS
                    BIORX IS ENJOINED FROM USING THE "NUTRITHRIVE" MARK...........22

20                  1.      Erosion of Nutrishare's Market Share Qualifies as Irreparable Harm
                            Entitling Nutrishare to a Preliminary Injunction....................................22

21                  2.      In Addition to the Erosion of its Market Share, Nutrishare Has Lost
                            Control Of its Brand and Reputation to a Newcomer Who May
22                          Tarnish It.........................................................................................23

23                  3.      Nutrishare's Delay Does Not Preclude Irreparable Harm .........................24

24          C.      THE BALANCE OF THE HARDSHIPS STRONGLY TIPS IN
                    NUTRISHARE'S FAVOR................................................................................24

25          D.      A PRELIMINARY INJUNCTION WILL PROTECT THE PUBLIC
                    INTEREST ................................................................................................26

26   III.    CONCLUSION ....................................................................................................27

27

28

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1

**TABLE OF AUTHORITIES**

2

Page

3

**FEDERAL CASES**

4    *Alfacell Corp. v. Anticancer Inc.,*
     71 U.S.P.Q.2d 1301 (C.D. Cal. 2004) .................................................................5, 11, 27
5

   *American Int'l Group v. American Int'l Bank,*
6      926 F.2d 829 (9th Cir. 1991) ............................................................................... 8

7    *AMF Inc. v. Sleekcraft Boats,*
     599 F.2d 341 (9th Cir. 1979) ............................................................................2, 13
8

   *Au-Tomotive Gold, Inc. v. Volkswagen of Am., Inc.,*
9      457 F.3d 1062 (9th Cir. 2006) ............................................................................ 8

10    *Brookfield Communs. v. W. Coast Entm't Corp.,*
     174 F.3d 1036 (9th Cir. 1999) ........................................................................2, 10, 12
11

   *Century 21 Real Estate Corp. v. Magee,*
12      19 U.S.P.Q.2d 1530 (C.D. Cal. 1991) ................................................................ 5

13    *Champions Golf Club v. Champions Golf Club,*
     78 F.3d 1111 (6th Cir. 1996) .............................................................................. 10
14

   *Daddy's Junky Music Stores v. Big Daddy's Family Music,*
15      109 F.3d 275 (9th Cir. 1997) .............................................................................. 12

16    *Dreamwerks Production Group, Inc. v. SKG Studio,*
     142 F.3d 1127 (9th Cir. 1998) ............................................................................ 14
17

   *E. & J. Gallo Winery v. Gallo Cattle Co.,*
18      967 F.2d 1280 (9th Cir. 1992) ............................................................................ 14

19    *Earth Technology Corp. v. Environmental Research & Technology, Inc.,*
     222 U.S.P.Q. 585 (C.D. Cal. 1983) .................................................................... 5
20

   *Earthquake Sound Corporation v. Bumper Industries, Inc.,*
21      188 F.3d 513 (9th Cir. 1999).............................................................................. 7

22    *Eclipse Associates Ltd. v. Data General Corp.,*
     894 F.2d 1114 (9th Cir. 1990) ............................................................................ 9
23

   *Entrepreneur Media, Inc. v. Smith,*
24      279 F.3d 1135 (9th Cir. 2002) ............................................................................ 13

25    *Ethicon, Inv. v. American Cyanamid Company*
     192 U.S.P.Q. 647 (TTAB 1976) .........................................................................23, 27
26

   *Fleischmann Distilling Corp. v. Maier Brewing Co.,*
27      314 F.2d 149 (9th Cir. 1963) .............................................................................. 14

28

ii

1

### TABLE OF AUTHORITIES
### (continued)

2

Page

3    *Geigy Chemical Corp. v. Atlas Chemical Indus., Inc.*,
         58 C.C.P.A. 972 (C.C.P.A. 1971) ................................................................ 11
4
     *GoTo.com, Inc. v. The Walt Disney Co.*, 202 F.3d 1199 (9th Cir. 2000) ...................................... 2
5
     *Guaber, S.P.A. v. Nutri-Metics Int'l, Inc.*,
6        1991 U.S. App. LEXIS 10842 (Fed. Cir. 1991) ......................................... 5
7    *In re Corning Glass Works*,
         229 USPQ 65 (TTAB 1985) ........................................................................ 14
8
     *In re Jeep Corp.*,
9        222 USPQ 333 (TTAB 1984) ...................................................................... 14
10   *In re Martin's Famous Pastry Shoppe, Inc.*,
         748 F.2d 1565 (Fed. Cir. 1984) .................................................................. 14
11
     *In Re Merck. & Co.*
12       1982 TTAB LEXIS 35 (TTAB 1992) .......................................................... 27
13   *In re National Data Corp*,
         753 F.2d 1056 (Fed. Cir. 1985) ................................................................... 5
14
     *Kroger Co. v. Suprex, Inc.*,
15       193 U.S.P.Q. 245 (E.D. Pa. 1976) .............................................................. 10
16   *Lambert Pharmacal Co. v. Kalish Pharmacy*,
         219 F. 323 (C.C.N.Y. 1911) .......................................................................... 8
17
     *McLeod v. Hosmer-Dorrance, Inc.*,
18       1976 U.S. Dist. LEXIS 12289, 192 U.S.P.Q.683 (C.D. Cal. 1976) .................... 26
19   *Nutri/System, Inc. v. Con-Stan Industries, Inc.*,
         809 F.2d 601 (9th Cir. 1987) ................................................................2, 3, 4
20
     *Official Airlines Guides, Inc. v Goss*,
21       6 F.3d 1385 (9th Cir. 1993) ...................................................................4, 12
22   *On-line Careline Inc. v. America Online Inc.*,
         229 F.3d 1080 (Fed. Cir. 2000) .................................................................. 14
23
     *Paul Sachs Originals Co. v. Sachs*,
24       325 F.2d 212 (9th Cir. 1963) ........................................................................ 5
25   *Personeta, Inc. v. Persona Software, Inc.*,
         418 F.Supp.2d 1013 (N.D. Ill., 2005)........................................................... 7
26
     *Rodeo Collection, Ltd v. West Seventh*,
27       812 F.2d 1215 (9th Cir. 1987) ................................................................. 4, 8

28

iii

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1

2

**TABLE OF AUTHORITIES**
(continued)

Page

*Russell v. Caesar,*
   62 U.S.P.Q.2d 1125 (N.D. Cal. 2001) ............................................................. 5

*Steinway & Sons v. Demars & Friends,*
   210 U.S.P.Q. 954, 1981 U.S. Dist. LEXIS 15169, at *36 (C.D. Cal. 1981) ...................... 10

*Stork Restaurant v. Sahati,*
   166 F.2d 348 (9th Cir. 1948.) ...................................... 12

*Syntex Laboratories, Inc. v. Norwich Pharmacal Co.,*
   437 F.2d 566 (2d Cir. 1971) ........................................ 11

*Thane Int'l v. Trek Bicycle Corp.,*
   305 F.3d 894 (9th Cir. 2002) ....................................... 9

*Tillamook Country Smoker v. Tillamook County Creamery Ass'n,*
   311 F. Supp. 2d 1023 (D. Or. 2004)................................ 14

*Watts Health Systems, Inc. v. United Healthcare Corp.,*
   960 F. Supp. 1431 (C.D. Cal. 1996)................................ 26

**FEDERAL STATUTES**

15 U.S.C. § 1125(a) ........................................................ 10

**STATE STATUTES**

Bus. & Prof. Code § 4051 .................................................... 3

**OTHER AUTHORITY**

4 J. Thomas McCarthy,
   MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION §23:41 (4th ed. 2008)7, 12, 13, 19, 20, 2

THE NEW SHORTER OXFORD ENGLISH DICTIONARY (ed. Leslie Brown),
   Clarendon Press, Oxford (1993), at 671 ........................... 7

Trademark Manual of Examining Procedure § 1201(a)(i).................13, 14

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

# I.    **INTRODUCTION**

After establishing its brand identity and reputation over nearly two decades of hard work and dedication to its patients, Nutrishare is now in the untenable position of not only losing market share to a copycat business, but of now having the reputation of its brand name at risk of being tarnished or destroyed altogether while in the hands of a third party.  That is the necessary result when a competitor such as defendant Nutrithrive here begins using a mark that is likely to cause consumer confusion as to the source, sponsorship, or affiliation.  Aside from the presumption of irreparable harm the flows from the likelihood of confusion determination, the threatened loss of market share from a direct competitor also establishes irreparable harm.

BioRx's opposition is replete with hyperbole and overstatements.  None of its arguments have any merit.  Laches is not a defense to this action or this motion.  The Nutrithrive mark is strong, and all of the *Sleekcraft* factors weigh in favor of a finding of infringement.  Recognizing the weakness of its arguments, BioRx engages in an effort at misdirection, and would have the Court believe that Nutrishare's motion seeks to "shut down NutriThrive" and prevent BioRx from "providing enteral care and other infusion products and services," (Opposition to Motion for Preliminary Injunction, filed 8/4/08 (hereinafter "Opp.") at 19:16.).  This could not be farther from the truth.  Nutrishare merely seeks an injunction requiring BioRx to cease using a name which is likely to cause consumer confusion.  BioRx can continue to engage in any business it chooses, as long as it does so in a manner that is not likely to cause consumer confusion.

Where, as in this case, the public welfare is also implicated in view of the nature of the competing pharmaceutical products at issue, the need to avoid consumer confusion is that much more compelling.  This case is about "dangerous drugs or dangerous devices" as defined by the California Business & Professions Code, which are prescribed by doctors and dispensed by licensed pharmacies.  Confusion about source, affiliation, sponsorship, or relationship of such products could lead to tragic consequences.  Accordingly, preliminary injunctive relief to protect both Nutrishare and the consuming public during the pendency of this action is absolutely necessary and appropriate.

944404.2

1

## II.    LEGAL ARGUMENT

**A.    NUTRISHARE IS LIKELY TO SUCCEED ON THE MERITS OF ITS CLAIMS.**

### 1.    Nutrishare Has Established a "Likelihood of Confusion."

In its moving brief, Nutrishare demonstrated why it is likely to prevail on each of the eight "likelihood of confusion" factors under *AMF Inc. v. Sleekcraft Boats*, 599 F.2d 341, 348 (9th Cir. 1979). BioRx's response incorrectly analyzes several of the factors, and completely fails to address two critical *Sleekcraft* factors: (1) the relatedness or proximity of the goods and services; and (2) the marketing channels used. (*See generally* Opp.) BioRx's failure to discuss these key factors can only mean that BioRx admits that: (1) the NutriThrive goods and services are essentially identical to Nutrishare's goods and services; and (2) both parties utilize identical marketing channels. BioRX's failure to addresses these factors strongly suggest that Nutrishare is likely to succeed on the merits of its claims. *See Brookfield*, 174 F.3d at 1054 (relatedness of goods and services "will always be important"); *GoTo.com, Inc. v. The Walt Disney Co.*, 202 F.3d 1199, 1207 (9th Cir. 2000) *GoTo.com*, 202 F.3d at 1207 (use of same marketing channels, especially the Internet, "is particularly susceptible to a likelihood of confusion.")

Even if the Court were to consider the remaining *Sleekcraft* factors, BioRx's arguments on these factors are unavailing.

#### a.    Strength of the Mark.

In its moving brief, Nutrishare demonstrated why the "Nutrishare" mark at a minimum is entitled to protection as a "suggestive" mark under *Nutri/System, Inc. v. Con-Stan Industries, Inc.*, 809 F.2d 601 (9th Cir. 1987), which holds that Plaintiff's "Nutri/System" mark was entitled to protection as a "suggestive" mark. Furthermore, Nutrishare established that its seventeen-year campaign of building a name and reputation around its "Nutrishare" mark has only strengthened the mark.

BioRx's response turns the *Nutri/System* case on its head and argues that, if the *Nutri/System* court found "Nutri"-prefix marks to be suggestive in "food and health products field" (*Nutri/System,* 809 F.2d at 605), then that necessarily means that "Nutri"-prefix marks are

1   generic or descriptive in the nutrition industry and not entitled to protection.[1]  BioRx's argument

2   is belied by its own actions, and characterization of the products and services at issue in this case.

3   This case is not about energy bars, Vitamin Water or any other run-of-the-mill "nutritional"

4   product, as BioRx would have the Court believe.  This case is about "dangerous drugs or

5   dangerous devices" as defined by the California Business & Professions Code.  *See* Bus. & Prof.

6   Code § 4051.  This case is about medicine and pharmaceuticals.  If parenteral and enteral

7   nutrition were not medicine, but rather, simply a nutritional product such as baby formula, then

8   there would be no requirement that <u>doctors</u> prescribe, or that <u>licensed pharmacies</u> dispense it. (*see*

9   Opp. at 3:21-22).  There would have been no reason for BioRx to obtain a <u>pharmacy license</u> with

10  the California Board of Pharmacy.  There would have been no basis for BioRx to have applied for

11  registration of the "NutriThrive" name in the category of "<u>medical services</u>" and "<u>pharmaceutical</u>

12  <u>preparations</u>." (*See* Opp. at 4:27-5:7.)  BioRX took all of these actions because it clearly

13  understands and admits that the products and services that it and Nutrishare provide are

14  pharmaceuticals.

15      Furthermore, although *Nutri/Systems* represents an example of a case involving "Nutri"-

16  prefix marks, that is the extent of its relevance to this case: that is, it is only an example and its

17  "likelihood of confusion" analysis is by no means controlling.  Likelihood of confusion is

18  determined on a case-by-case basis only after examining all eight *Sleekcraft* factors.

19  Accordingly, just because the Ninth Circuit previously held a "Nutri"-prefix mark not to be

20  infringed in one unique situation, does not mean that all courts of this circuit should across the

21  board find that "Nutri"-prefix marks are not entitled to any trademark protection.

22      More importantly, although the marks at issue in *Nutri/Systems*, like the marks at issue in

23  this case, contain "Nutri" prefixes, the similarity in the cases ends there.  Specifically:

24      •    *Nutri*/Systems was about health food products. *Id.* at 605.  By contrast, this case
25           is about medical products and pharmaceuticals.

26      •    The competing marks in *Nutri/Systems* – "Nutri/Systems" and "Nutri-Trim" –
           were completely dissimilar, containing different punctuations between the

27

28  ───────────────────────────────
[1] Interestingly, by applying for a federal trademark for the mark Nutrithrive, BioRX is necessarily representing to the
    USPTO that its mark is distinctive and entitled to full protection under the Lanham Act.

944404.2

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

"Nutri" prefix and the suffix, and containing completely different suffixes that do not share the same number of syllables or other linguistic characteristics. *Id.* at 606. By contrast, the marks in this case are very similar, both containing no punctuations between the "Nutri" prefix and the suffixes, and both containing single-syllable suffixes that begin with rhyming digraphs and end in a silent "e."

- The marketing channels and customer base for the products and services in *Nutri/Systems* were completely different, with both parties serving different socioeconomic groups. *Id.* By contrast, the marketing channels in this case are identical.

- The defendant in *Nutri/Systems* had been using the "Nutri"-prefix to market its products long before the plaintiff even existed. *Id.* at 606. By contrast, BioRx began using the "Nutri" prefix only one year ago and sixteen years after Nutrishare started using the "Nutri" prefix to identify its products and services.

- The sales volumes in *Nutri/Systems* were so high that the few instances of actual confusion were considered "de minimis." *Id.* By contrast, here, the sales volumes of the parties' products are so low – in the tens (Opp. at 5:26-27) – that even a single instance of actual confusion is highly probative.

In addition to improperly relying on the *Nutri/Systems* case, BioRx also improperly dissects the "Nutrishare" mark to argue that the "Nutri" root stem is generic of nutritional products, and therefore entitled to little weight in considering a likelihood of confusion. However, the strength of the "Nutrishare" mark should not be determined by dissecting the mark into separate components, but rather, by analyzing the mark "in its entirety and in the context of [the relevant] services, not piecemeal and in the abstract." *Rodeo Collection, Ltd v. West Seventh*, 812 F.2d 1215, 1218 (9th Cir. 1987) (West Seventh mistakenly focused on part of Rodeo's mark, 'collection,' and then argued that the overall mark was weak because the phone book revealed eleven other business uses of the term 'collection.'); *Official Airlines Guides, Inc. v Goss*, 6 F.3d 1385 (9th Cir. 1993) ("under the anti-dissection rule, the validity and distinctiveness of a composite trademark is determined by viewing the trademark as a whole, as it appears in the marketplace.") Thus, one must consider the specific associations that the *composite* mark triggers in the minds of consumers when it is used on the identified goods and/or services. In this case, customers are unlikely to dissect the marks and consider the "thrive" and "share" portions independently of the "Nutri" prefixes. And indeed, as explained in Nutrishare's moving brief, it is the "Nutri" prefixes that will dominate the minds of the consumers as they observe the marks in

1  the marketplace.[2]

2      As further "support" for its erroneous argument that the "Nutrishare" mark is allegedly

3  weak, BioRx cites to examples of marks where the USPTO purportedly "required a disclaimer of

4  the phrase 'nutri' or 'nutra'." (Opp. at 8:25-9:8.) BioRx opines "[t]his list of disclaimed

5  Nutri/Nutra marks is further evidence that 'nutri' is a weak source identifier for nutrition

6  products."

7      Given BioRX's reliance on US Patent and Trademark Office practice, one must question

8  why BioRX chose not to disclose the *Guaber, S.P.A. v. Nutri-Metics Int'l, Inc.*, 1991 U.S. App.

9  LEXIS 10842, 1-5 (Fed. Cir. 1991) decision. In that case, the Court of Appeals for the Federal

10  Circuit affirmed the TTAB's determination that the marks "Nutromed" and "Nutri-metrics" were

11  likely to cause consumer confusion.

12     Moreover, BioRx's purported list of disclaimers (Opp. at 8:27-28) is evidence of nothing.

13  As a matter of law, "the technicality of a disclaimer . . . has no legal effect on the issue of

14  likelihood of confusion" because (1) "The public is unaware of what words have been disclaimed

15  during prosecution of the trademark application at the PTO;" (2) "The power of the PTO to

16  accept or require disclaimers is discretionary under the statute;" and (3) "its practice over the

17  years has been far from consistent." *In re National Data Corp*, 753 F.2d 1056 (Fed. Cir. 1985).

18  A review of the USPTO file history of other marks containing the "Nutri" prefix only confirms

19  that the USPTO is indeed inconsistent in requiring a disclaimer of "Nutri," and follows no

20  particular formula in this regard. (Declaration of Ellen Tenud in support of Reply in support of

21  Motion for Preliminary Injunction, filed herewith (hereinafter "Tenud Decl."), ¶ 6, Ex. C.) Thus,

22  "it is inappropriate to give the presence or absence of a disclaimer any legal significance." *Id.*

23  [2]  Contrary to BioRx's assertion that Nutrishare has improperly dissected the marks by noting that the "nutri" prefix is
the dominant feature of the mark, (Opp. at 11:3-4), as discussed in Nutrishare's moving brief, focusing on the
24  dominant "Nutri" feature of the mark "does not amount to a dissection of the mark" (*Guaber*, 1991 U.S. App. LEXIS
10842 at * 3; McCarthy, § 23:42) and courts of this circuit have routinely found a likelihood of confusion based on
25  the parties' use of identical dominant features. *See, e.g., Paul Sachs Originals Co. v. Sachs,* 325 F.2d 212 (9th Cir.
1963); *Century 21 Real Estate Corp. v. Magee*, 19 U.S.P.Q.2d 1530 (C.D. Cal. 1991) ("CENTURY 21" and
26  "CENTURY 31" for real estate services); *Earth Technology Corp. v. Environmental Research & Technology, Inc.*,
222 U.S.P.Q. 585 (C.D. Cal. 1983) ("ERT" and "ERTEC" for environmental consulting services; preliminary
27  injunction granted); *Alfacell Corp. v. Anticancer Inc.*, 71 U.S.P.Q.2d 1301 (C.D. Cal. 2004) ("ONCANASE" and
"ONCASE" for anti-cancer drugs); *Russell v. Caesar*, 62 U.S.P.Q.2d 1125 (N.D. Cal. 2001) ("RABBIT RIDGE" and
28  "RABBIT HILL" for wine).

944404.2

5

1    Furthermore, without reviewing the history of each of the marks in BioRx's "list," it is impossible

2    to know if the disclaimed matter was disclaimed voluntarily, or *required* by the USPTO.  What

3    Nutrishare does know is that  the first three references relied upon by BioRx are all for the

4    identical mark, owned by the same entity. (*See* Declaration of Steven Coffaro in support of Opp.,

5    filed 8/4/08, Ex. C.)  Therefore, BioRx's alleged evidence of disclaimers is unavailing.

6         BioRx also attempts to contrive a "crowded" field of "Nutri" prefix marks in the

7    parenteral nutrition industry by listing three trademark registrations that BioRx alleges show

8    "entities offering parenteral nutrition-related products and services that currently use a 'nutri'

9    prefix." (Opp. at 9:19-26.)  This argument too holds no water.  First, two of these registrations

10   have been cancelled.  (*See id.*)  Second, the existence of one live trademark registration does not

11   constitute proof that the owner of that registration currently offers parenteral nutrition-related

12   products and services.  Succinctly stated, the fact that these registrations exist on paper or on the

13   USPTO's Register has no bearing in the real world.

14         Next, BioRx refers to two website addresses – www.nutrepletion.com and

15   www.nutricia.com – to support the argument that "the marketplace includes other providers of

16   nutritional therapies with similar names."  (Opp. at 10-11.)  Initially, there is no evidence before

17   the court as to what markets these supposed businesses actually serve, what geographic regions

18   they serve, or whether the are able to actually in business.

19         Moreover, a review of these websites reveals that "Nutrepletion Resources" and

20   "Nutricia" are merely trade names of businesses, and not product identifiers.  (Tenud Decl., ¶ 7.)

21   In fact, Nutricia uses other trademarks for its supposed products such as Nutilis, Nutrilon Royal,

22   Forticare, and Flocare.  (*Id.*)  In addition, neither Nutricia nor Nutrepletion offers total parenteral

23   services.  (*Id.*)  Therefore, BioRx's assertions that the existence of these two websites and the use

24   of these trade names "conclusively shows" that Nutrishare's mark "is neither unique or

25   uncommon" is simply false.

26         In summary, the "Nutrishare" mark, when considered as a whole as it must be considered,

27   is a strong mark and this factor weighs in favor of finding a likelihood of confusion.

28   / / /

944404.2

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1          **b.     Similarity of the Marks.**

2          The "Nutrishare" and "NutriThrive" marks are confusingly similar on several grounds.

3     Both marks start with the identical term "Nutri" and end with single syllable suffixes that are

4     nearly the same in length (5 versus 6 letters), and which begin with the rhyming digraphs[3] "sh"

5     and "th," followed by "are" and "rive," which contain silent "e's."  Moreover, the two marks

6     share the same cadence, word structure, and differ in length only by one letter, and neither has

7     any punctuation.  *See, e.g., Earthquake Sound Corporation v. Bumper Industries, Inc.*, 188 F.3d

8     513 (9th Cir. 1999) (finding likelihood of confusion where "Both Earthquake and Carquake are

9     one word, two syllable marks of the same length, ending in 'quake.'"); *Personeta, Inc. v. Persona*

10    *Software, Inc.*, 418 F.Supp.2d 1013, 78 U.S.P.Q.2d 1142 (N.D. Ill., 2005) (finding likelihood of

11    confusion between "Personeta, Inc." and "Persona Software, Inc." on the grounds that "both

12    marks have the identical six letters, and both end in an 'a.' [and] although Personeta contains an

13    extra syllable,  the term 'person' is identical in the two names"

14         In its argument that the "Nutrishare" and "NutriThrive" marks are not similar, BioRx

15    engages in a side-by-side comparison and dissection of the marks at issue, neither of which are

16    the proper test for determining likelihood of confusion. *See* McCARTHY ON TRADEMARKS AND

17    UNFAIR COMPETITION (hereinafter "McCARTHY"), § 23:41 (Fourth Ed. 2008).

18         Side-by-side comparisons are inappropriate based on the common sense observation that

19    the impression of a mark is created by the purchaser's cursory reaction to a mark in the

20    marketplace, not a meticulous comparison of it to others to access possible legal differences or

21    similarities.  Indeed, purchasers do not have the luxury of making a side-by-side comparison

22    between the marks.  They are not infallible in their recollection of trademarks and often retain

23    only a general overall commercial impression of marks that they may have previously seen in the

24    marketplace.  This is particularly true in the present case because the marks are visually seen at

25    separate times in the point-and-click world of the Internet, where slight differences are not likely

26    to be noted or remembered by consumers and where their respective digraphs – "sh and "th" –

27    _____

28    [3] A digraph is a linguistic term for a pair of letters representing a single speech sound, as "ea" in meat or "th" in path.
THE NEW SHORTER OXFORD ENGLISH DICTIONARY (ed. Leslie Brown), Clarendon Press, Oxford (1993), at 671.

1   can be easily mistaken for each other.

2        Nor is dissection appropriate.  It is well-settled that composite marks should be examined

3   in their entirety, not piece by piece.  *Rodeo*, *supra*.   This is because the commercial impression of

4   a mark on an ordinary consumer is created by the mark as a whole, and not only by its component

5   parts.  In this respect, the Court must look beyond the mere suggestiveness or descriptiveness of

6   any one portion or component of the marks and evaluate the likelihood of confusion on the basis

7   of the commercial impression that the marks as a whole convey to prospective purchasers.

8        It is furthermore unlikely that purchasers will be able to mentally and visually dissect the

9   marks into two separate components, disregard the identical term "Nutri," and compare only

10  "share" to the "Thrive."  Rather, consumer, being familiar with Nutrishare's mark, and

11  encountering the "NutriThrive" mark on identical goods, likely will confuse the marks, and

12  misremember one as the other, or mistakenly conclude that there is an association, sponsorship, or

13  affiliation between Nutrithrive and Nutrishare.  *Au-Tomotive Gold, Inc. v. Volkswagen of Am.,*

14  *Inc.,* 457 F.3d 1062, 1075-76 (9th Cir. 2006).  ("There is a likelihood of confusion when

15  consumers who see a mark 'would probably assume that the product or service it represents is

16  associated with the source of a different product or service identified by a similar mark.'");

17  *Lambert Pharmacal Co. v. Kalish Pharmacy*, 219 F. 323 (C.C.N.Y. 1911) ("The trade-name

18  [Listerseptine] was chosen by the defendant…about 17 years after complainant's origination of

19  the trade-mark 'Listerine.'  The similarities of the names in appearance and sound, when

20  considered with the similarity of the articles to which the trade-names are applied, is clearly

21  apparent, and the probabilities of the defendant's designation misleading the unwary customer in

22  my opinion is so clear that it amounts to infringement of the complainant's trade-mark.")

23        Thus, the "Nutrishare" and "NutriThrive" marks are highly similar, and this factor favors

24  Nutrishare.

25              **c.      Evidence of Actual Confusion.**

26        The Ninth Circuit has recognized that evidence of actual confusion is not required to find

27  a likelihood of confusion, and it is certainly not a prerequisite to issuing a preliminary injunction.

28  *American Int'l Group v. American Int'l Bank*, 926 F.2d 829, 832 (9th Cir. 1991); *Eclipse*

1   *Associates Ltd. v. Data General Corp.*, 894 F.2d 1114 (9th Cir. 1990).  However, "[e]vidence of

2   actual confusion constitutes persuasive proof that future confusion is likely."  *Thane Int'l v. Trek*

3   *Bicycle Corp.*, 305 F.3d 894, 902 (9th Cir. 2002).

4           In its moving and supplemental declarations, Nutrishare demonstrated that, within six

5   months of its launch, BioRx already has caused doctors, nurses, pharmacists, and other medical

6   professionals to become confused regarding the relationship, sponsorship, or affiliation between

7   NutriThrive and Nutrishare.  These instances are chronicled in great detailed in the original and

8   supplemental declarations of Rod Okamoto[4] and the declarations of Reid Nishikawa, Anita

9   Wallin, and Kerry Stone filed in support of this motion. (Okamoto Decl. ISO Moving Brief, filed

10  6/24/08, ¶ 16; Nishikawa Decl. filed 6/24/08, ¶ 4; Wallin Decl filed 6/24/08, Stone Decl. filed

11  7/8/08, Suppl. Okamoto Decl. filed 7/8/08).

12          In its opposition, BioRx relies on cases from other jurisdictions (while conveniently

13  ignoring controlling 9th Circuit authority) in an erroneous effort to discredit this evidence of

14  actual confusion by stating that these individuals were not actually confused, but merely raised

15  "questions as to whether Plaintiff and Defendant are connected" and asked to "clarify the

16  relationship, if any, between NutriThrive and Nutrishare."[5]  (Opp. at 12:10-17.)

17          This argument is nonsensical.  Pure logical deduction and plain common sense indicates

18  that if someone enquires regarding whether two companies are connected or related, and seeks

19  clarification regarding the same, that person by definition is "confused" regarding the affiliation

20  or relationship between the companies.  Controlling law confirms common sense.  BioRx's

21  citations to non-controlling law from the Eighth and Second Circuits are inappropriate and

22  misleading.  (*See* Opp. at 13:5-16.)  Courts of <u>this circuit</u> have accepted such inquiries regarding

23  

---

24  [4] BioRx has attempted to attack the veracity of Mr. Okamoto's original and supplemental declarations, in which Mr.
    Okamoto discusses instances related to confusion between the "Nutrishare" and "NutriThrive" marks. (See Decl. of
25  Timothy Fensky filed 8/4/08; Decl. of Eric Hill filed 8/8/08).  As explained in Mr. Okamoto's reply declaration filed
    herewith, BioRx's attacks are unavailing.

26  [5] BioRx also argues that the Declaration of Sheila Messina, which Nutrishare filed on 7/28/08 in support of its
    Opposition to BioRx's Motion to Dismiss or Transfer Venue, is not evidence actual confusion.  (Opp. at 12:22-25.6.)
27  But Nutrishare did not submit Ms. Messina's declaration to show that Ms. Messina was confused.  Rather, Nutrishare
    submitted this declaration in connection with BioRx's pending Motion to Dismiss or Transfer Venue to show that
28  NutriThrive was actively marketing to California residents at a conference in California.

affiliation as evidence of actual confusion.  *Steinway & Sons v. Demars & Friends*, 210 U.S.P.Q. 954, 1981 U.S. Dist. LEXIS 15169, at *36 (C.D. Cal. 1981) (considering evidence that plaintiff's retailers and wholesalers were making inquiries about a connection between the parties); *see also Kroger Co. v. Suprex, Inc.*, 193 U.S.P.Q. 245, 247 (E.D. Pa. 1976) ("customers evidenced such confusion by inquiring as to whether defendant's store was affiliated with [plaintiff's] national chain").    The *Steinway* court specifically held that

> Since reliable evidence of actual confusion is difficult to obtain in trademark infringement cases, any such evidence is substantial evidence that confusion is likely. . . .  Very little proof of actual confusion [is] necessary to prove likelihood of confusion.

*Steinway & Sons*, 1981 U.S. Dist. LEXIS 15169, at *36.  Thus,

Moreover, contrary to BioRx's claims that "there has been *no confusion* between the two marks [because] third parties have actually recognized a difference between them" (Opp. at 12:13-15), actual confusion need not occur only as to the <u>source</u> of the parties' products and/or services.  Rather, under the plain words of the Lanham Act, confusion that gives rise to a trademark infringement or unfair competition claim can also be about the "<u>affiliation, connection, or association</u>" between the parties.  *See* Lanham Act section 43(a), 15 U.S.C. section 1125(a); *Brookfield Communs. v. W. Coast Entm't Corp.*, 174 F.3d 1036 (9th Cir. 1999) (holding that Lanham Act protects against many forms of confusion); *see also Champions Golf Club v. Champions Golf Club*, 78 F.3d 1111 (6th Cir. 1996) (where there were two golf courses  named "Champions," the issue was not whether golfers were confused about which course they were playing on, but rather, whether the courses were affiliated).

### d.    Degree of Purchaser Care.

In its opposition, BioRx argues that the "customers" for TPN and enteral products are doctors and pharmacists, and that these customers are not likely to be confused about the source, affiliation or sponsorship of Nutrishare and NutriThrive's products and services  because they are "as sophisticated a group as one could imagine."  (Opp. at 14:4-15:5.)

This argument is specious given that the "pharmacist" is not BioRx's "customer" – rather,

1   BioRx is the pharmacist.  Nutrishare's customer is the TPN patient, and not the doctor or

2   pharmacist.  (Reply Okamoto Decl., ¶7.)  Moreover, BioRx's argument is akin to claiming that

3   companies like Walgreens and Rite-Aid are marketing directly to doctors, and not to end users of

4   pharmaceuticals.  BioRx's argument is particularly ludicrous in light of the fact that BioRx admits

5   that it is working directly with a patient family in Redding, not with their doctor.  Moreover,

6   BioRx's web-site for its NuriThrive products obviously is directed to the end user, and not

7   medical professionals.  It is the TPN consumer, not the doctor, who would sign up on-line to be a

8   "NutriThrive customer."  It is the TPN consumer, not the doctor, who would post messages on the

9   on-line message board asking NutriThrive's clinician team for advice.  And if BioRx was more

10  concerned about marketing to doctors, it would not have attended the Oley Conference, which is a

11  consumer-oriented conference, and it would not have aggressively solicited TPN consumers at

12  that conference.

13       Even assuming, *arguendo*, the thrust of BioRx's marketing is directed to doctors, and not

14  enteral and parenteral nutrition customers, it is very telling that even doctors – who BioRx alleges

15  to be the most sophisticated of customers for medical products – have actually experienced

16  confusion.  Medical professionals are the proverbial "canary in the cole mine."  If medical

17  professionals are confused, there can be no question that lay persons will be even more confused.

18       Moreover, even doctors and pharmacists are not infallible, and can experience confusion

19  despite their sophistication.  *See e.g., Alfacell Corp. v. Anticancer Inc.*, 71 U.S.P.Q.2d 1301

20  (TTAB 2004) ( "there is no reason to believe that medical expertise as to pharmaceuticals will

21  ensure that there will be no likelihood of confusion as to source or affiliation"); *Geigy Chemical*

22  *Corp. v. Atlas Chemical Indus., Inc.*, 58 C.C.P.A. 972, 974 (C.C.P.A. 1971) ("Given even a

23  moderate interval of time, and even though these are prescription drugs, we do not feel that

24  physicians who prescribe these two diuretics would be immune from confusion either as to the

25  products or their source. The prefixes HYDRO- and HYGRO- sound very much alike and convey

26  almost the same meaning.  There is also an obvious similarity in the last four letters of the marks,

27  -ONOL and –OTON"); *Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 569

28  (2d Cir. 1971) (pharmacists can be confused "if the prescriptions are written, because of

1   physicians' illegible style, or if they are telephoned, because of the phonetic similarities.")

2          Finally, when there is a strong likelihood of confusion created by other factors, even the

3   existence of the most discerning customer base will not be sufficient to tip the scales in favor of

4   the infringer.  McCARTHY, § 23:103.

5          **e.**      **Intent to Deceive Consumers.**

6          BioRx cites to no authority for its argument that, although it had actual and constructive

7   knowledge of Nutrishare's mark, there is no evidence of intent to deceive.  (Opp. at 15.)

8   Controlling law does <u>not</u>  require Nutrishare to show that BioRx adopted its mark with the

9   specific purpose of infringing Nutrishare's mark.  *Daddy's Junky Music Stores v. Big Daddy's*

10   *Family Music*, 109 F.3d 275, 287 (9th Cir. 1997).  Rather, it is sufficient that, despite having an

11   "infinity" of names to choose from, BioRx adopted its confusingly similar "NutriThrive" mark

12   with actual or constructive knowledge of Nutrishare's mark.  *Id.* (citing *Official Airlines Guides*,

13   6 F.3d at 1394); *see also Stork Restaurant v. Sahati*, 166 F.2d 348 (9th Cir. 1948.)

14          It is also disingenuous for BioRx to deny that it intentionally hired spokespersons who are

15   former Nutrishare customers and/or family members, as it could not be purely coincidental that

16   these particular individuals – rather than any of the other 30-odd NutriThrive customers – became

17   BioRx's spokespersons.  Accordingly, BioRx should be presumed to have acted with the intent to

18   deceive the public.  *Brookfield*, 174 F.3d at 1059.

19          **f.**      **Proximity of the Products and Services Offered by the Parties.**

20          Although BioRx has failed to specifically address this factor in its opposition brief, BioRx

21   has in various court filings and elsewhere in its opposition brief attempted to draw false

22   distinctions between "enteral" and "parenteral" nutrition in order to prove that the parties'

23   products and services are non-competitive.  (Opp. at 5:27-28, BioRx's Motion to Dismiss or

24   Transfer Venue, filed 7/23/08, at 2:13-14.)  In the event that BioRx intends to make such an

25   argument at the hearing on this motion, Nutrishare would like to dispel this argument once and

26   for all.

27          As an initial matter, BioRx's argument fails because both parties provide both enteral and

28   parenteral nutrition products and services to their customers.  (Okamoto Decl. in support of

1   Nutrishare's Opp. to BioRx's Motion to Dismiss, filed 7/28/08, ¶ 14; Okamoto Decl. in support

2   of Reply, filed herewith (hereinafter "Okamoto Reply Decl." ¶¶ 6-7.)  And the customer base for

3   these two products is essentially the same.  Depending on their physical condition, some patients

4   are on both enteral and parenteral therapy, some are exclusively on enteral therapy, some are

5   exclusively on parenteral therapy, some are on enteral therapy and occasionally "revert" to

6   parenteral therapy, and some are on parenteral therapy and may "graduate" to enteral therapy.

7   (Okamoto Reply Decl., ¶ 6.)  The products and services offered by the parties are therefore

8   identical and competitive.

9          Moreover, BioRx's sales of even completely unrelated and noncompetitive products under

10  the "NutriThrive" name can give rise to trademark infringement and unfair competition, as long

11  as there is a likelihood of confusion about the source, affiliation, sponsorship, or relationship of

12  the products and services offered by the two parties.

13         Competition between the parties is but one of eight factors the Court evaluates to

14  determine whether the relevant consuming public is likely to be confused.  *AMF Inc. v. Sleekcraft*

15  *Boats*, 599 F.2d 341, 348 (9th Cir. 1979).  In fact, the *Sleekcraft* test was developed for the very

16  purpose of determining if there is infringement when the products "are <u>not</u> in direct competition"

17  *Id.* at 348 (emphasis added).  McCarthy's treatise on trademark law also echoes the sentiment that

18  "The vast majority of modern decisions have adopted the rule that competition is not necessary

19  between the parties for there to be a likelihood of confusion."  McCARTHY, §24:13.  The

20  Trademark Manual of Examining Procedure, published by the United States Patent and

21  Trademark Office, likewise provides:

22         The goods or services do not have to be identical or even competitive in order to
           determine that there is a likelihood of confusion. . . . The issue is not whether the
23         goods will be confused with each other, but rather whether the public will be
           confused about their source.
24

25  TMEP § 1201(a)(i).

26         Following this rationale, numerous courts of this and other circuits have held there to be

27  infringement notwithstanding that the parties' products and/or services were not competitive.  *See*

28  *e.g. Entrepreneur Media, Inc. v. Smith*, 279 F.3d 1135, 1147 (9th Cir. 2002) (ENTREPRENEUR

for public relations company held likely to be confused with ENTREPRENEUR for magazine);

*Dreamwerks Production Group, Inc. v. SKG Studio*, 142 F.3d 1127, 1131-32 (9th Cir. 1998)

(DREAMWORKS for film studio held likely to be confused with DREAMWERKS for company

that promotes science fiction merchandise and organizes Star Trek conventions); *E. & J. Gallo*

*Winery v. Gallo Cattle Co.*, 967 F.2d 1280, 1291 (9th Cir. 1992) (GALLO for cheese held likely

to be confused with GALLO for wine and salame). *Fleischmann Distilling Corp. v. Maier*

*Brewing Co.,* 314 F.2d 149, 151 (9th Cir. 1963) (BLACK AND WHITE for beer held likely to be

confused with BLACK AND WHITE for whisky); *On-line Careline Inc. v. America Online Inc.,*

229 F.3d 1080, 56 USPQ2d 1471 (Fed. Cir. 2000) (ON-LINE TODAY for Internet connection

services held likely to be confused with ONLINE TODAY for Internet content); *In re Martin's*

*Famous Pastry Shoppe, Inc.*, 748 F.2d 1565, 223 USPQ 1289 (Fed. Cir. 1984) (MARTIN'S for

wheat bran and honey bread held likely to be confused with MARTIN'S for cheese); *In re*

*Corning Glass Works*, 229 USPQ 65 (TTAB 1985) (CONFIRM for a buffered solution

equilibrated to yield predetermined dissolved gas values in a blood gas analyzer held likely to be

confused with CONFIRMCELLS for diagnostic blood reagents for laboratory use); *In re Jeep*

*Corp.*, 222 USPQ 333 (TTAB 1984) (LAREDO for land vehicles and structural parts therefor

held likely to be confused with LAREDO for pneumatic tires).  Under this law, even if

NutriThrive sold no enteral or parenteral products – which is not true – its activities could still

constitute infringement as long as the public is likely to be confused.

      Furthermore, even if NutriThrive sold only enteral nutrition products – which is also not

true – the fact that the parties' products are "likely to be encountered by the same persons"

suggests infringement is likely.  TMEP § 1201(a)(i).  *E. & J. Gallo Winery*, 967 F.2d at 1291

(GALLO salame and cheese are "are sold in the same deli cases in grocery stores"); *Tillamook*

*Country Smoker v. Tillamook County Creamery Ass'n*, 311 F. Supp. 2d 1023, 1042 (D. Or. 2004)

(defendant's TILLAMOOK cheese and plaintiff's TILLAMOOK smoke meats "appear in the

same supermarkets and thus are likely to be encountered by consumers during the same shopping

trip").  BioRx cannot deny that its NutriThrive enteral products and services and Nutrishare's

14

1    TPN products and services are likely to be encountered by the same consumer in the marketplace;

2    that is, BioRx and Nutrishare would be in the same proverbial "aisle" of an on-line drug store.

3          Accordingly, this factor strongly supports a finding of likelihood of confusion.

4

5          **2.**      **BioRx's Federal Trademark Application for "NutriThrive" Is Not a Defense to this Action.**

6              **a.**      **NutriThrive's Notice of Allowance is Not a Defense to Trademark Infringement.**

7

8          Throughout its opposition brief, BioRx cites to the United States Patent and Trademark

9    Office's granting of a Notice of Allowance for the mark "NutriThrive" as indicative of the fact

10   that there is no likelihood of confusion.  Specifically, BioRx states that "the U.S PTO has

11   completed its review of the [NutriThrive] mark by an Examining Attorney, with no citation to the

12   Nutrishare mark as being confusingly similar" (Opp. at 5.)  and that Nutrishare "ignores the

13   opinion of the US Patent and Trademark Office, which examined the applications for NutriThrive

14   . . . and found no likelihood of confusion with the Nutrishare marks[.] (Opp. at 10.)

15         The reason that Nutrishare has "ignored" the USPTO's actions with respect to BioRx's

16   "NutriThrive" application is that the USPTO's actions do not impact this court's decision

17   making.[6]  It is well-established that determinations by the USPTO during the trademark

18   application process must be regarded as inconclusive since they are made at its lowest

19   administrative level.  *See Chesebrough-Pond's, Inc. v. Faberge, Inc.*, 666 F.2d 393, 397 (9th Cir.

20   Cal. 1982) ("a decision of the Patent and Trademark Office allowing the registration of

21   Chesebrough's trademark would not preclude a subsequent infringement action or be

22   determinative of the issues involved"); *Carter-Wallace, Inc. v. Procter & Gamble Co.*, 434 F.2d

23   794, 802 (9th Cir. Cal. 1970); *Self-Insurance Inst. of Am. v. Software & Info. Indus. Ass'n*, 208 F.

24   Supp. 2d 1058, 1071 (C.D. Cal. 2000) ("[a]dministrative decisions of the PTO are not binding on

25   the Court.")  In fact, in practice, the Trademark Trial and Appeal Board (the "TTAB") routinely

26

27   _____

[6]  The only relevance to BioRX's trademark application is that it constitutes a binding admission by BioRX that a composite mark starting with the "Nutri" prefix used for pharmaceuticals is distinctive and entitled to full protection under the Lanham Act.  This is the only conclusion one can draw from BioRX's attempt to register the Nutrithrive mark on the Lanham Act Principal Register.

28

944404.2                      15

1    overturns "likelihood of confusion" determinations made by lower-level trademark examiners.

2    *See e.g.*, *In re The W.W. Henry Co., L.P.*, 82 USPQ2d 1213 (TTAB 2007); *In re Emissive Energy*

3    *Corp.*, Serial No. 78358172 (June 15, 2006); *In re Box Solutions Corp.*, 79 USPQ2d 1953 (TTAB

4    2006).  Therefore, the Notice of Allowance issued by a single trademark examiner at the USPTO

5    for the mark "NutriThrive," and any determinations related to the application, are neither

6    determinative, conclusive, nor binding upon this Court.

7        Moreover, what BioRx has failed to state is that the USPTO did not even consider the

8    "Nutrishare" mark in its determination of whether to issue a Notice of Allowance for the

9    "NutriThrive" mark.  The "Nutrishare" mark was never before the examiner who was reviewing

10   the "NutriThrive" mark because no combination of queries in the examiner's search for

11   conflicting marks would have brought to light the "Nutrishare" mark.  (Tenud Decl., ¶¶ 3-5, Ex.

12   A-B.)  Therefore, the Examiner's granting of a Notice of Allowance on the "NutriThrive" marks

13   says nothing of whether it is likely to be confused with the "Nutrishare" mark.

14                   **b.    That Nutrishare Has Not Yet Challenged the NutriThrive Mark at the
                            USPTO is Also Not a Defense to Trademark Infringement.**

15

16        BioRx also argues that the fact that Nutrishare has not yet challenged the "NutriThrive"

17   marks before the USPTO weighs against granting a preliminary injunction.  But the fact that

18   Nutrishare, although aware of NutriThrive's pending federal trademark application, chose to

19   challenge the mark in Court rather than at the USPTO, is inconsequential.  Faced with

20   NutriThrive's infringement, Nutrishare had several strategic options.  Nutrishare could have

21   challenged NutriThrive's mark at the USPTO level in lieu of filing this lawsuit, but this would

22   have accomplished nothing with regard to preventing the likelihood of confusion, as the

23   cancellation or non-registration of a mark would not have prevented NutriThrive from using the

24   "NutriThrive" name in commerce.  The trademark branch of the USPTO, and the TTAB, have no

25   power to issue injunctions.  They only have the power to register or cancel trademarks on the

26   Lanham Act registers.  Nutrishare could have challenged the mark in tandem with filing this

27   lawsuit, but this too would have achieved nothing because the USPTO likely would have

28   suspended Nutrishare's petition pending resolution of this litigation.  *See* TMEP § 510.02.

1    Nutrishare could also wait to challenge the mark until after the Court rules on its preliminary

2    injunction motion, or after final judgment is entered, since a favorable Court decision likely will

3    be binding on the USPTO and result in a more efficient resolution of Nutrishare's USPTO action.

4    Or, Nutrishare could decide never to challenge NutriThrive's mark, as a finding of infringement

5    and issuance of injunction will be sufficient to preclude NutriThrive from being able to use its

6    trademark in a way that will be likely to confuse the public.  The bottom line is that the decision

7    whether to challenge an infringing trademark at the USPTO or through a civil action has no

8    bearing on whether NutriThrive is infringing Nutrishare's marks.

9

10        **3.    BioRx Cannot Establish an Affirmative Defense of Laches.**

11        BioRx erroneously argues that Nutrishare's trademark infringement claims are foreclosed

12    under the doctrine of laches because Nutrishare unduly delayed in filing its lawsuit.  (Opp. at 16-

13    17.)  Citing *Tillamook Country Smoker, Inc. v. Tillamook County Creamery Ass'n*, 465 F.3d

14    1102, 1108-11 (9th Cir. 2006), and two non-controlling cases decided by district courts in New

15    York and Ohio, BioRx claims that Nutrishare waited "a full year after learning of BioRx's

16    intentions in June, 2007," and that such delay is "inexcusable."  (*Id.*)  However, BioRx is wrong

17    on the facts and utterly fails to cite the well-established law on laches or analyze the relevant

18    factors, which demonstrate that BioRx has no viable laches defense.

19

20        **a.    There is a Strong Presumption that Laches is Inapplicable Because Nutrishare Filed its Lawsuit Within Four Years.**

21        As a preliminary matter, equitable defenses such as laches are <u>not favored</u> by the courts

22    where – as is the case here – injunctive relief has been sought in cases of clear trademark

23    infringement."  *United States Jaycees v. San Francisco Junior Chamber of Commerce*, 354 F.

24    Supp. 61, 73 (N.D. Cal. 1972), *aff'd,* 513 F.2d 1226 (9th Cir.1975) (citing *McLean v. Fleming*, 96

25    U.S. 245, 253 (1877))

26        Second, the applicable period of delay that is presumed to be "unreasonable" under the

27    laches defense, is <u>four years</u>.  *Tillamook Country Smoker, Inc. v. Tillamook Country Creamery*

28    *Ass'n,* 465 F.3d 1102 (9th Cir 2006) ("To determine the correct limitation period for a laches

944404.2                                    17

claim "where an injunction is sought, courts first determine when the statute of limitations period

expired for the most closely analogous action under state law.") (citing *Jarrow Formulas, Inc. v.*

*Nutrition Now, Inc.,* 304 F.3d 829, 836 (9th Cir. 2002)); *Miller v. Glenn Miller Prods.,* 318 F.

Supp. 2d 923 (C.D. Cal. 2004) (the California state causes of action "most closely analogous" to

federal trademark infringement are state unfair competition claims under California Business and

Professional Code § 17208. If the plaintiff files suit within this four-year period, "the strong

presumption is that laches is inapplicable." *Jarrow Formulas,* 304 F.3d at 836; *Tillamook,* 465

F.3d at 1108.

In this case, Nutrishare waited only six months from when BioRx officially launched the

NutriThrive division to file its lawsuit. But even assuming, arguendo, that Nutrishare waited one

year, Nutrishare falls well within the four-year period and there is therefore a strong presumption

that laches does not apply.

### b.      Laches is also Inapplicable Under the Six *E-Systems* Factors.

Laches is also inapplicable because Nutrishare's alleged delay was reasonable in light of

the six factors espoused by this Circuit in *E-Systems, Inc. v. Monitek, Inc.*: (1) the strength and

value of the trademark rights asserted; (2) plaintiff's diligence in enforcing the mark; (3) harm to

the senior user if relief is denied; (4) good faith ignorance by the junior user; (5) competition

between the senior and junior users; and (6) extent of harm suffered by the junior user because of

the senior user's delay. *E-Systems, Inc. v. Monitek, Inc.,* 720 F.2d 604, 607 (9th Cir. 1983); *see*

*also Tillamook,* 465 F.3d at 1108 (after determining expiration of the analogous statute of

limitations, district court must consider six E-Systems factors "to determine whether the

trademark owner's delay in filing suit was unreasonable"); *Grupo Gigante,* 391 F.3d at

1102(same); *Internet Specialties West v. ISPwest,* 2006 U.S. Dist. LEXIS 96351, at *15 (C.D.

Cal. Nov. 14, 2006) (same). Interestingly, BioRx does not even cite the *E-Systems* factors, let

alone analyze them.

Factors (1) and (5) are the same as three of the *Sleekcraft* factors, and are already

addressed in Subsections II(A)(1)(a) and (f) above. Factor (3), the harm to Nutrishare, is

1   addressed in great detail in Subsection II(B) below.  Analysis of the remaining three factors, (2),

2   (4), and (6), indicates that BioRx does not have a valid laches defense.

3                    (i)      *Nutrishare was diligent in enforcing its mark.*

4
5        BioRx also does not have a viable laches defense under the "progressive encroachment"

6   doctrine.  The Ninth Circuit has long recognized that "laches cannot bar injunctive relief when an

7   infringing user progressively encroaches on the owner's mark over time."  *Grupo Gigante S.A. de*

8   *C.V. v. Dallow & Co.,* 391 F.3d 1088, 1103 (9th Cir. 2004).  Under this doctrine, laches is not

9   measured from NutriThrive's first use of the mark, but from the date that NutriThrive's acts "first

10  significantly impacted on [Nutrishare's] good will and business reputation. . . . Any change in the

11  format or method of use of the mark or expansion into new product lines or territories should be

12  sufficient to excuse a prior delay."  MCCARTHY, § 31:19.  Following this rationale, courts have

13  excused delays of even twenty years on the grounds that the parties did not squarely compete

14  until the respondent either expanded its products/services or expanded into a new territory.  *See*

15  *Id.* (citing *Westchester Media v. PRL USA Holdings, Inc.*, 214 F.3d 658, 55 U.S.P.Q.2d 1225 (5th

16  Cir. 2000).

17       The "progressive encroachment" doctrine is also cited in the *Tillamook* case, on which

18  BioRx relies to make its laches argument.  Under *Tillamook,* Nutrishare need not have taken

19  immediate action in the face of  *de minimis* infringement by BioRx.  Rather, Nutrishare was

20  permitted to wait until BioRx "move[d] into direct competition…selling the same 'product'

21  through the same channels and causing actual market confusion.'"  *Tillamook*, 465 F.3d at 1110

22  (quoting *Prudential Ins. Co. of America v. Gibraltar Fin. Corp. of California,* 694 F.2d 1150,

23  1154 (9th Cir. 1982).  Specifically, Nutrishare was permitted to wait until BioRx expanded its

24  NutriThrive business "into different regions or into different markets."  *Tillamook*, 465 F.3d at

25  1110 (citing *Grupo Gigante,* 391 F.3d at 1103) (citing also *Prudential Ins.,* 694 F.2d at 1154).

26  Furthermore, under the progressive encroachment doctrine:

27           a period of low-profile sales by a fledgling business should not be counted toward
             laches.  The trademark owner is justified in delaying the unleashing of litigation
28           until it is seen if the infringing business or product line will survive, let alone

944404.2                                     19

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1    significantly impact on plaintiff's trademark rights.

2    MCCARTHY, § 31.19.

3        This case is a veritable exemplar of "progressive encroachment." When BioRx made its

4    announcement a year ago, Nutrishare's founders were not aware of the exact nature of

5    NutriThrive's business, the territory in which it intended to provide its products and services, or

6    the extent to which NutriThrive intended to compete with Nutrishare.  (Motion at 2:24-28, 3:1-7.)

7    Even when NutriThrive was officially launched in November, 2007, it was unclear that the

8    business would survive.  In fact, BioRx admits in its opposition that even today,  "NutriThrive is

9    still in its relative <u>infancy</u>," and is in fact only a "<u>nascent</u> competitor" with a mere thirty-six

10   customers nationwide, and which only now has "started to make inroads into [Nutrishare's]

11   market share." (Opp. at 2:12-13, 5:26, 19:26, 1:23-24)  Thus, Nutrishare was more than justified

12   in waiting until this fledgling business survived, and after it became clear that BioRx's activities

13   were significantly impacting Nutrishare's trademark rights, to file its lawsuit.

14           (ii)    *BioRx did not have good faith ignorance of Nutrishare's trademark.*

15

16       BioRx may not raise laches as a defense because it infringed Nutrishare's mark

17   notwithstanding its prior knowledge of the registered "Nutrishare" mark. *Competition Specialties,*

     87 Fed. Appx. at 40 (citing *Danjaq LLC v. Sony Corp.,* 263 F.3d 942, 956-957 (9th Cir. 2001).

18   That is, BioRx cannot claim laches because it is not a good faith junior user.  *Chips 'N Twigs, Inc.*

19   *v. Prives,* 226 F. Supp. 529 (N.D. Cal. 1963); *In re Beatrice Foods Co.,* 429 F.2d 466, 472

20   (CCPA 1970); *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358 (2d cir. 1959).

21       First, BioRx has admitted that it had actual knowledge of Nutrishare's mark before BioRx

22   used the NutriThrive mark in commerce.  BioRx was familiar with the Oley Foundation and its

23   national events; and it knew that Nutrishare was one of exhibitors at the June 2007 conference.

24   (Opp. at 4:5-13.)   It was at this event that BioRx first unveiled NutriThrive to the market, so it

25   could not have used its mark in commerce until after that date.  (*Id.* at  4:5-7.)  It also applied for

26   federal registration of the NutriThrive mark following the conference and after it had knowledge

27   of Nutrishare's mark. (*Id.* at 4:26-28.)

28

1    Second, BioRx also had constructive knowledge of Nutrishare's mark before BioRx used

2    the NutriThrive mark in commerce.  Nutrishare received a federal trademark for its "Nutrishare"

3    trademark and it has continuously used that mark since 1993.  (Motion at 5:19-27, 6:1-6.)  BioRx

4    did not begin to use its mark until 2007.  (*Id.* at 8:21-22.)

5        Because BioRx had actual and constructive knowledge of Nutrishare's mark before BioRx

6    used its mark in commerce, BioRx cannot claim good faith ignorance of Nutrishare's trademark.

7    Moreover, BioRx intentionally chose "NutriThrive" to trade off of Nutrishare's notoriety and

8    goodwill.  (*Id.* at 1:11-21.)  BioRx mimicked Nutrishare's advertising format, mirrored

9    Nutrishare's web-site functionality, copied Nutrishare's marketing slogans, and solicited and

10   hired former patients of Nutrishare, as well as their family members, to become spokesperson for

11   NutriThrive.  (*Id.*)  In sum, BioRx intentionally infringed on Nutrishare's trademark.  Therefore,

12   BioRx's lack of good faith bars it from raising a laches defense.

13              (iii)    *BioRx has suffered minimal prejudice from Nutrishare's Timing of*
                         *its Lawsuit.*
14

15       The timing of Nutrishare's infringement claim did not prejudice BioRx.  "Prejudice to the

16   defendant is an essential element of any laches defense."  *Grupo Gigante,* 391 F.3d at 1105.  Such

17   prejudice exists when the defendant "has continued to build a valuable business around its

18   trademark during the time that the plaintiff delayed the exercise of its legal rights."  *Id.*  However,

19   this involves more the fact that the defendant continued to operate its business during the laches

20   period.  *Id.*  There must be a discernable lost expectation, which occurs when the defendant takes

21   "actions that it would not have taken or" the defendant suffers "consequences it would not have

22   suffered had the plaintiff brought suit promptly."  *See, e.g., McCarthy* § 31:12).

23       BioRx has not suffered any harm that it would not have suffered had Nutrishare filed its

24   lawsuit earlier.  Before Nutrishare was even aware of NutriThrive, BioRx had already expended

25   money developing its TPN and enteral products and services, hiring designers to create the names

26   and logos, employing focus groups, and participating in the 2007 Oley Foundation Conference.

27   (Opp. at 3:26-28, 4:1-16.)  Although since that time, it has made available a website and

28   advertised in publications; it would have undertaken the same marketing efforts had it been using

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1   another name.  *See Internet Specialties West v. ISPwest*, 2006 U.S. Dist. LEXIS 96351, at *15.

2   Should BioRx be required to use a different mark, the "additional cost for changing stationary,

3   logos, and phone system programming, and registering a new domain name, are minimal." *Id.*

4   Because BioRx had already sunk most of its costs into its NutriThrive mark before Nutrishare

5   was even aware of "NutriThrive," and because it would not have spent any less money

6   subsequently marketing a mark other than "NutriThrive," BioRx has not suffered any appreciable

7   prejudice as a result of Nutrishare's delay.

8               **c.     The doctrine of Inevitable Confusion Also Bars BioRx's laches defense.**

9        "Because laches is an equitable remedy, laches will not apply if the public has a strong

10   interest in having the suit proceed." *Jarrow Formulas*, 304 F.3d at 840.  "The public's interest is

11   of overriding importance, and as such, should be considered apart from any presumption of

12   laches." *Id.*  In *Jarrow Formulas,* the Ninth Circuit held that the public interest was especially

13   significant when health and safety concerns are implicated.  *Id.*

14       In Section II(D) below, Nutrishare explains why the public has a strong interest in the

15   issuance of an injunction.  For those same reasons, this factor trumps BioRx's laches defense.

16   **B.     NUTRISHARE WILL SUFFER IRREPARABLE HARM UNLESS BIORX IS
          ENJOINED FROM USING THE "NUTRITHRIVE" MARK.**

17

18       In its moving brief, Nutrishare established that, although it is presumed to have suffered

19   irreparable harm if it shows a likelihood of confusion, it nonetheless can independently establish

20   that it has suffered irreparable harm as a result of BioRx's infringement.  In response, BioRx

21   claims that (1) Nutrishare cannot establish irreparable harm because it is claiming "erosion of its

22   market share" which is "redressable through an award of lost profits" (Opp. at 18:3-4); and (2)

23   Nutrishare's alleged delay in filing its lawsuit and move for preliminary injunction forecloses any

24   claims that it has been irreparably harmed (Opp. at 18:5-17.).  As set forth below, none of

25   BioRX's arguments has any merit whatsoever.

26   / / /

27   / / /

28   / / /

944404.2

22

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1      **1.      Erosion of Nutrishare's Market Share Qualifies as Irreparable Harm**
2              **Entitling Nutrishare to a Preliminary Injunction**

As a preliminary matter, this Court should dispense with BioRx's argument that Nutrishare is not entitled to a preliminary injunction based on BioRx's erosion of Nutrishare's market share. There is more than ample authority that permits plaintiffs to obtain injunctive relief based on a defendant's threat to their market share. *See, e.g., Doran v. Salem Inn, Inc.*, 422 U.S. 922, 932 (1975) (loss of business); *Grand River Enterprise Six Nations, Ltd. v. Pryor*, 481 F.3d 60. 67 (2d Cir. 2007) (loss of current or future market share); *Stuhlbarg Int'l Sales Co., Inc. v. John D. Brush & Co., Inc.*, 240 F.3d 832, 841 (9th Cir. 2001) (threatened loss of prospective customers or goodwill).

**2.      In Addition to the Erosion of its Market Share, Nutrishare Has Lost Control Of its Brand and Reputation to a Newcomer Who May Tarnish It.**

This lawsuit is not merely about BioRx "eroding" Nutrishare's market share. Of tantamount concern at this stage of this lawsuit is that BioRx's use of "NutriThrive" has already caused patients and doctors to become confused and mistakenly believe that Nutrishare and NutriThrive are either one and the same or are somehow affiliated or related. The consequences of such confusion could be dire, as Nutrishare no longer has any control over its brand or reputation.

In this case, the evidence of actual confusion as to the affiliation, connection, or sponsorship between medical goods providers could cause great irreparable harm to Nutrishare. *AMP, Inc. v. Foy*, 540 F.2d 1181, 1184 (4th Cir. N.C. 1976) ("the trademark registrant could be harmed by such popular confusion because inferior service by the infringer might be attributed to the registrant."); *Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. McBurnie*, 1989 U.S. Dist. LEXIS 13442 (S.D. Cal. 1989) ("Damages caused by trademark infringement are by their nature irreparable and not susceptible of measurement for a remedy at law"); see also *Ferrari S.p.A. Esercizio Fabbriche Automobili e Corse v. Roberts*, 944 F.2d 1235 (6th Cir. 1991) ("The Lanham Act, however, was intended to do more than protect consumers at the point of

1  sale…Ferrari's reputation in the field could be damaged by the marketing of [defendant's]

2  replicas…despite the absence of point of sale confusion.")

3       Imagine if a "NutriThrive" parenteral nutrition solution somehow became adulterated and

4  caused a child to become ill or die. As BioRx has admitted, "the field of TPN is not a crowded

5  one." (Opp. at 13:24.) It is a small and relatively insular group of people. If such a tragedy were

6  to occur, there would no doubt be a flurry of posts on on-line forums such as www.parent-2-

7  parent.com and other message boards in which parenteral and enteral nutrition patients and their

8  families – such as the woman Jessica with whom NutriThrive has communicated – actively

9  participate. The harm to Nutrishare would be incalculable. The goodwill it has established over

10 the past 17 years would be gone in an instant. This is but one of numerous scenarios that

11 illustrate the incredible risk Nutrishare now faces in the absence of injunctive relief.

12
13        **3.    Nutrishare's Delay Does Not Preclude Irreparable Harm.**

14       Nutrishare has already discussed at length why BioRx's laches argument is inapplicable.

15 Further to these arguments, there is ample authority showing that delay does not automatically

16 undermine a finding of irreparable harm in a preliminary injunction context. "[D]elay standing

17 alone does not overturn any presumptions of irreparable injury that otherwise apply." *Praefke*

18 *Auto Elec. & Battery Co., Inc. v. Tecumseh Products Co.*, 123 F.Supp.2d 470, 479 (E.D.Wis.

19 2000) (*citing Vaughan Mfg. Co. v. Brikam Intern., Inc.*, 814 F.2d 346, 351 (7th Cir.1987)). Delay

20 is but one factor in the irreparable harm analysis, and is not conclusive. *Lydo Enterprises, Inc. v.*

21 *City of Las Vegas*, 745 F.2d 1211, 1213-1214 (9th Cir. 1984).

22
23 **C.    THE BALANCE OF THE HARDSHIPS STRONGLY TIPS IN NUTRISHARE'S FAVOR.**

24       In its motion, Nutrishare discussed at length why the harm that would be suffered by

25 BioRx as a result of a preliminary injunction would be *de minimis*, especially in comparison to

26 the harm that would be suffered by Nutrishare in the absence of a preliminary injunction.

27       BioRx greatly overstates the harm that it would incur if the requested injunction is granted

28

944404.2

24

1    by claiming that the injunction would "eliminate NutriThrive as a legitimate competitor,"

2    "enjoin" BioRx "from providing enteral care and other infusion products and services," "shut

3    down NutriThrive," "terminate the employment" of NutriThrive's employees, and "cease

4    providing its products and services to the enteral and TPN patients who have come to rely on it."

5    (Opp. at 17:24-26; 19:14-19.)

6           These statements are specious and ridiculous given the plain words of Nutrishare's

7    requested injunction, which only seeks that BioRx cease using a name for its products and

8    services that is likely to cause customers to be confused about their source, relationship,

9    affiliation, or sponsorship in relation to Nutrishare. For a multitude of reasons, this request will

10   not unduly harm BioRx.

11          First, BioRx already markets at least three other home infusion products and services

12   under the "BioRx" name.  Bringing its enteral and parenteral products within its "BioRx" brand

13   name umbrella would not result in a great burden to BioRx, as it would not result in a complete

14   upheaval of its marketing strategy or require it to modify its letterhead, business cards, or web-

15   site.

16          Second, BioRx only launched the "NutriThrive" product line in November, 2007 and

17   admits that "NutriThrive is still in its relative infancy" (Opp. at 19:26.) and is in fact only a

18   "nascent competitor." (Opp. at 2:12-13.)  Compared to Nutrishare's seventeen-year investment in

19   the "Nutrishare" name, BioRx has spent only one year developing its "NutriThrive" name. And

20   while BioRx may have announced that it intended to launch NutriThrive nearly a year ago,

21   NutriThrive did not have a single customer at the time, and did not have a web-site until it was

22   officially launched in November, 2007 – only six months ago.  (Okamoto PI Declaration, ¶ 15.)

23   Apparently, even today, NutriThrive has a total of only 36 customers (Opp. at 5:26.)  This is not

24   the case of Nike having to change its brand name, thereby affecting the millions of Nike

25   customers world-wide.  This is a case where BioRx simply can call each of its 36 customers over

26   the course of a single day and let them know that it will be changing the name of NutriThrive.

27   This cannot possibly constitute a great hardship.

28          Third, Nutrishare is not asking BioRx to completely change its "NutriThrive" name or

1   remove the "Thrive" portion from its name, which BioRx asserts to be the most important term in

2   the "NutriThrive" name that was developed by three graphic designers with the assistance of a

3   focus group to "convey wellness and positive energy." (Opp. at 3:26-4:3.) Rather, Nutrishare is

4   simply asking BioRx to change the "NutriThrive" name to one that is not confusingly similar to

5   "Nutrishare."

6        Fourth, even if an injunction is granted, BioRx can continue to provide long-term in-home

7   TPN and aggressively pursue any TPN consumer it wants to pursue in California, including

8   Nutrishare's own customers, as long as it competes fairly in compliance with all applicable laws

9   and does so under a name other than "NutriThrive."

10       Fifth, the fact that BioRx may have allegedly spent $500,000 in developing and promoting

11  its "NutriThrive" name is of no consequence,[7] since BioRx was undisputedly aware of the

12  trademark infringement issue and chose to ignore it. *See Watts Health Systems, Inc. v. United*

13  *Healthcare Corp.*, 960 F. Supp. 1431, 1437 (C.D. Cal. 1996) ("any monies expended by United

14  in promoting, advertising or otherwise using the 'United Healthcare' mark was accomplished at

15  its own peril").  Any expenses incurred by BioRx in connection with its new name could have

16  been avoided had it simply chosen a name not confusingly similar to the federally registered

17  trademark "Nutrishare" – a trademark BioRx should have known about from day one.  Nutrishare

18  should not be made to suffer great harm as a direct result of BioRx's incompetence and/or

19  carelessness in choosing a new name among the infinity of possible names, or its arrogant refusal

20  to change its name in light of the rights granted to Nutrishare through its registered trademarks.

21  **D.    A PRELIMINARY INJUNCTION WILL PROTECT THE PUBLIC INTEREST.**

22       In its moving brief, Nutrishare explained why this case presents a unique instance where

23  the public interest is implicated by whether or not the Court grants an injunction.  Because both

24  parties are in the medical field, the public could be harmed if medical decisions are made based

25  on confusion between Nutrishare and NutriThrive.  *See, e.g., McLeod v. Hosmer-Dorrance, Inc.*,

26  1976 U.S. Dist. LEXIS 12289, 192 U.S.P.Q. 683, at *8 (C.D. Cal. 1976) ("The product in

27  _____

[7] BioRx twice asserts in its opposition that it has spent $500,000 on developing the "NutriThrive" name (Opp. at
18:17, 19:24.)  In neither instance does BioRx cite to any declarations or other evidence in support of this bald
28  assertion.

1    question here is a medical device used in the care and treatment of serious injury; as such, there is

2    even a greater public interest in insuring that no confusion exists as to the source of plaintiff's and

3    defendant's products") (citations omitted); *see also Morgenstern Chem. Co. v. G.D. Searle & Co.*,

4    253 F.2d 390, 393 (3rd Cir. 1958) ("in the field of medical products, it is particularly important

5    that great care be taken to prevent any possibility of confusion in the use of trade-marks.");

6    *Alfacell Corp. v. Anticancer Inc.*, 71 U.S.P.Q.2d 1301 (TTAB 2004) ("where the marks are used

7    on pharmaceuticals and confusion as to source can lead to serious consequences, it is extremely

8    important to avoid that which will cause confusion."); *see also In Re Merck. & Co.* 1982 TTAB

9    LEXIS 35 (TTAB 1992); *Ethicon, Inv. v. American Cyanamid Company* 192 U.S.P.Q. 647

10   (TTAB 1976).

11        The public interest element goes completely overlooked in BioRx's opposition brief.

12   Consequently, this factor weighs in favor of granting an injunction.

### III.    <u>CONCLUSION</u>

14        This is not a "close call." Even though the Court is not required to rigidly apply all eight

15   *Sleekcraft* factors, Nutrishare has demonstrated that all eight factors weigh in its favor, thereby

16   showing that an injunction is required to prevent actual and potential confusion by doctors and

17   patients alike regarding the source, affiliation, relationship, or sponsorship of the products and

18   services offered by the parties. None of BioRx's purported defenses is valid. That it has a

19   pending application for the "NutriThrive" mark with the USPTO that that Nutrishare has not yet

20   challenged this mark are irrelevant. That it purportedly offers primarily enteral products – rather

21   than parenteral products – is entirely misleading and inconsequential. Given the harm that

22   Nutrishare would suffer in the absence of an injunction, and the lack of harm to BioRx should an

23   injunction issue, Nutrishare's request for injunctive relief is entirely appropriate and necessary.

24   For those reasons, Nutrishare respectfully requests that the Court grant this Motion.

25

26

27

28

1    DATED:  August 13, 2008                DOWNEY BRAND LLP

2

3                                           By:_____/s/ Michael J. Thomas_____
                                                        MICHAEL J. THOMAS
4                                                       Attorney for Plaintiff
                                                        Nutrishare, Inc
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

REPLY ISO MOT. FOR PRELIMINARY INJUNCTION

1   DOWNEY BRAND LLP
    MICHAEL J. THOMAS (Bar No. 172326)
2   APARNA RAJAGOPAL-DURBIN (Bar No. 218519)
    555 Capitol Mall, Tenth Floor
3   Sacramento, CA  95814-4686
    Telephone:    (916) 444-1000
4   Facsimile:    (916) 444-2100
    E-mail: mthomas@downeybrand.com
5   E-mail: adurbin@downeybrand.com

6   Attorneys for Plaintiff
    Nutrishare, Inc.
7

8                   UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10

11  Nutrishare, Inc., a California corporation,    | Case No.  2:08-CV-01252-WBS-EFB

12                    Plaintiff,                    | **DECLARATION OF RODNEY
                                                    | OKAMOTO RE: REPLY IN SUPPORT OF
13          v.                                      | MOTION FOR PRELIMINARY
                                                    | INJUNCTION**
14  BioRx, LLC, an Ohio Limited Liability
    Company,
15
                      Defendant.                    | Date:        August 18, 2008
16                                                  | Time:        2:00 p.m.
                                                    | Dept:        Courtroom 5
17                                                  | Judge:       Hon. William B. Shubb

18

19  I, RODNEY OKAMOTO, hereby declare as follows:

20          1.      I am an individual residing in Galt, California.  I make this declaration of my own

21  personal knowledge, and if called to testify, could and would testify consistent with the facts

22  stated herein.

23          2.      I am co-founder and President of Plaintiff in this action, Nutrishare, Inc.

24  (hereinafter "Nutrishare")

25          3.      In its opposition papers filed August 4, 2008, BioRx, LLC (hereinafter "BioRx")

26  filed a declaration from Timothy Fensky, who states he is the Director of Pharmacy Operations

27  for Sullivan's Pharmacy and that he "was not confused by BioRx's use of the name NutriThrive."

28

                                        1
    945250.1
    DECL. OF RODNEY OKAMOTO IN SUPPORT OF REPLY RE: MOT. FOR PRELIM. INJUNCTION

1   BioRx's submission of this declaration is an attempt to call into question the veracity of the

2   declaration I filed with the Court on June 24, 2008.  However, in that declaration, I never stated

3   that Mr. Fensky "was confused by BioRx's use of the name NutriThrive."  In that declaration, I

4   stated that Mr. Fensky "indicated that the names 'Nutrishare' and 'NutriThrive' could cause

5   confusion among his pharmacists and that he would have to explain the difference to them."

6        4.      In supplemental papers filed on August 8, 2008, BioRx, LLC provided the Court

7   with a letter from an attorney, Daniel Cahill, to BioRx's Vice President, Eric Hill, in which Mr.

8   Cahill states that statements I made in my July 8, 2008 supplemental declaration were "inaccurate

9   or taken out of context."  Mr. Cahill's letter appears to call my recollection or my integrity into

10  question.  In my July 8, 2008 supplemental declaration filed in support of Nutrishare's Motion for

11  Preliminary Injunction, I described a conversation I had with Thomas E. Cesar, president of the

12  Accreditation Commission for Healthcare, Inc. (ACHC), on Wednesday, July 2, 2008.  Mr. Cahill

13  did not participate in and has no personal knowledge of this conversation – the conversation was

14  solely between me and Mr. Cesar.  It does not appear that either Mr. Cahill or Mr. Cesar have

15  provided the Court with a sworn statement under penalty of perjury, so unfortunately, all I can do

16  is reiterate under penalty of perjury that on July 2, 2008 Mr. Cesar did tell me that both he and the

17  ACHC's Director of Accreditation, Sherry Hedrick, believed that the "NutriThrive" and

18  "Nutrishare" names were very similar, that the public was likely to be confused between the

19  "NutriThrive" and "Nutrishare" name, and that it was not in the best interests of the public to be

20  confused.

21       5.      BioRx states that enteral and parenteral therapy are not competitive.  But actually,

22  both enteral and parenteral nutrition are medical nutrition therapies that lie along the same clinical

23  care continuum.  That is, an individual patient may be able to receive adequate advanced nutrition

24  via an enteral feeding tube, which allows formulas to be delivered directly into the stomach or

25  intestines but that same individual may later require more aggressive nutrition therapy and that

26  may mean parenteral (intravenous) feedings will be the only way that his or her clinical team can

27  make sure that adequate nutrition is provided to the patient.

28       6.      The "timeline" of a patient requiring supplemental nutrition therapy may be

2

945250.1

1    summarized as follows:  A patient with a minimally affected gastrointestinal ("GI") system can

2    supplement a regular oral diet with an oral nutrition formula such as "Ensure."  A patient with a

3    more severely affected GI system may require enteral nutrition, or delivery of the same oral

4    nutrition formula into the GI tract via an enteral feeding tube, which can enter via the nose or

5    through the skin of the abdomen, directly into the stomach or intestines.  A patient with an even

6    more severely affected GI system requires parenteral nutrition, which involves pumping a special

7    intravenous nutrition formula we call "Total parenteral nutrition" through an intravenous catheter.

8    When this is done by the patient in his or her home, we call it 'Home TPN'.  However, some

9    patients are on both enteral and parenteral therapy, some are exclusively on enteral therapy, some

10   are exclusively on parenteral nutrition, some are on enteral therapy and occasionally "revert" to

11   parenteral therapy, and some are on parenteral therapy and may "graduate" to enteral therapy.  As

12   I stated in a previous declaration, although Nutrishare focuses on parenteral therapy, it still

13   provides enteral nutrition to its parenteral patients, some of whom are now exclusively on enteral

14   nutrition.

15        7.        BioRx has stated that the "customers" for its NutriThrive products are physicians

16   and nurses.  Based on my several decades of experience in the home infusion industry in general,

17   and in the home TPN industry specifically, this cannot be true.  Enteral and parenteral nutrition

18   consumers and their insurance companies – not doctors – pay home infusion pharmacies for

19   providing pharmaceuticals.  The only involvement that physicians and nurses have is to diagnose

20   patients and prescribe parenteral or enteral nutrition therapy.  Pharmacies like Nutrishare (and

21   presumably NutriThrive) dispense parenteral nutrition products to patients.  Nutrishare is like any

22   other pharmacy in several respects (with the exception that it is a "closed door" pharmacy and not

23   a "brick and mortar" pharmacy).  Just as the primary "customer" of Rite-Aid or Walgreens is the

24   patient, the primary "customer" of Nutrishare is the TPN patient, not the doctor.  So, just as with

25   any other pharmacy, a doctor might suggest that a patient get his or her prescription filled by

26   "Nutrishare," or a doctor might directly send a TPN prescription to the pharmacy of the patient's

27   choice, the doctor might simply give the patient a prescription that the patient can fill at the

28   pharmacy of his or her choice, or, in some cases, the patient's insurance company might require

3

1  the patient to use a "contracted pharmacy" in order to receive coverage. So while Nutrishare has

2  professional relationships with doctors and insurance companies, the primary "customer" is the

3  consumer.

4

5      I declare under penalty of perjury under the laws of the United States and the State of

6  California that the foregoing is true and correct to the best of my knowledge.

7      Dated this 12th day of August, 2008, at Galt, California.

8

9

RODNEY OKAMOTO

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

945250.1

DECL. OF RODNEY OKAMOTO IN SUPPORT OF REPLY RE: MOT. FOR PRELIM. INJUNCTION

1  DOWNEY BRAND LLP
   MICHAEL J. THOMAS (Bar No. 172326)
2  APARNA RAJAGOPAL-DURBIN (Bar No. 218519)
   555 Capitol Mall, Tenth Floor
3  Sacramento, CA  95814-4686
   Telephone:    (916) 444-1000
4  Facsimile:    (916) 444-2100
   E-mail: mthomas@downeybrand.com
5  E-mail: adurbin@downeybrand.com

6  Attorneys for Plaintiff
   Nutrishare, Inc.

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10

11  Nutrishare, Inc., a California corporation,        Case No.  2:08-CV-01252-WBS-EFB

12              Plaintiff,                             **DECLARATION OF ELLEN J. TENUD
                                                       RE:  REPLY IN SUPPORT OF MOTION
13         v.                                          FOR PRELIMINARY INJUNCTION**

14  BioRx, LLC, an Ohio Limited Liability
    Company,                                           Date:      August 18, 2008
15                                                     Time:      2:00 p.m.
                Defendant.                             Dept:      Courtroom 5
16                                                     Judge:     Hon. William B. Shubb

17

18

19  I, Ellen J. Tenud, declare as follows:

20         1.     I am a trademark paralegal  to counsel at  Downey Brand LLP, attorneys of record

21  for Nutrishare, Inc. (hereinafter "Nutrishare") in this action.  I have personal knowledge of the

22  facts set forth herein, except to the extent they are stated on information and belief, and, if called

23  to testify, I could and would testify competently to the contents hereof.

24         2.     I have been a trademark paralegal since 1988.  In my capacity as a trademark

25  paralegal, I have extensive experience in conducting research for conflicting marks on the United

26  States Patent and Trademark Office ("USPTO") database, as well as other third party commercial

27  databases tailored for trademark research, such as Dialog and the like.

28  ///

                                                    1
944298.1
─────────────────────────────────────────────────────────────────────────
DECL. OF ELLEN J. TENUD IN SUPPORT OF REPLY RE: MOT. FOR PRELIM. INJUNCTION

3.      Counsel for Nutrishare requested that I review the Examiner's research conducted during prosecution of the applications for the NutriThrive marks (Serial Nos. 77/229275 and 77/229266) to ascertain if, in my experience and opinion, the Examiner would have uncovered Nutrishare's registered trademark "Nutrishare" based on the search query.  Attached hereto as Exhibit A are copies of the Examiner's research queries obtained from the United States Patent and Trademark Office's TDR database.  The Examiner conducted an identical search in each case.  Based on my experience and in my opinion, the Examiner would not have uncovered or been aware of the registered Nutrishare trademark based on the search query.

4.      Specifically, the Examiner only reviewed marks that contained the letters "n{v}tr" and "thr{v:2}v".  This search query would not retrieve marks that are pronounced with the similar sounding prefixes "sh" and/or "ch."

5.      In order to verify that my analysis and opinion as set forth herein is accurate, I conducted a search on the USPTO TESS "free form" database using the Examiner's research queries verbatim.  Attached here to as Exhibit B are copies of the research Session Summary showing the queries that I asked, and copies of the listing of marks uncovered.  As can be ascertained from the listing of marks, Nutrishare was never before the Examiner or considered during the Examiner's analysis of the registrability of the NutriThrive marks.

6.      Counsel for Nutrishare also requested that I conduct research at the USPTO website to ascertain if marks exist that include the prefix "Nutri" either combined with other terms as a solitary word mark, or used as a term separately in a composite mark, that do not include a disclaimer of "Nutri."  Attached hereto as Exhibit C is copy of an active Principal Register registration obtained from the USPTO  website for the mark "Nutri-Bite" which includes a disclaimer of "Bite," but does not include a disclaimer of "Nutri."

7.      Counsel for Nutrishare also requested that I review the web-sites www.nutrepletion.com and www.nutricia.com to investigate the nature of the goods and services provided by the web site owners.  My review indicated that "Nutrepletion Resources" and "Nutricia" are trade names of businesses, and not product identifiers.  Nutricia uses other trademarks for its products such as Nutilis, Nutrilon Royal, Forticare, and Flocare.  In addition,

2

1    neither Nutricia nor Nutrepletion appears to offer total parenteral nutrition services.

2    I declare under the laws of the State of California that the foregoing is true and correct.

3    Executed this 12th day of August, 2008 in Sacramento, California.

4

5

6

7                                                    _____
                                                          ELLEN J. TENUD
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

944298.1

DECL. OF ELLEN J. TENUD IN SUPPORT OF REPLY RE: MOT. FOR PRELIM. INJUNCTION

Case No.  2:08-CV-01252-WBS-EFB

DECLARATION OF ELLEN J. TENUD IN RE:  REPLY IN
SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT A

*** User:mlewis4 ***

| # | Total Marks | Dead Marks | Live Viewed Docs | Live Viewed Images | Status/ Search Duration | Search |
|---|---|---|---|---|---|---|
| 01 | 6 | 1 | 5 | 5 | 0:01 | "biorx"[on] |
| 02 | 10908 | N/A | 0 | 0 | 0:04 | *n{v}tr{v}*[bi,ti] |
| 03 | 326 | N/A | 0 | 0 | 0:01 | *thr{v:2}v*[bi,ti] |
| 04 | 4 | 1 | 3 | 3 | 0:01 | 2 and 3 |
| 05 | 17 | 8 | 9 | 4 | 0:01 | *n{v:2}tr{v:2}th*[bi,ti] |
| 06 | 54 | 32 | 22 | 13 | 0:01 | *n{v:2}tr$th*[bi,ti] |

Session started 10/18/07 8:55:03 AM
Session finished 10/18/07 10:58:39 AM
Total search duration 0 minutes 9 seconds
Session duration 123 minutes 36 seconds
Defaut NEAR limit=1 ADJ limit=1

Sent to TICRS as Serial Number: 77229266

Exhibit A

*** User:mlewis4 ***

| # | Total Marks | Dead Marks | Live Viewed Docs | Live Viewed Images | Status/ Search Duration | Search |
|---|---|---|---|---|---|---|
| 01 | 6 | 1 | 5 | 5 | 0:01 | "biorx"[on] |
| 02 | 10908 | N/A | 0 | 0 | 0:04 | *n{v}tr{v}*[bi,ti] |
| 03 | 326 | N/A | 0 | 0 | 0:01 | *thr{v:2}v*[bi,ti] |
| 04 | 4 | 1 | 3 | 3 | 0:01 | 2 and 3 |
| 05 | 17 | 8 | 9 | 4 | 0:01 | *n{v:2}tr{v:2}th*[bi,ti] |
| 06 | 54 | 32 | 22 | 13 | 0:01 | *n{v:2}tr$th*[bi,ti] |

Session started 10/18/07 8:55:03 AM
Session finished 10/18/07 10:58:53 AM
Total search duration 0 minutes 9 seconds
Session duration 123 minutes 50 seconds
Defaut NEAR limit=1ADJ limit=1

Sent to TICRS as Serial Number: 77229275

Exhibit A

Case No.  2:08-CV-01252-WBS-EFB

DECLARATION OF ELLEN J. TENUD IN RE:  REPLY IN
SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT B



**Trademark Electronic Search System(Tess)**

*TESS was last updated on Wed Aug 6 04:12:52 EDT 2008*

PTO HOME  TRADEMARK  TESS HOME  NEW USER  STRUCTURED  FREE FORM  BROWSE DICT  BOTTOM  HELP

# Session Summary:

| No. | Search Terms | Documents | Occurrences |
|-----|--------------|-----------|-------------|
| S1 | *n{v}tr{v}*[bi,ti] | 11627 | 11994 |
| S2 | *thr{v:2}v*[bi,ti] | 385 | 385 |
| S3 | S1 and S2 | 7 | 14 |
| S4 | *n{v:2}tr{v:2}th*[bi,ti] | 18 | 18 |
| S5 | *n{v:2}tr$th*[bi,ti] | 57 | 64 |

Logout

Please logout when you are done to release system resources allocated for you.

PTO HOME  TRADEMARK  TESS HOME  NEW USER  STRUCTURED  FREE FORM  BROWSE DICT  TOP  HELP

Exhibit B



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Aug 6 04:12:52 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | BOTTOM |
| HELP |

Logout  *Please logout when you are done to release system resources allocated for you.*

Start List At: [        ]  OR  Jump to record: [        ]

# 7 Records(s) found (This page: 1 ~ 7)

Refine Search [S1 and S2                    ]  Submit

**Current Search: S3: S1 and S2 docs: 7 occ: 14**

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 78360912 | | NUTRATHRIVE | TARR | DEAD |
| 2 | 77270816 | | T H R I V E NUTRITION DO  MORE  THAN  SURVIVE | TARR | LIVE |
| 3 | 77229275 | | NUTRITHRIVE | TARR | LIVE |
| 4 | 77423862 | | THRIVE NUTRITION | TARR | LIVE |
| 5 | 77376735 | | NUTRATHRIVE | TARR | LIVE |
| 6 | 77361485 | | THRIVE ACTIVE FITNESS CLUBS NUTRITION EXERCISE TRAINERS 24-7 | TARR | LIVE |
| 7 | 77229266 | | NUTRITHRIVE | TARR | LIVE |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | TOP |
| HELP |

|.HOME | SITE INDEX | SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Exhibit B

Record List Display                                                        Page 1 of 2



**United States Patent and Trademark Office**

Home | Site Index | Search | FAQ | Glossary | Guides | Contacts | eBusiness | eBiz alerts | News | Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Aug 6 04:12:52 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | BOTTOM |

| HELP |

Logout  *Please logout when you are done to release system resources allocated for you.*

Start | List At: [         ]   OR   Jump  to record: [         ]    **18 Records(s) found (This page: 1 ~ 18)**

Refine Search [*n{v:2}tr{v:2}th*[bi,ti]          ]    Submit

**Current Search: S4: *n{v:2}tr{v:2}th*[bi,ti] docs: 18 occ: 18**

|    | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|----|---------------|-------------|-----------|--------------|-----------|
| 1  | 78648881      |             | NUTRATHIN | TARR | DEAD |
| 2  | 78627949      | 3160789     | NUTRATHIRST | TARR | LIVE |
| 3  | 78360912      |             | NUTRATHRIVE | TARR | DEAD |
| 4  | 78273567      | 2893356     | CASINOTRUTH.COM | TARR | LIVE |
| 5  | 78107737      |             | CASINOTRUTH.COM | TARR | DEAD |
| 6  | 77264609      | 3448313     | NUTRATHAI | TARR | LIVE |
| 7  | 77229275      |             | NUTRITHRIVE | TARR | LIVE |
| 8  | 77376735      |             | NUTRATHRIVE | TARR | LIVE |
| 9  | 77229266      |             | NUTRITHRIVE | TARR | LIVE |
| 10 | 76216767      | 2522371     | NUTRITHERAPY | TARR | LIVE |
| 11 | 75592850      | 2550386     | NUTRITHENE | TARR | LIVE |
| 12 | 75380577      | 2292000     | NUTRITHYS | TARR | LIVE |
| 13 | 75333288      |             | NUTRATHERAPY | TARR | DEAD |
| 14 | 75312576      | 2211853     | NUTRITHERAPY | TARR | LIVE |
| 15 | 74274510      |             | NUTRATHERAPY | TARR | DEAD |
| 16 | 74036203      | 1777236     | NEUTRATHERM | TARR | DEAD |
| 17 | 73769464      | 1626478     | NUTRITHIN | TARR | DEAD |
| 18 | 72154534      | 0765715     | NEUTROTHERM | TARR | DEAD |

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | TOP |

| HELP |

Exhibit B

Record List Display



**United States Patent and Trademark Office**

Home|Site Index|Search|FAQ|Glossary|Guides|Contacts|eBusiness|eBiz alerts|News|Help

## Trademarks > Trademark Electronic Search System (TESS)

*TESS was last updated on Wed Aug 6 04:12:52 EDT 2008*

| TESS HOME | NEW USER | STRUCTURED | FREE FORM | BROWSE DICT | SEARCH OG | PREV LIST | NEXT LIST | IMAGE LIST | BOTTOM |

| HELP |

Logout  *Please logout when you are done to release system resources allocated for you.*

Start  List At: [        ]   OR   Jump  to record: [        ]   **57 Records(s) found (This page: 1 ~ 57)**

Refine Search [*n{v:2}tr$th*[bi,ti]        ]   Submit

**Current Search: S5: *n{v:2}tr$th*[bi,ti] docs: 57 occ: 64**

| | Serial Number | Reg. Number | Word Mark | Check Status | Live/Dead |
|---|---|---|---|---|---|
| 1 | 78889775 | | NUTRA-SMOOTHIE | TARR | DEAD |
| 2 | 78889760 | | NUTRI-SMOOTHIE | TARR | DEAD |
| 3 | 78743280 | | NUTRAEARTH | TARR | LIVE |
| 4 | 78662120 | | NUTRI-EARTH | TARR | LIVE |
| 5 | 78659004 | 3262571 | NUTRAESTHETICS | TARR | LIVE |
| 6 | 78648881 | | NUTRATHIN | TARR | DEAD |
| 7 | 78627949 | 3160789 | NUTRATHIRST | TARR | LIVE |
| 8 | 78609666 | 3116649 | NUTRIBATH | TARR | LIVE |
| 9 | 78570115 | | NUTRI-HEALTH SOLUTIONS | TARR | DEAD |
| 10 | 78451622 | 2992505 | NUTRI-THICK | TARR | LIVE |
| 11 | 78360912 | | NUTRATHRIVE | TARR | DEAD |
| 12 | 78345478 | | NUTRASMOOTH | TARR | DEAD |
| 13 | 78298853 | | NUTRASMOOTH | TARR | DEAD |
| 14 | 78273567 | 2893356 | CASINOTRUTH.COM | TARR | LIVE |
| 15 | 78195549 | | NUTRAPATH | TARR | DEAD |
| 16 | 78107737 | | CASINOTRUTH.COM | TARR | DEAD |
| 17 | 77518999 | | NUTRI-SOOTHE | TARR | LIVE |
| 18 | 77336055 | 3467214 | NUTRAPATHIC | TARR | LIVE |
| 19 | 77264609 | 3448313 | NUTRATHAI | TARR | LIVE |
| 20 | 77229275 | | NUTRITHRIVE | TARR | LIVE |
| 21 | 77376735 | | NUTRATHRIVE | TARR | LIVE |
| 22 | 77229266 | | NUTRITHRIVE | TARR | LIVE |
| 23 | 77220308 | | NUTRACHEMOTHERAPY | TARR | LIVE |

Exhibit B

| 24 | 76444262 |         | NUTRIWEALTH                                              | TARR | DEAD |
|----|----------|---------|----------------------------------------------------------|------|------|
| 25 | 76444260 | 2950850 | NUTRIHEALTH                                              | TARR | DEAD |
| 26 | 76374265 |         | NUTRIHEALTH                                              | TARR | DEAD |
| 27 | 76235515 | 2512727 | NUTRABREATHE                                            | TARR | LIVE |
| 28 | 76216767 | 2522371 | NUTRITHERAPY                                            | TARR | LIVE |
| 29 | 76121576 | 2831143 | NUTRIPATH                                               | TARR | LIVE |
| 30 | 75715059 |         | NUTRI-HEALTH                                            | TARR | DEAD |
| 31 | 75592850 | 2550386 | NUTRITHENE                                              | TARR | LIVE |
| 32 | 75562890 |         | NATRALITH                                               | TARR | DEAD |
| 33 | 75492729 | 2277697 | NUTRI-CATH                                              | TARR | LIVE |
| 34 | 75380577 | 2292000 | NUTRITHYS                                               | TARR | LIVE |
| 35 | 75357545 |         | NUTRA-SMOOTHIE                                          | TARR | DEAD |
| 36 | 75333288 |         | NUTRATHERAPY                                            | TARR | DEAD |
| 37 | 75330906 |         | NETRHYTHMS                                              | TARR | DEAD |
| 38 | 75312576 | 2211853 | NUTRITHERAPY                                            | TARR | LIVE |
| 39 | 74647667 | 2030937 | NUTRIBATH                                               | TARR | DEAD |
| 40 | 74274510 |         | NUTRATHERAPY                                            | TARR | DEAD |
| 41 | 74188423 | 1777369 | NUTRI-HEALTH                                            | TARR | DEAD |
| 42 | 74069491 |         | NUTRICATH                                               | TARR | DEAD |
| 43 | 74053545 | 1635898 | MY NUTRI...THE THIRD GENERATION MUSHROOM SUPPLEMENT    | TARR | DEAD |
| 44 | 74036203 | 1777236 | NEUTRATHERM                                             | TARR | DEAD |
| 45 | 73769464 | 1626478 | NUTRITHIN                                               | TARR | DEAD |
| 46 | 73745096 | 1594824 | NUTRAPATHIC                                             | TARR | LIVE |
| 47 | 73715287 |         | NUTRIBATH                                               | TARR | DEAD |
| 48 | 73561459 | 1394541 | NEUTRAGANTH                                             | TARR | DEAD |
| 49 | 73533088 | 1397346 | NUTRI-HEALTH                                            | TARR | DEAD |
| 50 | 73481652 |         | NAADS (NITROMETHANE ANTI-ARMOR DITCHING SYSTEM)         | TARR | DEAD |
| 51 | 73475447 |         | NUTRIPATHY                                              | TARR | DEAD |
| 52 | 73466198 | 1329203 | NUTRI-THIN                                              | TARR | DEAD |
| 53 | 73459622 | 1307890 | NUTRI-CATH                                              | TARR | DEAD |
| 54 | 73054899 | 1035142 | NUTRABATH                                               | TARR | LIVE |
| 55 | 81017569 | 1017569 | NUTRI-THERMALIZED                                       | TARR | DEAD |
| 56 | 72260358 | 0839891 | NUTRI-HEALTH                                            | TARR | DEAD |
| 57 | 72154534 | 0765715 | NEUTROTHERM                                             | TARR | DEAD |

TESS HOME   NEW USER   STRUCTURED   FREE FORM   BROWSE DICT   SEARCH OG   PREV LIST   NEXT LIST   IMAGE LIST   TOP   HELP

|.HOME | SITE INDEX| SEARCH | eBUSINESS | HELP | PRIVACY POLICY

Exhibit B

Exhibit B

Case No.  2:08-CV-01252-WBS-EFB

DECLARATION OF ELLEN J. TENUD IN RE:  REPLY IN
SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

EXHIBIT C

Int. Cl.: 5

Prior U.S. Cls.: 6, 18, 44, 46, 51 and 52

## United States Patent and Trademark Office

Reg. No. 3,023,459

Registered Dec. 6, 2005

### TRADEMARK
### PRINCIPAL REGISTER

# NUTRI-BITES

VETS PLUS, INC. (WISCONSIN CORPORATION)

102 3RD AVE. E.

KNAPP, WI 54749

FOR: DIETARY SUPPLEMENTS FOR PETS AND HORSES, IN CLASS 5 (U.S. CLS. 6, 18, 44, 46, 51 AND 52).

FIRST USE 5-8-2003; IN COMMERCE 5-8-2003.

THE MARK CONSISTS OF STANDARD CHAR-ACTERS WITHOUT CLAIM TO ANY PARTICULAR FONT, STYLE, SIZE, OR COLOR.

NO CLAIM IS MADE TO THE EXCLUSIVE RIGHT TO USE BITES, APART FROM THE MARK AS SHOWN.

SER. NO. 78-486,389, FILED 9-20-2004.

PATRICIA EVANKO, EXAMINING ATTORNEY

Exhibit C

Case No. 2:08-cv-01252-WBS-EFB

REPLY IN SUPPORT OF MOTION FOR
PRELIMINARY INJUNCTION

UNPUBLISHED CASE

24 of 154 DOCUMENTS

**GUABER, S.P.A., Appellant, v. NUTRI-METICS INTERNATIONAL, INC., Appellee**

**No. 91-1098**

**UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT**

*1991 U.S. App. LEXIS 10842*

**May 17, 1991, Decided**

**NOTICE:**    [*1]  RULE 47.8. OPINIONS AND ORDERS DESIGNATED AS UNPUBLISHED SHALL NOT BE EMPLOYED AS PRECEDENT BY THIS COURT, AND MAY NOT BE CITED BY COUNSEL, EXCEPT IN SUPPORT OF A CLAIM OF RES JUDICATA, COLLATERAL ESTOPPEL, OR LAW OF THE CASE. ANY PERSON MAY REQUEST THAT AN UNPUBLISHED OPINION OR ORDER BE REPREPARED AND REISSUED FOR PUBLICATION, CITING REASONS THEREFOR. SUCH REQUEST WILL BE GRANTED OR DENIED BY THE PANEL THAT RENDERED THE DECISION.

**SUBSEQUENT HISTORY:**    Reported as Table Case at *935 F.2d 281, 1991 U.S. App. LEXIS 17867.*

**PRIOR HISTORY:**    Appeal from the United States Patent and Trademark Office Trial and Appeal Board; No. 79,047.

**JUDGES:** Rich, Archer and Lourie, Circuit Judges.

**OPINION BY:** ARCHER

**OPINION**

   DECISION

   Guaber, S.P.A. (Guaber) appeals from the decision of the United States Patent and Trademark Office's Trademark Trial and Appeal Board (board) in Opposition No. 79,047 (Sept. 26, 1990), sustaining the opposition of Nutri-Metics International, Inc. (Nutri-Metics) to registration of the mark NEUTROMED and DESIGN by Guaber. We *affirm.*

   OPINION

   The board determined that a likelihood of confusion exists between Guaber's mark NEUTROMED and DESIGN, and the opposer's mark NUTRI-METICS. This is

a question of law, which we review de novo. *Jewelers Vigilance Comm., Inc. v. Ullenberg Corp., 853 F.2d 888, 893, 7 USPQ2d 1628, 1632 (Fed. Cir. 1988)*; [*2] *Giant Food, Inc. v. Nation's Foodservice, Inc., 710 F.2d 1565, 1569, 218 USPQ 390, 394 (Fed. Cir. 1985).* After considering the evidence before the board on the factors set out in *In re DuPont de Nemours & Co., 476 F.2d 1357, 1361, 177 USPQ 563, 567 (CCPA 1973)*, we conclude that the board correctly determined that the marks when used are likely to cause confusion.

   Guaber seeks to register its mark for use on goods substantially identical to those listed in the NUTRI-METICS registration. At oral argument, Guaber's counsel conceded that purchasers of these goods are not sophisticated. Because there is no restriction on the uses or trade channels in NUTRI-METICS' application and because its products are to some extent sold in salons (although most are sold directly to consumers), the board determined that both parties' goods are likely to be distributed through the same or similar trade channels. *See DuPont, 476 F.2d at 1361, 177 USPQ at 567.*

   Assessing the "similarity or dissimilarity of the marks in their entireties as to appearance, sound, connotation and commercial impression," *DuPont, 476 F.2d at 1361, 177 USPQ at 567*,  [*3]  we see no error in the board's finding that the marks are confusingly similar in their entireties. While the words NEUTROMED and NUTRI-METICS are not visually identical, the board determined that both use a variation of the same prefix, that the pronunciation of the marks would be virtually identical and confusingly similar to an ordinary purchaser, and that such a purchaser would not attach differing connotations to the marks.

   Guaber argues that the marks are strikingly dissimilar if compared *as a whole*, and asserts that the board erred because it dissected Guaber's mark and ignored the significance of the colored design and the term "pH 5.5." We disagree.

1991 U.S. App. LEXIS 10842, *

While marks must be evaluated in their entireties, one feature of a mark may be considered to dominate other features in creating the mark's commercial impression. *Burger Chef Sys., Inc. v. Sandwich Chef, Inc., 608 F.2d 875, 877, 203 USPQ 733, 735 (CCPA 1979)*; *Tektronix, Inc. v. Daktronics, Inc., 534 F.2d 915, 917, 189 USPQ 693, 695 (CCPA 1976)*. This does not amount to dissection of the mark. It is, rather, a recognition that a typical purchaser would not retain [*4] a mark's details, only a mental impression. *See Giant Food, 710 F.2d at 1570-71, 218 USPQ at 395*. In finding that the word NEUTROMED dominated Guaber's mark, the board did not disregard the non-word portions of the mark; the board merely concluded that a consumer viewing the mark would attach greater significance to the word NEUTROMED than to the colored design or to the "pH 5.5" reference. In so doing, the board did not err.

Notwithstanding the colors and reference to "pH 5.5," the dominant feature of the mark is clearly the word NEUTROMED. Further, the term "pH 5.5" was disclaimed in Guaber's application and was shown to be descriptive. *See In re National Data Corp., 753 F.2d 1056, 1059, 224 USPQ 749, 751 (Fed. Cir. 1985)* ("That a particular feature is descriptive . . . with respect to the involved goods or services is one commonly accepted rationale for giving less weight to a portion of a mark.").

Guaber also contends that the third party registrations it submitted show that opposer's NUTRI- prefix is weak and should be afforded little protection. We agree with the board that "even if we were to consider the [NUTRI- [*5] prefix] to be weak, that would not preclude a likelihood of confusion if, in their entireties, the marks are so alike as to be confusingly similar." The board correctly found that to be the case here.

```
Send To:  DURBIN, APARNA
          DOWNEY BRAND SEYMOUR & ROHWER
          555 CAPITOL MALL 10TH FL
          SACRAMENTO, CA 95814-4601
```